**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF VIRGINIA**

**HARRISONBURG DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

08/22/2025

LAURA A. AUSTIN, CLERK
BY: _/s/ Amy Fansler_
DEPUTY CLERK

THOMAS RICHARDS                                    Case No.  **5:25cv00082**

                        *Plaintiff,*


                                                   DEMAND FOR JURY TRIAL


            *v.*

GOOGLE LLC

                        *Defendant*

_____

                                                   Lisa Weingarten Richards, Esq.

                                                   VSB #96671

                                                   LWR Law Offices

                                                   3060 Williams Dr

                                                   Ste 300 #510

                                                   Fairfax, VA 22031

                                                   *Tel.:* (202) 981-2059

                                                   lwr@lwrlawoffices.com

                                                   *Counsel for plaintiff*

<u>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**</u>

**EXECUTIVE SUMMARY**

**The Core Violation: 16 Years of Systematic Religious Suppression by Illegal Monopolist**

For over 25 years, Thomas Richards has conducted biblical ministry through his website SpirituallySmart.com, sharing religious content, biblical analysis, and related research and discussion of world events that challenges institutional corruption. Since at least 2009, Google LLC--now a federally adjudicated illegal monopolist--has systematically suppressed Mr. Richards' religious expression in search results, effectively silencing his biblical voice while amplifying competing Catholic perspectives.

This is not a contractual dispute. Mr. Richards never sought out a relationship with Google. Rather, Google unilaterally began indexing his religious content and then weaponized its monopoly power to systematically suppress biblical viewpoints that challenge institutional authority, particularly Catholic institutional perspectives that receive preferential treatment under Google's exclusive Vatican partnership.

**Federal Courts Have Established Google's Illegal Monopoly Status**

In August 2024 and April 2025, two different federal courts ruled that Google operates as an illegal monopolist in violation of the Sherman Act. In August 2024, Judge Amit Mehta of the United States District Court for the District of Columbia ruled that Google operates as an illegal monopolist in search markets,[1] and on April 17, 2025, Judge Leonie Brinkema of the United

---

[1] *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. Aug. 5, 2024).

States District Court for the Eastern District of Virginia, ruled that Google operates illegal

monopolies in digital advertising technology markets.[2]

The April 17, 2025 ruling found that Google operates illegal monopolies in digital advertising

technology markets, stating that "Google has willfully engaged in a series of anticompetitive acts

to acquire and maintain monopoly power" and that "this exclusionary conduct substantially

harmed Google's publisher customers, the competitive process, and, ultimately, consumers of

information on the open web."[3] The Court found that Google uses "artificial technical limitations

that made it harder for customers to do business with rivals" and systematically "reduc[es]

publisher revenue" through monopolistic manipulation of content visibility and monetization.[4]

Attorney General Pamela Bondi declared: "This is a landmark victory in the ongoing fight to

stop Google from monopolizing the digital public square. This Department of Justice will

continue taking bold legal action to protect the American people from encroachments on free

speech and free markets by tech companies."[5] Mr. Richards' case demonstrates exactly that

systematic censorship in action—targeting Mr. Richards' religious expression for over 16 years.

**The Vatican Connection: Preference for Catholicism over Biblical Religious Views**

Google's suppression operates within a documented framework of cooperation with Vatican

interests. In 2009, the Vatican launched its YouTube channel through Google's exclusive

partnership[6]—the only religious institution in Google's 20-year history to receive such

---

[2] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 73, 115 (E.D. Va. Apr. 17, 2025).
[3] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).
[4] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 108 (E.D. Va. Apr. 17, 2025).
[5] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.
[6] Vatican Going Digital with YouTube Channel, SPOKESMAN-REV. (Jan. 24, 2009), https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.

preferential treatment.[7] During a January 15, 2016 meeting at the Vatican, when speaking of

Pope Francis' goals, Eric Schmidt personally promised Pope Francis: "I want to work with you to

make these points... We will make it happen,"[8] demonstrating Google's commitment to cooperate

with Vatican messaging priorities.

This coordination manifested directly five years later when Pope Francis publicly demanded tech

censorship, stating: "In the name of God, I ask the technology giants to stop exploiting human

weakness, people's vulnerability, for the sake of profits without caring about the spread of hate

speech, grooming, fake news, conspiracy theories, and political manipulation."[9] Schmidt's

promise to "make it happen" followed by the Pope's explicit censorship demands establishes the

coordinated relationship between Vatican institutional interests and Google's systematic

suppression of Mr. Richards' biblical criticism of the same institution.

While claiming to be a type of Christianity, the Vatican proves itself to be exactly the opposite by

its actions, and by the speech it promotes and the speech it dissuades. For example, the

systematic Vatican bias against biblical truth is exemplified by Vatican endorsement of

evolutionary theory—with Pope Francis stating "Evolution in nature is not opposed to the notion

of Creation"[10] and Pope Leo XIV committing to continuing this "precious legacy"[11]—

---

[7] Pope Channel Makes Debut on YouTube, CATH. NEWS AGENCY,
https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.
[8] Pope Francis Meets with Google Executive Eric Schmidt, ROME REP. (Jan. 15, 2016),
https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.
[9] Mark A. Kellner, Pope Francis Begs Social Media Firms to Block Fake News 'In the Name of God', WASH.
TIMES (Oct. 19, 2021), https://www.washingtontimes.com/news/2021/oct/19/pope-francis-begs-social-media-firms-
block-fake-ne/.
[10] Josephine McKenna, Pope Francis: 'Evolution ... is not inconsistent with the notion of creation', NAT'L CATH.
REP. (Oct. 27, 2014), https://www.ncronline.org/news/vatican/pope-francis-evolution-not-inconsistent-notion-
creation.
[11] Austen Ivereigh, A pope of communion: Leo XIV and the Francis legacy, TABLET (May 15, 2025).

demonstrating institutional opposition to genuine biblical faith that hold Scripture to be literally true.

**Constitutional Violations and Resulting Massive Damages**

The religious suppression of Mr. Richards' bible-based work intensified following this documented coordination between tech platforms and government entities. The systematic targeting of Mr. Richards' biblical viewpoints while promoting institutional Catholic perspectives violates both Free Speech and Establishment Clauses through government-coordinated religious preference that exceeds private business conduct.

Based on documented revenue patterns for established religious content creators with comparable reach and audience engagement, Google's monopolistic suppression has cost Mr. Richards over $544 million in lost ministry opportunities, speaking engagements, publishing revenue, and religious outreach over the 16-year suppression period.[12] The silencing of biblical religious expression by an illegal monopolist requires substantial damages also to deter future constitutional violations and restore religious liberty in the digital public square. This damage award is supported by precedent from comparable speech-related cases including the $1.48 billion Alex Jones defamation verdict, the $787.5 million Fox/Dominion settlement, and the $83.3 million E. Jean Carroll judgment, demonstrating that substantial damages are appropriate when speech rights are systematically violated.

---

[12] Damages calculations based on industry analysis of successful religious content creators, including revenue streams documented in creator economy research showing top-tier content creators earn $8-85 million annually through diversified platforms. See Prayer for Relief ¶ 8 for detailed breakdown.

**INTRODUCTION**

1.  This case presents the first comprehensive legal challenge to systematic religious
    suppression by Google LLC. Federal courts have now ruled in two separate antitrust
    cases that Google operates as an illegal monopolist, with the April 2025 ruling
    specifically finding that Google systematically manipulates which online content receives
    visibility and revenue and "substantially harm[s] Google's publisher customers, the
    competitive process, and, ultimately, consumers of information on the open web."[13]

2.  For over 16 years, Google has weaponized its search monopoly to suppress biblical
    religious expression while promoting competing institutional religious perspectives,
    creating both antitrust violations and unprecedented constitutional harm.

3.  Unlike typical platform content moderation cases, this lawsuit addresses monopolistic
    interference with an independent religious ministry using the same "exclusionary
    conduct" mechanisms that federal courts found "substantially harmed Google's publisher
    customers, the competitive process, and, ultimately, consumers of information on the
    open web."[14] Mr. Richards conducted his biblical ministry through SpirituallySmart.com
    independently, and Google unilaterally began indexing and then systematically
    suppressing his religious content using the same "artificial technical limitations that made
    it harder for customers to do business with rivals" that federal courts have now
    prohibited.[15]

---

[13] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).
[14] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025
[15] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).

4.  Federal courts have confirmed what Mr. Richards experienced firsthand: Google operates as an illegal monopolist that uses its dominance to "censor and deplatform American voices."[16] In August 2024, Judge Amit Mehta ruled that "Google is a monopolist, and it has acted as one to maintain its monopoly" in violation of Section 2 of the Sherman Act.[17] In April 2025, Judge Leonie Brinkema ruled that Google operates illegal monopolies in digital advertising technology markets, finding that Google "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web" through systematic content and revenue manipulation.[18] Attorney General Pamela Bondi emphasized the broader constitutional implications, declaring this "a landmark victory in the ongoing fight to stop Google from monopolizing the digital public square" and promising continued "bold legal action to protect the American people from encroachments on free speech and free markets by tech companies."[19]

5.  The April 2025 court specifically found that Google's monopolistic conduct creates "artificial technical limitations that made it harder for customers to do business with rivals"[20] and "substantially harmed Google's publisher customers,"[21] establishing the precise legal framework that applies to Google's suppression of Mr. Richards' religious content

---

[16] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.

[17] *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. Aug. 5, 2024).

[18] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

[19] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.

[20] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).

[21] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

6.  The suppression of Mr. Richards' biblical religious expression represents exactly the type
    of monopolistic abuse that federal courts have now prohibited. Google's documented
    pattern of suppressing religious content critical of institutional authority while promoting
    Catholic institutional perspectives through its exclusive Vatican partnership creates both
    antitrust violations and constitutional violations through denominational preference.

7.  This case seeks comprehensive relief to restore Mr. Richards' religious expression, to end
    Google's suppression of biblical viewpoints, and establish precedent protecting religious
    liberty from monopolistic digital censorship.

8.  The suppression operates through government-directed AI coordination pursuant to
    Executive Order 14179's federal AI framework, transforming private content moderation
    into constitutional violations.

9.  The Court's intervention is essential not only for Mr. Richards but for every American
    whose religious expression faces suppression by Google's illegal search monopoly.

**PARTIES**

10. **Plaintiff Thomas Richards** is a natural person and longtime resident of Virginia who can
    trace his direct ancestry to Joseph Bridger I (1632-1686), one of Virginia's most
    prominent early colonial leaders who served in both the House of Burgesses and Virginia
    Governor's Council. Mr. Richards' deep Virginia heritage connects him to the
    Commonwealth's foundational commitment to religious liberty and constitutional
    governance. Mr. Richards is also a born-again Christian (Χριστιανός - Christianos) who
    experienced a profound spiritual conversion in March 1997, becoming a believer in Jesus
    Christ (Ἰησοῦς Χριστός - Iēsous Christos) through a powerful, unexpected, life-changing

supernatural encounter with God (Θεός - Theos).[22] His transformative spiritual experience has informed all of his subsequent work, including his biblically-guided critiques of corruption and injustice in world systems.

11. Mr. Richards serves as the founder, sole author, and administrator of SpirituallySmart.com, a website created around the year 2000 dedicated to sharing bible messages, historical research, spiritual revelation, and personal growth content. Despite never attending college, his dedication to sharing his biblical message drove him to master complex technical skills, learning HTML coding and web development when such knowledge was far less accessible than today. He also has spent years studying biblical Greek in order to read, understand, and teach the revelations Θεός (Theos) has given him through Ἰησοῦς Χριστός (Iēsous Christos) to help others.

12. His religious expression focuses primarily on: (1) unique spiritual revelations founded in sincere biblical faith and interpretation, (2) institutional critique and commentary on social and political issues from a biblical viewpoint, (3) Bible messages relating to modern life and society, and (4) his own religious artwork and media. His theology compels him to speak against institutional corruption and to challenge powerful figures, in the tradition of biblical prophets.

---

[22] About Biblical Greek: The New Testament was originally written in Koine Greek (κοινὴ διάλεκτος - koinē dialektos), the common language of the first-century Mediterranean world. Greek served as the vessel through which God (Θεός - Theos) chose to preserve His Word (λόγος - logos) for all nations (ἔθνη - ethnē). The Greek alphabet, from which our English letters derive (Alpha/Ἄλφα to A, Beta/Βῆτα to B, etc.), carries the foundational structure that underlies many modern alphabets. Understanding these original Greek terms connects readers directly to the precise meanings God intended in Scripture (γραφή - graphē), revealing layers of truth (ἀλήθεια - alētheia) that translation alone cannot fully convey. All δόξα (doxa - glory) goes to Θεός (Theos) through Ἰησοῦς Χριστός (Iēsous Christos) for preserving His Word in its original form for accurate understanding.

13. **Defendant Google LLC** is a limited liability company organized under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google operates the dominant internet search engine, controlling approximately 89.2% of global search traffic and 94.9% of mobile search traffic in 2020, according to federal court findings.[23]

14. Google maintains substantial business operations in Virginia, serves millions of Virginia users, and derives significant revenue from Virginia residents and businesses. Google's search algorithms determine what information Virginia residents can access about religious topics, causing Google's content decisions to directly impact Virginia's residents and religious communities.

15. Google publicly represents itself as providing neutral, unbiased search results through its mission statement "to organize the world's information and make it universally accessible and useful" -- a mission that federal courts noted Google uses to justify providing "many of its key services at no financial cost to Internet users"[24] -- where Google states that Google "Deliver[s] the most relevant and reliable information available"[25] and its "Honest Results" policy, which promises that "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships" and "ensures that you can trust Google Search to deliver the most relevant and reliable information."[26]  Claiming "no one can buy better placement in the Search

---

[23] *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. Aug. 5, 2024).

[24] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).

[25]  Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug 22, 2025).

[26] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug 22, 2025).

results."[27] However, Google's suppression of biblical religious viewpoints while promoting Catholic institutional perspectives directly contradicts these public representations.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States, including the First Amendment, Sherman Antitrust Act, and other federal civil rights statutes. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity), as Plaintiff is a citizen of Virginia, Defendant is organized in Delaware with its principal place of business in California, and the amount in controversy exceeds $75,000.

17. This Court has personal jurisdiction over Defendant because Google conducts substantial and systematic business in Virginia, purposefully directs its search engine services at Virginia residents, systematically indexed Virginia-based religious content including Plaintiff's SpirituallySmart.com website and his social media pages (@tlthe5th on X and https://www.facebook.com/SpirituallySmart/ and others on facebook), and has caused injury to a Virginia resident through its monopolistic conduct and discriminatory practices affecting Virginia users, businesses, and the state's digital religious community.

**Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because:**

---

[27] https://www.google.com/intl/en_us/search/howsearchworks/how-search-works/rigorous-testing/

18. a. **Substantial acts occurred in this district**: Google's suppression of Mr. Richards' religious content directly impacts Virginia residents' access to religious information and violates Mr. Richards' constitutional rights in Virginia where he resides and conducts his online ministry.

b. **No contractual relationship exists**: Mr. Richards' claims arise from Google's unilateral monopolistic interference with his independent religious ministry. Plaintiff never entered into any agreement with Google's search services; Google unilaterally began indexing his content and then systematically suppressing it.

c. **Constitutional claims**: Direct First Amendment violations through government entanglement and religious freedom claims permit venue where the constitutional violations occurred and were suffered.

d. **Adjudicated monopolist conduct**: Google's systematic suppression of Mr. Richards' religious content employs the same exclusionary mechanisms that federal courts found constitute illegal monopolistic conduct, creating federal antitrust violations that permit venue where the harm occurred.

e. **Virginia's Substantial Interest**: Virginia participated as a plaintiff in federal antitrust litigation against Google and actively seeks "limit[s] to Google business practices to end search engine monopoly,"[28] demonstrating Virginia's substantial regulatory interest in Google's conduct affecting Virginia residents and businesses.

---

[28] Press Release, Commonwealth of Va. Office of the Attorney Gen., Virginia, Justice Department Seek Limits to Google Business Practices to End Search Engine Monopoly (Nov. 21, 2024), https://www.oag.state.va.us/media-

19. **Google cannot invoke forum selection clauses against Plaintiff because no contractual relationship exists between the parties.** Google unilaterally chose to index Mr. Richards' independent website and then weaponized its illegal search monopoly to suppress his religious expression. Constitutional and antitrust violations permit suit where harm occurred regardless of any purported contractual provisions.

## FACTUAL BACKGROUND

### A. Plaintiff's Independent Religious Ministry (2000-2009)

20. Around 2000, Mr. Richards created SpirituallySmart.com as his independent platform for sharing spiritual revelations from God—(Θεός (Theos) in the original Greek). These revelations encompass biblical messages, religious commentary, historical research, theological analysis, and his own artwork - all challenging institutional corruption from a biblical perspective.

21. Mr. Richards' ministry gained significant online attention through the early 2000s, with thousands of weekly visitors accessing his biblical content. His religious expression included documented research exposing institutional corruption, particularly regarding the Catholic Church's historical connections to Nazi escape networks and cover-ups of child sex-abuse scandals.

22. Mr. Richards' approach to religious ministry emphasizes direct biblical authority over institutional religious hierarchy. His theological perspective compels him to expose

---

center/news-releases/2807-november-21-2024-virginia-justice-department-seek-limits-to-google-business-practices-to-end-search-engine-monopoly.

corruption and challenge powerful religious and governmental authorities, and therefore

he is critical of institutional power structures.

23. **Self-Study Technical and Biblical Expertise in Service of Ministry** - Despite never

attending college, Mr. Richards' dedication to sharing his biblical message drove him to

master complex technical and linguistic skills without being taught by any man. His

experiences with God (Θεός - Theos) through Jesus Christ (Ἰησοῦ Χριστοῦ - Iēsou

Christou) motivated him to learn computer programming and web development when

such knowledge was far less accessible than today. Around 2000, he taught himself

HTML coding and created SpirituallySmart.com—a significant technical achievement

during an era when web development tutorials were scarce and such skills were

uncommon among non-professionals. He also developed sophisticated macros for AOL

chatrooms to disseminate biblical messages, demonstrating remarkable technical

innovation for that time period.

24. His advocacy work has shown unusual compassion, which is a gift from God (Θεός -

Theos) through Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) for His (αὐτός - autos)

glory. In 2005, during the nationally significant Terri Schiavo case, Mr. Richards learned

to use complex messaging ("spamming") software—known for its challenging

interface—to reach decision-makers in an effort to save her life. His digital advocacy

continued in 2013 when he created a Facebook page supporting Miriam Carey, an

unarmed young mother killed by DC police after making a wrong turn with her baby in

the backseat. The page gained 30,000 followers, raising awareness for the case before he

transferred the platform to the victim's sister to continue the advocacy. His unwavering

faith guides his efforts, and he views his abilities and accomplishments merely as

vehicles through which God's (Θεός - Theos') purpose is fulfilled and for which all glory (δόξα - doxa) goes to God (Θεός - Theos) through Christ (Χριστός - Christos).

25. **Mastery of Biblical Greek for Scriptural Understanding and Accuracy** - Mr. Richards has spent years in intensive study of biblical Greek, teaching himself the language to properly understand the scriptures in their original form. Through painstaking independent research using Greek lexicons and biblical materials, he has developed expertise that far exceeds what most people acquire through traditional university degrees. This Greek language mastery enables him to read, understand, and teach the revelations God (Θεός - Theos) has given him through Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) with accuracy and depth. His knowledge encompasses not only New Testament Greek but also understanding of the Septuagint as a superior Old Testament source compared to the Masoretic text.

26. **Scholarly Biblical Research and Contemporary Analysis** - Mr. Richards has authored the recent book #OvertPsyops, which combines his biblical wisdom with contemporary analysis to promote transparency about psychological influence operations in the digital age. His work demonstrates scholarly depth and analytical capability that rivals or exceeds traditional academic approaches, as his revelations from God (Θεός – Theos) provide insights unavailable through conventional educational paths. All glory (δόξα - doxa) for this understanding goes to Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) and God (Θεός - Theos) our Father (Πατήρ - Patēr), THE Word (ὁ λόγος - ho logos) who opens the mind to understand all things.

27. Continuing through 2008, Mr. Richards' website appeared prominently in Google search results for relevant topics, allowing his biblical message to reach a growing audience seeking alternative perspectives on Christianity and institutional accountability.

**B. The 2009 Triggering Event: Vatican-Google Partnership and Systematic Biblical Suppression**

25. In January 2009, the Vatican launched its YouTube channel through a special partnership with Google, becoming the first and only religious institution in Google's 20-year history to receive such exclusive preferential treatment. Google's Managing Director of European Sales personally attended the Vatican's press conference to announce this unique collaboration.[29] The YouTube executive described it as a "landmark announcement" and explicitly confirmed it was "the first ever global religious institution to partner with YouTube."[30] This exclusive partnership established a pattern of Vatican-Google coordination that would systematically exclude and suppress biblical religious expression challenging Catholic institutional authority.

26. **The Independent Article and Immediate Retaliation**: In 2009, The Independent published an article about the Vatican's YouTube launch that specifically mentioned Mr. Richards' work, stating: "Type 'Vatican' into YouTube's search engine and... the second [result] argues that 'Nazi Germany was a creation of the Vatican and the Jesuits'. Now the Vatican has the means to fight back."[31] Upon information and belief, following this

---

[29] Vatican Going Digital with YouTube Channel, SPOKESMAN-REV. (Jan. 24, 2009), https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.
[30] Pope Channel Makes Debut on YouTube, CATH. NEWS AGENCY, https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.
[31] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.

prominent media attention that highlighted Mr. Richards' biblical research exposing
Vatican institutional corruption, his content experienced an abrupt and dramatic decline in
search visibility across all Google properties that cannot be explained by organic user
behavior. The suppression occurred simultaneously across Google Search, YouTube, and
related services, demonstrating coordinated intervention.[32]

27. **Google Alerts Manipulation**: Upon information and belief based on observable patterns
and statistical analysis, Google's suppression extends beyond search results to include
manipulation of Google Alerts, preventing users from receiving notifications about Mr.
Richards' content. Despite Mr. Richards' 25-year internet presence and established online
ministry, Google Alerts for "Tommy Richards" consistently prioritize much younger, less
established individuals with minimal online presence—including an assistant college
baseball coach (with 2,602 followers on X[33]) and an alleged Meta employee who handles
press releases[34]—over Mr. Richards' extensive religious content and biblical research.
Google's preference for individuals with no comparable online history or relevance
demonstrates Google's complete and thorough effort to obscure Mr. Richards' digital
identity and prevent organic discovery of his biblical ministry, even by users specifically
seeking information about him.

28. Upon information and belief, Google's suppression extends to deliberate manipulation of
search results about Mr. Richards' social media presence. When users search Google for
information about his legal cases regarding his internet censorship, Google prominently

---

[32] Thomas Richards, Censorship Documentation, SPIRITUALLYSMART.COM,
https://spirituallysmart.com/censorship.html.
[33] https://x.com/tommyrich27?lang=en
[34] https://www.publishersweekly.com/pw/by-topic/digital/copyright/article/98093-meta-wins-ai-copyright-case-but-judge-writes-roadmap-for-authors-revenge.html

displays posts from his automated X (Twitter) bot accounts—which have fewer than 20 followers and were created only 7 months ago (January 2025)—while completely hiding posts on the same topic from his established main account @tlthe5th. His main account was created in 2009, has over 75,000 posts spanning 16 years of activity, and maintains approximately 3,500+ followers, yet it remains completely invisible in identical Google searches. For example, when searching "3 25 cv 916 ndtx" (his X Corp. lawsuit case number), Google prominently displays posts from his obscure bot accounts while his main @tlthe5th account—which posts extensively about the same legal case—never appears in Google search results. This demonstrates Google's coordinated algorithmic manipulation designed to obscure Mr. Richards' established digital identity by promoting irrelevant bot content over his genuine, established social media presence.[35]

29. **Cross-Platform Suppression:** This systematic suppression is part of a broader pattern evidenced by Plaintiff's parallel litigation in the Northern District of Texas against X Corp., Trump, and former X CEO Linda Yaccarino[36] for similar shadowbanning practices. This demonstrates that the coordinated cross-platform religious discrimination spans multiple tech platforms.

---

[35] https://www.google.com/search?q=3%3A25+cv+916+ndtx&sca_esv=32011946fbc5f18a&ei=ArKHaQLbJ6uTwPAPnO7CoAE&ved=0ahUKEwji5OPfiOCOAxWrCRAIHRy3EBQQ4dUDCBA&uact=5&oq=3%3A25+cv+916+ndtx&gs_lp=Egxnd3Mtd2l6LXNIcnAiEDM6MjUgY3YgOTE2IG5kdHhI5BhQwwVYxQhwAXgAkAEAmAHwAaABuwOqAQMyLTK4AQPIAQD4AQGYAgKgApECwgILEAAYsAMYogQYiQXCAggQABiiBBiJBcICBRAAGO8FwgIIEAAYgAQYogSYAwCIBgGQBgGSBwUxLjAuMaAH9gOyBwMyLTG4B4ICwgcFMi0xLjHIBxU&sclient=gws-wiz-serp; https://www.google.com/search?q=ndtx+3%3A25+cv+916+%40tlthe5th&sca_esv=32011946fbc5f18a&biw=1229&bih=777&ei=lrmHaL3yNLiwwPAPuYLHyAI&ved=0ahUKEwi9i9HFj-COAxU4GBAIHTnBESk4ChDh1QMIEA&uact=5&oq=ndtx+3%3A25+cv+916+%40tlthe5th&gs_lp=Egxnd3Mtd2l6LXNIcnAiGm5kdHggMzoyNSBjdiA5MTYgQHRsdGhlNXRoSJlYUMoDWNYVcAF4JABAJgBkQKgAYoRqgEFMC4zLje4AQPIAQD4AQGYAgCgAgCYAwCIBgGQBgGSBwCgB8gDsgcAuAcAwgcAyAcA&sclient=gws-wiz-serp

[36] *See* Richards v. X Corp & Trump, No. 3:25-cv-00916 (N.D. Tex. filed Apr. 13, 2025); Richards v. Yaccarino, No. 3:25-cv-01863 (N.D. Tex. filed July 16, 2025).

## C. Google as Vatican AI Authority: Leading the Global "Algorethics" Framework

30. Google's 2009 partnership was not an isolated business relationship but the foundation for an expanding coordination that would ultimately position Google as the secret architect of Vatican AI control. Eric Schmidt's 2016 promise to Pope Francis—"I want to work with you to make these points... We will make it happen"—represented Google's commitment to implement comprehensive content suppression aligned with Vatican messaging priorities.[37]

31. **Google's Leadership in Vatican AI Strategy and Systematic Institutional Bias**: Google's coordination with Vatican AI initiatives predates and underlies the public "Rome Call for AI Ethics." Demis Hassabis, co-founder of Google DeepMind, attended the Vatican's foundational 2016 workshop on "Power and Limits of Artificial Intelligence," establishing Google as the primary technology partner in developing what would become the Vatican's "algorethics" framework alongside self-proclaimed atheist Stephen Hawking.[38] This foundational relationship culminated in Pope Francis appointing Hassabis to the prestigious Pontifical Academy of Sciences in March 2024—an unprecedented honor for a tech executive in the Academy's 421-year history.[39]

32. **The Vatican's Pattern of Embracing All Viewpoints Except Bible-based Criticism**: The Pontifical Academy systematically welcomes atheists, with "religious belief – Catholic or otherwise – not a criterion for membership," including "self-proclaimed

---

[37] Pope Francis Meets with Google Executive Eric Schmidt, ROME REP. (Jan. 15, 2016), https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.
[38] Stephen Hawking and other experts weigh in on limits of artificial intelligence at the Vatican, CATH. NEWS AGENCY (Dec. 4, 2016), https://www.catholicnewsagency.com/news/35022/stephen-hawking-and-other-experts-weigh-in-on-limits-of-artificial-intelligence-at-the-vatican.
[39] Google AI expert named to Pontifical Academy of Sciences, ALETEIA (Mar. 12, 2024), https://aleteia.org/2024/03/12/google-ai-expert-named-to-pontifical-academy-of-sciences/.

atheist" Stephen Hawking and other non-Catholic scientists, while the Academy is
explicitly "non-sectarian in its choice of members."[40] Meanwhile, the Vatican's Pontifical
Biblical Commission officially condemns "fundamentalist interpretation" as "naively
literalist" and explicitly rejects biblical approaches that oppose "the use of the historical-
critical method, as indeed to the use of any other scientific method for the interpretation
of Scripture," demonstrating the Vatican's systematic alliance with secular academic
perspectives while suppressing traditional biblical scholarship that challenges Vatican
institutional authority.[41]

33. **The "Rome Call" as Global Religious Coalition Strategy**: The Vatican's 2020 "Rome
Call for AI Ethics," which created the term "algorethics" to describe Vatican control over
AI development, represents a comprehensive strategy uniting diverse religious and
secular perspectives under Vatican technological authority. While Microsoft, IBM, Cisco,
and Qualcomm formally signed agreements submitting to this papal guidance,[42] Google's
relationship operates at a deeper level—as the primary architect rather than mere
signatory of Vatican AI control strategy.

34. **Multi-Religious Expansion Under Vatican Leadership**: The Vatican expanded its AI
control strategy in July 2024 by securing signatures with "Eleven world religions, sixteen
new signatories, thirteen nations in attendance, more than 150 participants" in Hiroshima,
Japan, with the Vatican stating: "The Pew Research Center reports that 85 percent of the

---

[40] Why famed atheist Stephen Hawking is on a pontifical academy, CATH. NEWS AGENCY (May 16, 2025),
https://www.catholicnewsagency.com/news/35014/why-famed-atheist-stephen-hawking-is-on-a-pontifical-academy;
Pontifical Academy of Sciences - Index, VATICAN,
https://www.vatican.va/roman_curia/pontifical_academies/acdscien/index.htm.
[41] Pontifical Biblical Commission, Interpretation of the Bible in the Church, §F,
https://www.ewtn.com/catholicism/library/interpretation-of-the-bible-in-the-church-2319.
[42] Rome Call for AI Ethics, VATICAN PONTIFICAL ACAD. FOR LIFE, https://www.romecall.org/.

world's population identifies with a religious tradition. Leaders representing all major religions have signed the Rome Call for AI Ethics. This makes the Rome Call platform representative of most people on the planet."[43] This demonstrates the Vatican's success in building international coalitions—including atheists and all world religions—to support its technological authority while systematically suppressing biblical religious expression that challenges Catholic institutional corruption.

35. **The Vatican's Embrace of Secular Scientific Frameworks**: This is nothing new. The Vatican has historically originated and promoted scientific theories that serve secular rather than biblical worldviews, including the "Big Bang theory" developed by Catholic priest Georges Lemaître in 1927, which provides atheists with arguments against creation by God (Θεός – Theos).[44] The atheist astronomer Fred Hoyle coined the term "Big Bang" specifically because "he didn't want Creation to have a beginning, and with it, the implication of a Creator," demonstrating how Vatican-originated theories serve secular rather than biblical religious perspectives.[45]

36. Pope Francis explicitly endorsed evolutionary theory, stating: "Evolution in nature does not conflict with the notion of Creation, because evolution presupposes the creation of beings who evolve," directly contradicting biblical creation accounts that genuine biblical believers hold as literally true.[46] This demonstrates the Vatican's systematic

---

[43] Press Release, Vatican, AI Ethics for Peace (July 10, 2024),
https://press.vatican.va/content/salastampa/en/info/2024/07/10/240710a.html.
[44] When religion (Pope Francis) met science (Stephen Hawking), ALETEIA (Dec. 3, 2016),
https://aleteia.org/2016/12/03/when-religion-pope-francis-met-science-stephen-hawking/.
[45] A Big Bang was Not the Beginning, VATICAN OBSERVATORY (Jan. 31, 2024),
https://www.vaticanobservatory.org/sacred-space-astronomy/a-big-bang-was-not-the-beginning/.
[46] When religion (Pope Francis) met science (Stephen Hawking), ALETEIA (Dec. 3, 2016),
https://aleteia.org/2016/12/03/when-religion-pope-francis-met-science-stephen-hawking/.

accommodation of secular scientific frameworks that contradict biblical authority while
suppressing religious expression that challenges institutional corruption through biblical
literalism.

37. **Systematic Biblical Suppression Through "Algorethics"**: Google's implementation of
Vatican-aligned "algorethics" has resulted in coordinated suppression of Mr. Richards'
biblical criticism of Catholic institutional corruption while Catholic perspectives,
atheistic viewpoints, and multi-religious coalitions receive boosting of their content. This
coordination creates governmental endorsement of institutional religion over biblical
religious authority through what federal courts found to be Google's role as "a
monopolist" that has "revolutionized how we live" and serves as "the first place that you
can turn to" for "the vast majority of your information needs."[47] Google's AI systems
demonstrate systematic religious bias aligned with Vatican interests, where search results
promote Catholic institutional perspectives while suppressing biblical criticism of the
same institutions. This AI-powered discrimination operates under the Executive Order
"Preventing Woke AI in the Federal Government,"[48] which mandates that AI systems
used by government contractors comply with government-specified "neutrality"
standards, creating direct government involvement in algorithmic religious
discrimination.

38. The Vatican's digital control strategy has reached its apex with Pope Leo XIV, the first
American pope, who has explicitly positioned himself as the global authority over
artificial intelligence, emphasizing: "The Church offers to everyone the treasury of her

---

[47] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16, 203.
[48] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

social teaching, in response to another industrial revolution and to developments in the field of artificial intelligence."[49] Pope Leo XIV has explicitly committed to continuing this institutional framework, demonstrating continuity in the Vatican's systematic accommodation of secular theories while suppressing biblical literalism that challenges institutional authority.

39. **The Pattern of Denominational Discrimination**: This systematic partnership with atheists and all world religions while suppressing biblical criticism creates impermissible denominational preference in violation of the Establishment Clause, demonstrating constitutional violations that require both injunctive relief and substantial damages to restore religious liberty in the digital public square.

40. **The True Partnership Structure and Constitutional Violations**: Unlike other technology companies that publicly submitted to Vatican AI authority through Rome Call signatures, Google operates as the Vatican's primary technology partner and co-architect of global AI ethics frameworks. This deeper coordination enables systematic suppression of biblical religious expression that challenges Catholic institutional authority while promoting atheistic, multi-religious, and institutional Catholic perspectives—precisely the type of coordinated censorship that federal courts found enables Google to "censor and deplatform American voices" through its illegal monopoly power.[50] The exclusive 2009 YouTube partnership, followed by foundational AI workshop participation, Eric Schmidt's personal Vatican commitment, and Hassabis's unprecedented Academy

---

[49] Pope Leo XIV outlines his vision for the papacy, CBS NEWS (May 10, 2025), https://www.cbsnews.com/news/pope-leo-xiv-lays-out-vision-papacy-artificial-intelligence/.
[50] United States v. Google LLC, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025); Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.

appointment establish a pattern of preferential institutional access that no other

technology company has received.

41. **Government Coordination Through Compartmentalized Strategy**: The evidence

suggests coordinated government strategy where public-facing agencies (DOJ antitrust)

create appearance of opposing Google to maintain public legitimacy while intelligence

agencies (CIA/NSA) simultaneously coordinate with Google for surveillance and content

control, enabling systematic suppression of constitutional rights under cover of apparent

government oversight. Google's origins trace directly to CIA and NSA research grants for

mass surveillance, with the "Massive Digital Data Systems (MDDS) project" funding

Stanford researchers Sergey Brin and Larry Page to develop search technology for

intelligence community use.[51] NSA programs like PRISM directly access Google's data

systems, demonstrating ongoing government coordination with Google's information

control mechanisms.[52]

42. However, even if this compartmentalized coordination strategy coordination is

coincidental rather than intentional, the structural entanglement between government

agencies and Google's operations creates constitutional violations where Google's

Vatican-coordinated suppression of biblical religious expression operates through

government intelligence infrastructure, transforming private content moderation into state

action subject to First Amendment constraints regardless of the specific coordination

mechanisms involved.

---

[51] Google's true origin partly lies in CIA and NSA research grants for mass surveillance, QZ,
https://qz.com/1145669/googles-true-origin-partly-lies-in-cia-and-nsa-research-grants-for-mass-surveillance.
[52] PRISM, WIKIPEDIA, https://en.wikipedia.org/wiki/PRISM.

43. **The Vatican-Google Coordination Timeline**: The systematic suppression of Mr. Richards' biblical content follows a clear chronological pattern of Vatican-Google coordination: (a) January 2009: Vatican launches exclusive YouTube partnership, becoming the only religious institution in Google's history to receive such preferential treatment; (b) 2009: The Independent highlights Mr. Richards' Vatican-critical content as second result for "Vatican" searches, followed by immediate suppression across Google properties; (c) January 2016: Eric Schmidt promises Pope Francis "We will make it happen" regarding Vatican messaging priorities; (d) October 2021: Pope Francis demands tech censorship "in the name of God"; (e) 2024-2025: Trump's Religious Liberty Commission endorses Catholic Cardinal Timothy Dolan and Bishop Robert Barron while Google continues systematic suppression of biblical criticism of the same institutions.

44. **Government Entanglement Creating State Action**: Google's systematic suppression of Mr. Richards' religious content operates through government coordination that creates state action under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). As the Supreme Court established in *Norwood v. Harrison*, "a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." 413 U.S. 455, 465 (1973). Google's content moderation systems operate under Executive Order "Preventing Woke AI in the Federal Government"[53] mandates requiring compliance with government-specified "neutrality" standards through federal contracting relationships, while simultaneously implementing Vatican "algorethics" frameworks through Google's exclusive 2009 Vatican

---

[53] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

partnership and Vatican officials' appointments to Google leadership positions. Trump's
Religious Liberty Commission[54] endorses the same Catholic institutional authorities that
receive preferential treatment in Google's search algorithms, creating coordinated
government-private religious discrimination that violates *Norwood's* prohibition against
using private entities to accomplish unconstitutional objectives. This pervasive
operational integration of federal AI policy coordination and institutional religious
partnerships creates the "entwinement" that transforms Google's content decisions into
state action subject to constitutional constraints.

## D. 16 Years of Escalating Religious Suppression (2009-2025)

45. From 2009 to present, Google has systematically suppressed Mr. Richards' religious
content through multiple sophisticated mechanisms: a. **Search Result Manipulation**:
Removing or drastically reducing visibility of SpirituallySmart.com and Mr. Richards'
social media accounts (X/Twitter, Facebook, YouTube, etc.) in search results for relevant
religious topics b. **Algorithmic Throttling**: Systematically reducing organic discovery of
his content despite its relevance and quality c. **Google Alert Suppression**: **Extending
beyond search results to include manipulation of** Google Alerts (automated emails
users subscribe to on a certain search term), preventing users from receiving notifications
about Mr. Richards' content, **including** boosting other generally unknown individuals
named Tommy or Thomas Richards, who in some cases may even be fictitious
individuals, **to** obscure Mr. Richards in the search results. **d. Cross-Platform
Coordination**: Coordinated suppression across Google Search, YouTube, and related

---

[54] Cardinal Dolan, Bishop Barron to Serve on Trump's New Religious Liberty Commission, NAT'L CATH. REG.
(May 1, 2025) (Tyler Arnold), https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission.

properties **e. Competitive Advantage Denial**: Preventing normal search engine

optimization benefits available to other religious content creators;

46. **Statistical Evidence of Suppression**: Statistical analysis suggests systematic rather than

organic suppression: Mr. Richards' website, which previously received close to a

thousand visitors per day, now receives virtually no traffic from Google searches despite

maintaining very high-quality, relevant biblical and other relevant content. This decrease

happened shortly after the article in The Independent and has continued to intensify over

the 16-year period. Even his X account, where he is extremely active posting both

biblical content and prolific original artwork that critics describe as highly creative and

visually appealing, has virtually no presence in Google searches and alerts. Independent

verification confirms this suppression pattern is artificial rather than organic.

47. **Pattern Recognition**: The suppression specifically targets Mr. Richards' biblical critique

of institutional corruption while Catholic institutional content receives normal

algorithmic treatment, demonstrating viewpoint-based rather than content-neutral

restriction.

## E. Google's Adjudicated Illegal Monopoly Status

48. **August 5, 2024 Federal Court Ruling**: U.S. District Judge Amit Mehta ruled that

"Google is a monopolist, and it has acted as one to maintain its monopoly" in violation of

Section 2 of the Sherman Act. The court found Google "enjoys an 89.2% share of the

market for general search services, which increases to 94.9% on mobile devices."[55]

---

[55] *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024).

49. **April 17, 2025 Second Federal Ruling**: A second federal court ruled that Google established and maintained its monopoly power in advertising technology markets through anticompetitive practices. Assistant Attorney General Abigail Slater stated: "Google's unlawful dominance allows them to censor and deplatform American voices."[56] Attorney General Pamela Bondi further characterized the ruling as "a landmark victory in the ongoing fight to stop Google from monopolizing the digital public square," emphasizing the Department's commitment to "taking bold legal action to protect the American people from encroachments on free speech and free markets by tech companies."[57] The April 2025 court provided the legal framework for understanding this censorship, finding that Google uses "exclusionary conduct [that] substantially harmed Google's publisher customers" and creates "artificial technical limitations that made it harder for customers to do business with rivals," precisely describing the mechanisms Google uses to suppress Mr. Richards' biblical religious expression.[58]

50. **DOJ Remedial Actions**: The Department of Justice is seeking structural remedies including potential breakup of Google's business units, data sharing requirements, and prohibition of exclusive agreements that maintain Google's monopoly power.[59] Notably, the DOJ has maintained its structural remedies proposals -- which began under the Biden administration – and continues under the Trump administration, showing continuity across administrations in pursuing Google breakup as a remedy.

---

[56] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.
[57] *Id.*
[58] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).
[59] U.S. Dep't of Just., Antitrust Div., *Proposed Final Judgment and Remedies in United States v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. filed Oct. 8, 2024), available at https://www.justice.gov/atr/case/us-and-plaintiff-states-v-google-llc.

51. **Virginia's Participation**: The Virginia Attorney General joined the federal antitrust case against Google and is actively seeking "limits to Google business practices to end search engine monopoly,"[60] demonstrating Virginia's strong public policy interest in addressing Google's monopolistic conduct.

52. **Google's Systematic Publisher Revenue Manipulation**: The April 2025 federal court ruling established that Google uses its monopoly power to systematically "reduc[e] publisher revenue"[61] and "manipulat[e] auction rules and restrict customer choice in markets in which the firm had monopoly power."[62] The court found that Google's "exclusionary conduct substantially harmed Google's publisher customers" by creating "artificial technical limitations that made it harder for customers to do business with rivals,"[63] establishing the precise mechanisms through which Google suppresses content creators whose materials challenge institutional authority.[64]

53. Despite federal courts finding Google operates as an illegal monopolist that "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web,"[65] Google continues to falsely represent that it provides neutral search results. Google's "Honest Results" policy explicitly promises "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships, including advertising or unrelated

---

[60] Press Release, Va. Off. of the Att'y Gen., Virginia, Justice Department Seek Limits to Google Business Practices to End Search Engine Monopoly (Nov. 21, 2024), https://www.oag.state.va.us/media-center/news-releases/2807-november-21-2024-virginia-justice-department-seek-limits-to-google-business-practices-to-end-search-engine-monopoly.
[61] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 108 (E.D. Va. Apr. 17, 2025).
[62] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 111 (E.D. Va. Apr. 17, 2025).
[63] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).
[64] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).
[65] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).

business partnerships"[66] and claims this "ensures that you can trust Google Search to deliver the most relevant and reliable information."[67] These representations are demonstrably false, as Google provides systematic preferential treatment to Catholic institutional perspectives while suppressing biblical religious viewpoints through its documented Vatican partnerships.

## F. Government Entanglement Creating Constitutional Violations

54. **Structural Government Coordination Regardless of Antitrust Status:** Whether through coordinated strategy or structural necessity, Google's systematic suppression operates through government entanglement that transforms private content moderation into state action subject to constitutional constraints. Even as federal courts prosecute Google's monopolistic conduct, parallel government dependencies on Google's infrastructure for surveillance and information control create constitutional violations that require First Amendment analysis rather than purely antitrust remedies. Google's systematic suppression of Mr. Richards' biblical religious expression operates through documented government coordination that transforms private business decisions into direct constitutional violations, operating through multiple sophisticated channels that discovery will fully reveal.

55. **Vatican-Government-Tech Alliance**: The suppression occurs within a coordinated framework where the Vatican is allied with the US government. This includes: a.

---

[66] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 11, 2025).
[67] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 11, 2025).

**Institutional Religious Preference**: Trump's Religious Liberty Commission explicitly endorses Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives[68] while Google systematically suppresses bible-based criticism of the same Catholic institutions, creating governmental denominational preference implemented through monopolistic search control. b. **Direct Vatican-Google Coordination**: Eric Schmidt's 2016 promise to Pope Francis "We will make it happen"[69] followed by the Pope's explicit 2021 demand for tech censorship "in the name of God"[70] establishes coordinated suppression of religious viewpoints challenging Vatican authority.

c. **Government Coordination Framework for Content Control**: Executive Order 14179 "Removing Barriers to American Leadership in Artificial Intelligence" establishes comprehensive federal coordination with private AI development, creating direct government involvement in the algorithmic systems Google uses for content moderation.[71]

56. This coordination violates the fundamental principle established in *Norwood v. Harrison* that "a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." 413 U.S. 455, 465 (1973). The government cannot achieve indirectly through Google's Vatican-coordinated algorithmic suppression what it is constitutionally prohibited from doing directly—systematically suppressing

---

[68] Cardinal Dolan, Bishop Barron to Serve on Trump's New Religious Liberty Commission, NAT'L CATH. REG. (May 1, 2025) (Tyler Arnold), https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission.
[69] Pope Francis Meets with Google Executive Eric Schmidt, ROME REP. (Jan. 15, 2016), https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.
[70] Mark A. Kellner, Pope Francis Begs Social Media Firms to Block Fake News 'In the Name of God', WASH. TIMES (Oct. 19, 2021), https://www.washingtontimes.com/news/2021/oct/19/pope-francis-begs-social-media-firms-block-fake-ne/.
[71] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

biblical religious expression while promoting institutional Catholic perspectives. As *Norwood* held, "a State may not grant the type of tangible financial aid if that aid has a significant tendency to facilitate, reinforce, and support private discrimination," and here the government's coordination with Google's content moderation creates the same constitutional violation through technological aid (assistance).

57. **Direct Government-Google Content Coordination Through DHS/FBI Programs**: Leaked Department of Homeland Security documents also reveal systematic coordination between federal agencies and Google for content moderation and "takedown requests." DHS established formal processes where government officials directly flag content on Google properties for suppression, with meetings occurring "every two weeks" since 2020 to coordinate "Intelligence Community activities to counter disinformation."[72] FBI officials expressed concern that tech companies were not sufficiently accountable to the government, with FBI official Laura Dehmlow stating "we need a media infrastructure that is held accountable."[73]

58. **Formalized Government Censorship Portal**: Google operates a "content request system" that "requires a government or law enforcement email to use," allowing government officials to directly submit content for throttling or suppression through a special portal system.[74] This demonstrates that Google's content moderation operates under direct government influence rather than independent editorial decisions,

---

[72] Ken Klippenstein & Lee Fang, DHS Leaks Reveal Coordination with Twitter, Facebook, & Others for 'Content Moderation,' 'Takedown Requests', THE INTERCEPT (Oct. 31, 2022), https://theintercept.com/2022/10/31/social-media-disinformation-dhs/.
[73] *Id.*
[74] *Id.*

transforming private content moderation into state action subject to First Amendment constraints.

59. **Systematic Government-Directed Content Suppression**: The coordination resulted in systematic suppression where "of nearly 4,800 flagged items, technology platforms took action on 35 percent— either removing, labeling, or soft-blocking speech," demonstrating that government entities can reliably trigger content suppression across Google's platform through coordinated flagging.[75] This coordination specifically targeted content regarding "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine."[76] And DHS discussed "countering disinformation relating to content that undermines trust in financial systems and courts."[77]

60. **Content-Based Suppression Under Reed v. Town of Gilbert**: Under *Reed v. Town of Gilbert*, government regulation is content-based when it "applies to particular speech because of the topic discussed or the idea or message expressed." 576 U.S. 155, 163 (2015). Google's algorithmic suppression targets biblical religious content based precisely on its theological message and scriptural source material, making it a paradigmatic content-based restriction subject to strict scrutiny. As *Reed* established, such content-based restrictions are unconstitutional "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."[78] The defendants' claims of AI neutrality cannot transform this facially content-

---

[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Reed v. Town of Gilbert* 576 U.S. at 165.(2015)

based suppression into content-neutral regulation. *Reed* further held that "innocent

motives do not eliminate the danger of censorship presented by a facially content-based

statute, as future government officials may one day wield such statutes to suppress

disfavored speech."[79]

61. **Current Administration's Contradictory Religious Coordination**: Despite claims of

ending government content coordination, the current administration maintains

contradictory policies that demonstrate continued government religious preference and

create multiple layers of constitutional entanglement. While Executive Order "Preventing

Woke AI in the Federal Government" purports to eliminate ideological bias in AI

systems,[80] and Executive Order " Eradicating Anti-Christian Bias" prohibits federal

agencies from discriminating against Catholic viewpoints and viewpoints favored by the

Trump Administration,[81] the administration simultaneously: (1) established a Religious

Liberty Commission that explicitly endorses Catholic Cardinal Timothy Dolan and

Bishop Robert Barron as "Christian" representatives,[82] creating governmental

denominational preference; (2) continues operating the same government content

coordination infrastructure that enables Google's systematic suppression of biblical

religious criticism; and (3) continues significant federal contracting relationships with

Google—including a major April 2025 General Services Administration agreement

---

[79] *Id.*

[80] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

[81] Executive Order, Eradicating Anti-Christian Bias (Feb. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/eradicating-anti-christian-bias/.

[82] Cardinal Dolan, Bishop Barron to Serve on Trump's New Religious Liberty Commission, NAT'L CATH. REG. (May 1, 2025), https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission.

securing Google Workspace for all federal agencies[83] and a $200 million Defense

Department AI contract[84]—despite documented anti-Christian algorithmic bias; this

creates a framework where the government officially prohibits religious discrimination

while simultaneously enabling and financially supporting the very platform that

systematically suppresses Mr. Richards' biblical expression in favor of Catholic

institutional perspectives that the government's own Religious Liberty Commission

officially promotes.

### Government-Platform Content Coordination and the Executive Order Preventing Woke AI:

62. Government coordination with tech platforms on content moderation has been

documented through FCC Chairman Brendan Carr's direct communications with Apple,

Google, Meta, and Microsoft CEOs regarding their content policies, establishing that

government agencies actively coordinate with platforms on speech-related decisions

regardless of the specific policy direction.[85] This pattern of government-platform

coordination on content issues was formalized through Executive Order "Preventing

Woke AI in the Federal Government," which mandates that private AI companies seeking

federal contracts must ensure their large language models comply with government-

---

[83] Press Release, U.S. Gen. Servs. Admin., GSA Secures Cost Savings Through Strategic Agreement with Google (Apr. 10, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-secures-cost-savings-through-strategic-agreement-with-google-04102025.
[84] Google for All Government Business, NEXTGOV (June 2025), https://www.nextgov.com/acquisition/2025/06/google-all-government-business/405769/.
[85] FCC commissioner announces probe into Big Tech, 'NewsGuard' fact-checking platform: 'Censorship cartel', FOX NEWS (Nov. 18, 2024), https://www.foxnews.com/media/fcc-commissioner-probe-big-tech-newsguard-fact-checking-censorship-cartel.

specified "Unbiased AI Principles," creating direct government involvement in the

algorithmic content moderation systems of companies like Google.[86]

63. The Executive Order also requires that "LLMs shall be neutral, nonpartisan tools that do

not manipulate responses in favor of ideological dogmas" and prohibits developers from

"intentionally encod[ing] partisan or ideological judgments into an LLM's outputs,"

effectively mandating government control over private AI content decisions.[87] However,

the determination of what constitutes "unbiased" or "neutral" content (certainly including

avoiding "woke" content) necessarily reflects the ideological perspective of the

government officials making such determinations, meaning that AI systems must

conform to government-approved viewpoints rather than achieving genuine neutrality.

More troubling, this approach represents a form of Orwellian control where the

government mandates ideological conformity while deceptively claiming to require only

"neutrality," creating a system of thought control disguised as objectivity that is far more

insidious than direct government censorship.

64. The Executive Order also mandates that Federal agencies must "include in each Federal

contract for an LLM entered into following the date of the OMB guidance...terms

requiring that the procured LLM comply with the Unbiased AI Principles," with

"decommissioning costs...charged to the vendor in the event of termination by the agency

for the vendor's noncompliance."[88]

---

[86] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.
[87] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.
[88] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

65. Taken together, these various aspects of the Executive Order create a comprehensive framework where Google's Vatican-aligned suppression of biblical religious expression operates through government-mandated algorithmic standards rather than purely private editorial decisions, transforming private content moderation into state action subject to First Amendment constraints. Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, this coordination creates the "pervasive entwinement" where private actors performing governmental functions become subject to constitutional constraints. Google's AI systems simultaneously implement federal AI policy coordination and Vatican "algorethics" frameworks through identical technological infrastructure, creating the operational integration that *Brentwood Academy's* entwinement framework requires to establish state action.

66. **Algorithmic Prior Restraint Through Government Coordination**: This automated pre-publication suppression operates through the same government-coordinated AI frameworks that implement Vatican "algorethics" standards, creating systematic prior restraint of religious viewpoints. As the Supreme Court held in *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963), "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity," and such systems are tolerated only "where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint." Google's algorithmic suppression lacks these essential procedural safeguards while achieving the same censorship results that *Bantam Books* condemned, where "informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief."

67. **Critical Infrastructure Under Government Control**: Federal courts have established that "for more than 15 years, one general search engine has stood above the rest: Google," which "receives nine times more queries each day than all of its rivals combined" and serves as "the first place that you can turn to" and "a place that you go to for the vast majority of your information needs" for Americans seeking information.[89] This is infrastructure that government entities systematically influence through regulatory pressure, exclusive partnerships, and coordinated policy implementation. When government actors direct this essential infrastructure to suppress biblical religious viewpoints while promoting institutional Catholic perspectives through Vatican partnerships, Google's actions constitute direct constitutional violations rather than private editorial decisions.

68. **Evidence Requiring Discovery**: The full scope of government-Google coordination requires discovery of:

- Internal communications between Google and government entities regarding religious content suppression

- Records of Vatican coordination with US government officials about content moderation policies

- Documentation of regulatory pressure and preferential treatment arrangements

- AI training data showing government influence over religious content censorship by people or algorithms

---

[89] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 16-17, 34.

- Financial arrangements and government contracts creating dependency relationships

This creates government entanglement sufficient to trigger First Amendment constraints on Google's content moderation decisions regarding religious expression.

69. **Public Function Doctrine**: Google's search operations constitute performance of a traditional public function, satisfying the public function test for state action under *Marsh v. Alabama*, 326 U.S. 501 (1946). Federal courts have found that Google "is a monopolist" that has "revolutionized how we live" by controlling the infrastructure that serves as "the first place that you can turn to" and "a place that you go to for the vast majority of your information needs," performing essential public communication functions comparable to the company town in *Marsh*.[90] Just as the private company in *Marsh* could not restrict First Amendment rights while performing municipal functions, Google cannot systematically suppress religious expression while operating essential information infrastructure that the public relies upon for access to religious viewpoints. Google's representations about organizing "the world's information" and making it "universally accessible" --which federal courts noted Google uses to provide "many of its key services at no financial cost to Internet users"[91] -- demonstrate its assumption of a traditionally governmental role in information curation and public access to knowledge, triggering constitutional obligations under the public function doctrine. This public function analysis complements the entanglement doctrine from *Brentwood Academy*, as Google's assumption of governmental information-curation roles through federal coordination creates state action under both the public function and entanglement tests.

---

[90] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17.
[91] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 23 (E.D. Va. Apr. 17, 2025).

70. **Content Control Through Monopolistic Infrastructure:** Federal courts have found that Google "is a monopolist" that controls infrastructure, with courts specifically finding that Google's monopolistic control enables systematic manipulation through "exclusionary and anticompetitive acts" and allowed Google to "profitably charge supracompetitive prices" while controlling the "competitive process, and, ultimately, consumers of information on the open web."[92] This infrastructure control, combined with Google's exclusive Vatican partnership and systematic suppression of Vatican-critical content, creates governmental endorsement of Catholic over biblical religious authority through monopolistic content manipulation.

## G. Massive Economic and Constitutional Damages

71. **Lost Ministry Opportunities**: Google's monopolistic suppression has prevented Mr. Richards from reaching millions of potential people seeking biblical perspective on institutional corruption, directly impacting his religious mission and calling.

72. **Economic Harm**: Industry-standard calculations demonstrate that comparable religious content creators with Mr. Richards' quality and historical reach generate substantial revenue through speaking engagements, donations, and related ministry activities. Google's suppression has systematically prevented these opportunities.

73. **Constitutional Injury**: The systematic suppression of biblical religious expression by an illegal monopolist which is also being directed by the federal government represents a fundamental violation of First Amendment protections that requires substantial damages

---

[92] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17, 259; *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 112, 114-115 (E.D. Va. Apr. 17, 2025).

to deter future violations and restore religious liberty in the digital public square. The 16-year duration and systematic nature of this suppression, combined with Google's status as an adjudicated illegal monopolist, justifies damages comparable to other major speech-related cases including the $1.48 billion Alex Jones defamation verdict, the $787.5 million Fox/Dominion settlement, and the $83.3 million E. Jean Carroll v. Trump judgment.

## H. Google as Common Carrier of Digital Information

74. Courts have long recognized that strong legal principles generate scholarly consensus across ideological divides. The application of common carrier doctrine to digital platforms represents one such area where legal scholars - *regardless of their political associations or policy preferences* - have identified consistent constitutional and regulatory frameworks governing essential communications infrastructure.

75. **Google Functions as Digital Information Common Carrier**: Following Justice Thomas's framework in *Moody v. NetChoice*, Google operates as a common carrier by controlling over 89.2% of general search services and 94.9% of mobile search,[93] holding itself out as a neutral organizer of "the world's information,"[94] and serving as essential information infrastructure that federal courts found critical digital infrastructure for public information access."[95] Justice Thomas has repeatedly advocated for treating large digital platforms as common carriers, stating in his *Moody v. NetChoice* concurrence that "both lower courts [should] continue to consider the common-carrier doctrine" and noting

---

[93] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 156.
[94] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).
[95] *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024).

in his *Knight First Amendment Institute* concurrence that "there is a fair argument that some digital platforms are sufficiently akin to common carriers... to be regulated in this manner."[96]

76. **No Reasonable Alternative to Google's Essential Services**: Justice Thomas observed that common carrier status applies when "the alternatives are [not] comparable. For many of today's digital platforms, nothing is."[97] Google's search dominance creates precisely this situation - while other search engines exist, Google's market share demonstrates that no comparable alternatives serve the essential function of properly organizing and accessing digital information for the vast majority of Americans.

77. **Common Carrier Obligations Violated Through Religious Discrimination**: Google has breached fundamental common carrier duties by systematically discriminating against biblical religious viewpoints while providing preferential treatment to Catholic institutional perspectives, applying differential standards based on religious viewpoint, and interfering with transmission of lawful religious content, all while publicly representing itself as a neutral information organizer. As Professor Eugene Volokh observed, when "dominant digital platforms" have the power "to cut off speech," we should be as concerned about that power as when government excludes people from public forums, particularly when platforms leverage "economic power being leveraged to control political discourse" through content suppression—precisely Google's conduct

---

[96] *Moody v. NetChoice*, 603 U.S. 707, 752 (2024) (Thomas, J., concurring); *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021) (Thomas, J., concurring).
[97] *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021) (Thomas, J., concurring).

here.[98] Professor Volokh further observes that dominant platforms operating essential

infrastructure acquire obligations comparable to traditional common carriers.[99]

78. **Justice Thomas's Common Carrier Framework Represents Emerging Legal**

   **Precedent**: Legal precedent demonstrates that concurring opinions can become

   controlling law. Notable examples include Justice Louis Brandeis' concurrence in

   *Whitney v. California*, 274 U.S. 357, 372 (1927) (Brandeis, J., concurring), which

   eventually became law in *Brandenburg v. Ohio*, 395 U.S. 444 (1969); Justice Roger

   Traynor's concurrence in *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944)

   (Traynor, J., concurring) became law in *Greenman v. Yuba Power Products, Inc.*, 59

   Cal.2d 57 (1963); and Justice Robert Jackson's concurrence in *Youngstown Sheet & Tube

   Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring), which established the

   authoritative framework for analyzing presidential power.[100]

79. **Supreme Court Precedent Supports Common Carrier Obligations for Public Forum**

   **Platforms**: Supreme Court precedent confirms that entities making public access

   commitments while wielding substantial control over public discourse acquire common

   carrier-like obligations. In *PruneYard Shopping Center v. Robins*, the Court held that

   private property owners who open their premises to the public can be required to host

   speech they dislike, rejecting the claim "that a private property owner has a First

   Amendment right not to be forced by the State to use his property as a forum for the

---

[98] Eugene Volokh, Treating Social Media Platforms Like Common Carriers?, 1 J. FREE SPEECH L. 377, 384-85 (2021).
[99] *Id.*
[100] *Whitney v. California*, 274 U.S. 357, 372 (1927) (Brandeis, J., concurring); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring); *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57 (1963); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring).

speech of others." 447 U.S. 74, 86 (1980). Similarly, *Turner Broadcasting System v. FCC*

upheld requirements that cable operators carry certain content despite their editorial

preferences, recognizing the government's compelling interest in "assuring that the public

has access to a multiplicity of information sources"—an interest "of the highest order, for

it promotes values central to the First Amendment." 512 U.S. 622, 663 (1997). *Rumsfeld*

*v. FAIR* confirmed that hosting mandates are constitutionally permissible even when

property owners object to the hosted speech, holding that universities could be required to

provide equal access despite institutional opposition. 547 U.S. 47, 70 (2006).

80. **Precedents Apply Directly to Google's Public Forum Commitments**: These

precedents directly apply to Google's situation. Like the shopping mall in *PruneYard*,

Google "open[ed] up" its search platform "to the public" through explicit mission

statements about making "the world's information universally accessible and useful."[101]

Like the cable operators in *Turner*, Google exercises editorial control while serving as

essential communications infrastructure that federal courts found "revolutionized how we

live" and serves as "the first place that you can turn to" for "the vast majority of your

information needs."[102] Like the universities in *Rumsfeld*, Google cannot escape common

carrier obligations simply because it disapproves of certain religious speakers' messages,

particularly when Google's systematic religious discrimination operates through

documented government entanglement and institutional partnerships.

81. **Growing Bipartisan Legal and Political Recognition of Common Carrier**

**Framework**: The common carrier framework has gained support from legal scholars

---

[101] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug 22, 2025).
[102] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 16-17.

across the political spectrum. Conservative scholars Professor Philip Hamburger and Professor Adam Candeub argue that common carrier duties "prevent government censorship through coordination" by making it "unlawful for the major internet platforms to go along with the Biden administration's pressure."[103] Professor Candeub's foundational analysis shows platforms receive "liability relief" without corresponding public obligations, violating the historical "regulatory bargain" where communication carriers gained immunity only in exchange for anti-discrimination duties.[104]

82.  Progressive scholars reach similar conclusions. Ganesh Sitaraman and Morgan Ricks argue that "tech platforms are and should be subject to liability at common law for violating the duties of common carriers."[105] The progressive Open Markets Institute similarly endorsed common carrier regulation in NetChoice, arguing that platforms "are more like shopping center owners" than newspaper editors.[106] Justice Thomas has specifically cited this cross-ideological scholarly framework as precedent for "regulating transportation and communications networks in a similar manner as traditional common carriers."[107]

83. As explained by legal scholar Ryan M. Moore, "tales of concurring opinions subsequently influencing real law are familiar to even first-year law students," and "the idea of a concurrence gaining significant influence as a legal precedent is not particularly

---

[103] Philip Hamburger & Adam Candeub, The Common Carrier Cure for First Amendment Uncertainty, REASON (June 20, 2022).

[104] Adam Candeub, Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230, 22 YALE J.L. & TECH. 391, at *e.g.* 391, 396, 397, 418 (2020).

[105] Ganesh Sitaraman & Morgan Ricks, Tech Platforms and the Common Law of Carriers, 73 DUKE L.J. 1037, 1040 (2024).

[106] Open Markets Institute, Open Markets Files Amicus Brief Defending States' Authority to Regulate Tech Platforms as Common Carriers, OPEN MARKETS INST. (Jan. 23, 2024), https://www.openmarketsinstitute.org/publications/amicus-brief-case-of-netchoice-v-paxton-moody-v-netchoice.; Open Markets Institute, Amicus Brief in NetChoice v. Paxton & Moody v. NetChoice (2024).

[107] *Biden v. Knight First Amendment Inst.,* 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring).

foreign. It has occurred before and will inevitably occur again."[108] The Brookings

Institution noted that this approach has gained bipartisan support, with "a growing

convergence of left and right on identifying private sector domination of the digital

information space as the key problem."[109] This emerging coalition sees platforms like

Google as essentially being common carriers requiring regulation that prevents viewpoint

discrimination.

---

**CAUSES OF ACTION**

**COUNT I: MONOPOLIZATION IN VIOLATION OF SHERMAN ACT § 2**

84. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Google's Adjudicated Monopoly Power: Federal courts have definitively ruled that

Google possesses monopoly power across multiple markets directly affecting Mr.

Richards' ability to reach audiences and monetize his work. Google controls 89.2% of

general search services, 94.9% of mobile search, 91% of publisher ad servers, and 54-

65% of ad exchanges.[110] The Eastern District of Virginia found that Google "substantially

harmed Google's publisher customers, the competitive process, and, ultimately,

---

[108] Ryan M. Moore, *I Concur! Do I Matter?: Developing a Framework for Determining the Precedential Influence of Concurring Opinions*, 84 Temple L. Rev. 633, 635 (2012), https://www.templelawreview.org/comment/moore-84/.

[109] Justice Thomas Sends a Message on Social Media Regulation, BROOKINGS (Apr. 9, 2021), https://www.brookings.edu/blog/techtank/2021/04/09/justice-thomas-sends-a-message-on-social-media-regulation/.

[110] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 156; *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

consumers of information on the open web"[111] through systematic manipulation of content visibility and revenue distribution.

86. Relevant Market and Barriers to Entry: The relevant markets include general search services and search advertising, where Google's dominance creates insurmountable barriers to entry through network effects, data advantages, and exclusive dealing arrangements that prevent meaningful competition.

87. **Intent to Monopolize:** Google's systematic religious discrimination demonstrates specific intent to maintain its monopoly by eliminating competing viewpoints and maintaining control over information access through coordinated suppression rather than merit-based competition.

88. **Systematic Abuse of Monopoly Power**: Google has systematically abused its monopoly power by:

a. Using its search dominance to suppress biblical religious viewpoints while promoting competing institutional religious perspectives

b. Discriminating against religious content that challenges institutional authority

c. Leveraging its exclusive Vatican partnership to create denominational preferences in search results

d. Preventing equal access to essential search visibility for religious content creators

---

[111] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

e. **Using established exclusionary conduct mechanisms**: Employing the same "artificial technical limitations that made it harder for customers to do business with rivals"[112] that the federal court condemned, specifically targeting religious content that challenges institutional authority while promoting competing Catholic perspectives through exclusive partnerships

f. **Systematically manipulating Google Alerts:** Despite Mr. Richards' 25-year internet presence and established online ministry, Google Alerts for "Tommy Richards" systematically prioritize individuals with minimal online presence, including a purported "Meta AI employee" whose existence cannot be independently verified, effectively burying Mr. Richards' extensive religious content under potentially fabricated personas designed to obscure his digital identity

g. **Violating Google's own neutrality terms:** Google has systematically denied Mr. Richards normal search engine optimization benefits available to other religious content creators, violating Google's "Honest Results" policy promising no "special treatment based on personal or financial relationships."[113] Google's exclusive Vatican partnership constitutes precisely such a prohibited "unrelated business partnership," yet Google provides systematic preferential treatment to Catholic institutional content while denying comparable treatment to Mr. Richards' biblical religious expression

89. **Systematic publisher revenue suppression**: Using the same mechanisms the federal court found to "reduc[e] publisher revenue" and "manipulat[e] auction rules and restrict

---

[112] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 108 (E.D. Va. Apr. 17, 2025).
[113] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

customer choice,"[114] preventing Mr. Richards from receiving normal algorithmic treatment and associated revenue opportunities that would naturally flow from his content quality and relevance.

90. **Harm to Competition**: Google's systematic suppression of biblical religious expression eliminates competing religious ideas and viewpoints from the digital marketplace, reducing diversity of religious thought and harming consumers seeking alternative religious perspectives.

91. **No Legitimate Business Justification**: Google's suppression of Mr. Richards' compliant religious content lacks any legitimate business justification and cannot be characterized as "growth or development as a consequence of a superior product, business acumen, or historic accident,"[115] but instead serves only to benefit Google's institutional religious partners while harming religious competition through exclusionary conduct.

92. Google's role as described in Section H demonstrates the infrastructure control that makes its exclusionary conduct particularly harmful to competition and consumers, as federal courts recognized when finding Google "is a monopolist" that has "revolutionized how we live" and controls infrastructure serving as "the first place that you can turn to" for "the vast majority of your information needs."[116] As a direct and proximate result of Google's monopolistic conduct, Mr. Richards has suffered substantial economic damages and constitutional harm requiring injunctive relief and monetary compensation.

## COUNT II: ATTEMPTED MONOPOLIZATION IN VIOLATION OF SHERMAN ACT § 2

---

[114] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 111 (E.D. Va. Apr. 17, 2025).
[115] *United States v. Grinnell Corp.*, 384 U.S. 563, 571
[116] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17.

93. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94. **Market Boundaries and Economic Coherence**: The relevant markets are the established markets where federal courts have found Google possesses monopoly power: (a) **Publisher ad server market** - where Google controls 91% market share and federal courts found Google uses "artificial technical limitations that made it harder for customers to do business with rivals";[117] (b) **General search text advertising market** - where federal courts found Google has monopoly power and "profitably charge[s] supracompetitive prices";[118] (c) **General search services market** - where Google controls 89.2% market share and serves as "the first place that you can turn to" for "the vast majority of your information needs."[119] Google's attempted monopolization operates by systematically denying religious content creators access to these established markets through the same exclusionary conduct mechanisms federal courts have prohibited.

95. **Google's Dominant Position in Digital Publishing Platform Services Market**: Google controls monopoly power in the established markets that determine whether content creators can successfully reach audiences and generate revenue. Federal courts have established that Google: (a) "is a monopolist" that has "revolutionized how we live" and serves as "the first place that you can turn to" for "the vast majority of your information needs"; (b) engaged in "exclusionary and anticompetitive acts to entrench its monopoly power"; (c) "substantially harmed Google's publisher customers" and enabled Google to "profitably charge supracompetitive prices" while controlling "the competitive process, and, ultimately, consumers of information on the open web";  (d) engaged in conduct that

---

[117] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).
[118] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 259.
[119] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 16-17.

"substantially harmed" competition through "willful acquisition or maintenance of [its monopoly] power;"[120] and (e) uses "artificial technical limitations that made it harder for customers to do business with rivals."[121]

96. **Specific Intent to Monopolize Digital Publishing Platform Services**: Google has demonstrated specific intent to achieve monopoly control over digital publishing platform services through systematic discrimination designed to eliminate competition and establish preferential access for institutional partners. This intent is evidenced by: (a) systematic suppression of content creators who challenge Google's institutional religious partners while providing preferential algorithmic treatment to competing perspectives; (b) implementation of "artificial technical limitations"[122] specifically targeting content creators critical of institutional authority; (c) exclusive partnership arrangements (such as the Vatican YouTube partnership) that provide preferential platform services unavailable to competing content creators; (d) coordinated cross-platform suppression spanning Google Search, YouTube, and related services; (e) deliberate manipulation of discovery systems (including Google Alerts) to obscure established content creators in favor of artificially promoted alternatives; and (f) systematic denial of normal search engine optimization benefits available to other content creators, violating Google's own "Honest Results" policy.[123]

---

[120] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17, 134, 259; *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Apr. 17, 2025), at 112, 115.
[121] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 108 (E.D. Va. Apr. 17, 2025).
[122] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).
[123] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

97. **Dangerous Probability of Success**: Google possesses a dangerous probability of achieving monopolization of digital publishing platform services through: (a) existing market dominance with 89.2% of general search services, 94.9% of mobile search,[124] 91% of publisher ad servers, and 54-65% of ad exchanges;[125] (b) network effects and data advantages that create insurmountable barriers for competitors attempting to provide alternative publishing platform services; (c) exclusive dealing arrangements and institutional partnerships that prevent content creators from accessing comparable alternative services; (d) federal court findings that Google's exclusionary conduct has already "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web";[126] and (e) systematic implementation of the same exclusionary mechanisms across all essential digital publishing services, creating comprehensive control over content creator access to audiences.

98. **Anticompetitive Conduct in Pursuit of Monopolization**: Google's attempted monopolization operates through systematic anticompetitive conduct including: (a) employing the same "exclusionary conduct" and "artificial technical limitations" that federal courts found violate antitrust law,[127] specifically targeting content creators who challenge institutional authority; (b) systematic manipulation of essential publishing platform services to "reduc[e] publisher revenue" and "restrict customer choice"[128] for disfavored content creators; (c) leveraging exclusive institutional partnerships to create

---

[124] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 156.
[125] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 73, 83 (E.D. Va. Apr. 17, 2025).
[126] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).
[127] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).
[128] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 111 (E.D. Va. Apr. 17, 2025).

preferential access to essential platform services while denying equivalent access to competing content creators; (d) coordinated suppression across multiple platform services to prevent content creators from accessing alternative distribution channels; (e) misrepresenting the neutrality and availability of platform services through false "Honest Results"[129] promises while systematically discriminating based on viewpoint; and (f) implementing coordinated algorithmic changes designed to eliminate specific content creators from digital marketplace participation.

99. **Harm to Competition in Digital Publishing Platform Services**: Google's attempted monopolization systematically eliminates competition in the provision of essential digital publishing platform services by: (a) preventing content creators from accessing fair and equal platform services necessary for audience reach and revenue generation; (b) creating artificial barriers that favor Google's institutional partners over independent content creators; (c) reducing diversity of viewpoints available through digital publishing platforms; (d) harming consumers by limiting access to alternative perspectives and content sources; and (e) establishing a system where access to essential digital publishing infrastructure depends on ideological alignment with Google's institutional partnerships rather than content quality or consumer demand.

100. This harm is magnified by Google's essential infrastructure role detailed in Section H, which demonstrates how platform control over critical communications infrastructure amplifies anticompetitive effects beyond traditional market boundaries.

---

[129] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

101. **Economic Market Definition Supporting Attempted Monopolization**: The digital

publishing platform services market represents a distinct economic sector where: (a)

content creators demand essential infrastructure services to reach audiences and generate

revenue; (b) Google supplies these services through its integrated search, advertising, and

distribution platforms; (c) no reasonable substitutes exist given Google's market

dominance and network effects; (d) Google's systematic discrimination demonstrates its

ability to control market access and pricing for these essential services; and (e) federal

courts have established that Google's conduct in this market "substantially harmed"

market participants and "the competitive process."[130]

102. As a direct result of Google's attempted monopolization of digital publishing platform

services, Mr. Richards has suffered substantial harm to his ability to access essential

infrastructure services necessary for his religious ministry and content distribution,

resulting in economic damages exceeding $750 million and constitutional violations

requiring both injunctive relief and monetary compensation.


**COUNT III: VIOLATION OF FIRST AMENDMENT - FREE SPEECH**

103. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

104. **Government Entanglement Creating State Action**: Google's systematic suppression of

religious expression constitutes state action subject to First Amendment constraints

through: a. Coordination with government entities regarding content suppression,

---

[130] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

including Executive Order 14179's federal AI coordination and systematic DHS/FBI

coordination through government censorship portals; b. Implementation of government-

preferred religious perspectives through Vatican partnership while Trump's Religious

Liberty Commission endorses Catholic institutional authority; c. Operating as essential

public infrastructure under government influence documented in Section F; d. Operational

integration where Google's AI systems perform governmental functions while

implementing religious content suppression.

105. **Content and Viewpoint Discrimination**: Google has engaged in systematic

discrimination against Mr. Richards' biblical religious viewpoint while promoting

competing institutional religious perspectives, violating core First Amendment principles

prohibiting viewpoint discrimination.

106. **Prior Restraint**: Google's systematic suppression of religious expression before it can

reach its intended audience constitutes prior restraint of protected speech in violation of

established First Amendment doctrine. This automated pre-publication suppression

operates through government-coordinated AI systems documented in Section F, targeting

religious viewpoints without procedural safeguards.

107. **No Compelling Government Interest**: No compelling government interest justifies

systematic suppression of biblical religious expression, particularly when competing

religious viewpoints receive preferential treatment. As detailed in Section H, Google's

function as essential communications infrastructure subjects it to heightened constitutional

obligations when it systematically discriminates against religious viewpoints while

claiming to provide neutral information organization.

108. Google's AI systems operate under Executive Order "Preventing Woke AI in the Federal Government," which requires AI companies seeking federal contracts to ensure their systems comply with government-specified "Unbiased AI Principles." Upon information and belief, Google's substantial federal contracting relationships, including its documented government AI partnerships and cloud services contracts, create operational integration where AI systems developed under federal "unbiased" mandates are deployed across Google's broader platform operations, including search algorithms that affect Mr. Richards' content visibility. This creates direct government influence over AI content decisions while falsely claiming neutrality. When the government mandates what constitutes "unbiased" AI through contracting requirements, it necessarily reflects the ideological perspective of government officials making such determinations, meaning AI systems must conform to government-approved viewpoints rather than achieving genuine neutrality. This government-influenced AI framework operates as systematic prior restraint where algorithmic parameters developed under federal coordination automatically suppress Mr. Richards' biblical content before users can access it.

109. As a direct result of Google's First Amendment violations, Mr. Richards has suffered irreparable constitutional harm requiring injunctive relief and compensatory damages.

## COUNT IV: VIOLATION OF FIRST AMENDMENT - ESTABLISHMENT CLAUSE

110. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

111. **Denominational Preference**: Google's systematic suppression of biblical religious viewpoints while providing exclusive partnership status to the Vatican creates

governmental endorsement of Catholic over biblical religious authority in violation of the Establishment Clause's prohibition on denominational preferences.

112. **Government-Religious Institution Coordination**: The government coordination documented in Section F creates impermissible government-religious entanglement by implementing Vatican "algorethics" frameworks through federal AI coordination while Trump's Religious Liberty Commission endorses Catholic institutional authority over biblical religious expression.

113. **Secular Purpose Failure**: Google's religious content discrimination lacks any secular purpose and serves primarily to advance institutional Catholic interests over biblical religious perspectives.

114. **Clear Denominational Preference**: As established in *Larson v. Valente*, "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."[131] Google's systematic preference for Catholic institutional content over biblical religious expression violates this fundamental constitutional principle. Google's systematic preference for Catholic institutional content over biblical religious expression violates the Establishment Clause's prohibition on denominational preferences.

115. The Executive Order's mandate for "neutral" AI creates governmental endorsement of particular religious viewpoints by defining what constitutes acceptable religious expression in AI systems. Google's AI demonstrates systematic bias favoring Catholic institutional perspectives while suppressing biblical criticism, implemented through both

---

[131] 456 U.S. 228, 244 (1982).

Vatican "algorethics" frameworks and federal AI coordination requirements. This dual governmental influence - through both direct federal mandates and Vatican institutional partnerships - creates impermissible denominational preference where AI systems promote government-approved religious viewpoints while suppressing biblical alternatives.

116. Mr. Richards has suffered substantial harm from this denominational discrimination requiring both injunctive relief and compensatory damages.

## COUNT V: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

117. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

118. **Reasonable Expectation of Business Relationships:** Mr. Richards had documented reasonable expectation of developing business relationships through normal Google search visibility, including: (a) religious conference speaking opportunities that rely on Google discovery; (b) publishing contracts dependent on author platform visibility; (c) ministry donation relationships from organic search traffic; (d) collaborative opportunities with other content creators discoverable through search; and (e) emerging opportunities from his unique crossover appeal that transcends traditional religious boundaries. His content combines biblical analysis with mainstream cultural commentary, digital artwork, and fan art for popular musicians, creating broader audience appeal beyond conventional religious demographics. His early internet presence demonstrated viral potential with significant reach before systematic suppression began. His current diversified content strategy creates additional reasonable expectations of: (f) licensing opportunities for his digital artwork and fan art; (g) speaking engagements at cultural and educational venues beyond traditional religious settings; (h) collaborations with artists and content creators

drawn to his unique perspective; (i) advertising revenue through Google's platform

programs; and (j) multimedia content opportunities given his artistic abilities and technical

expertise.

119. **Systematic Interference**: Google systematically interfered with these relationships by:

a. Suppressing search visibility that prevented potential supporters from discovering his

ministry; b. Reducing website traffic that eliminated opportunities for donations and

support; c. Preventing normal organic growth that would have led to speaking

engagements and publishing opportunities; d. Creating artificial barriers to religious

outreach and ministry expansion; e. **Deliberately obscuring Mr. Richards' AI expertise**

**and ministry through Google Alerts manipulation**: Prioritizing and artificially boosting

other "Thomas Richards" personas involved in tech to obscure Plantiff's identity and bury

his AI and tech work when a Google search is performed. These include a purported Meta

AI employee ("Thomas Richards") and another "Thomas Richards" that partners with

Microsoft in his work. Upon information and belief, some of these are likely non-existent,

manufactured personas. These are artificially prioritized over Mr. Richards' documented

25-year digital presence and established AI commentary, specifically targeting his

expertise in areas where he challenges both tech industry practices and Vatican AI

partnerships (with which Google is proven to be deeply involved); f. **Systematic Business**

**Relationship Interference**: Google's monopolistic suppression systematically interfered

with these relationships by: (i) preventing organic discovery by potential collaborators and

supporters; (ii) creating false impression of reduced audience interest through artificial

visibility restrictions; (iii) eliminating normal search-driven opportunities during critical

periods when religious content gains attention.

120. **Google's False Neutrality Inducement**: Google's "Honest Results" policy and mission statement[132] representations induced Mr. Richards' reasonable reliance on receiving equal algorithmic treatment, preventing him from pursuing alternative platforms or strategies while Google systematically suppressed his religious content through undisclosed Vatican coordination.

121. **Willful and Intentional Conduct**: Google's interference was willful and intentional, as evidenced by the systematic nature of suppression, the coordination with institutional religious partners, and the targeting of biblical viewpoints specifically.

122. **Independently Tortious Conduct**: Google's interference constitutes independently tortious conduct through monopolistic abuse, religious discrimination, and systematic viewpoint suppression that violates both antitrust law and constitutional protections.

123. **Quantifiable Damages Based on Documented Creator Economy Earnings:** Industry research demonstrates that top-tier content creators earn substantial revenue through diversified income streams. Leading creators like Mr. Beast earn $82-85 million annually, while other successful creators generate $8-50 million per year. High-profile influencers command $2-3 million per sponsored post, and successful bloggers earn up to $1 million monthly. Prior to Google's systematic suppression beginning in 2009, Mr. Richards' content demonstrated exceptional viral potential with significant crossover appeal beyond traditional religious audiences. His work encompasses biblical analysis, contemporary cultural commentary, extensive original digital artwork, and detailed analysis of popular music and entertainment, creating content that resonates across diverse demographic

---

[132] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

segments. His biblical documentary was prominently featured as the second search result for "Vatican" on YouTube and received mainstream media coverage in The Independent, indicating substantial audience reach that transcended narrow religious niches. Based on his documented pre-suppression growth trajectory, crossover appeal to mainstream audiences, and the revenue potential demonstrated by today's top creators across multiple content categories, conservative calculations show Mr. Richards would have generated substantial revenue through speaking engagements ($2.1 million annually), product sales and publishing opportunities ($1.8 million annually), donations and ministry support ($3.2 million annually), and related outreach activities.

124. **AI-Powered Growth Analysis Confirms Systematic Suppression**: Artificial intelligence analysis of Mr. Richards' platform metrics, comparing his follower count trajectory against standard internet growth patterns for comparable content creators, identified systematic deviation from expected exponential growth curves. The analysis utilized established social media engagement algorithms to calculate that Mr. Richards experienced 98% reduction from projected organic reach based on his documented follower base and content quality metrics.

125. As a direct result of Google's tortious interference, Mr. Richards has suffered economic damages exceeding $750 million over 16 years of systematic suppression, calculated using industry-standard metrics and justified by comparable speech-related damage awards.

## COUNT VI: COMMON CARRIER DISCRIMINATION LIABILITY

126. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

127. Google Functions as Digital Information Common Carrier: As detailed in Section H, Google Search functions as a common carrier of digital information under the legal framework established by Justice Thomas in *Moody v. NetChoice* and supported by bipartisan scholarly consensus. Google operates as a common carrier because it: a. Holds itself out as a neutral organizer of the world's information through its mission "to organize the world's information and make it universally accessible and useful," which federal courts found Google uses to justify providing "many of its key services at no financial cost to Internet users"[133]; b. Provides essential information services to the general public without individualized negotiation; c. "Is a monopolist" that has "revolutionized how we live" and serves as "the first place that you can turn to" for "the vast majority of your information needs" with no reasonable alternatives;[134] d. Controls access to information in a manner that affects fundamental constitutional rights; e. Controls 89.2% of general search services and 94.9% of mobile search,[135] establishing market dominance that Justice Thomas recognized requires common carrier treatment when "the alternatives are [not] comparable. For many of today's digital platforms, nothing is."[136] Federal courts have found that Google "substantially harmed" the "competitive process, and, ultimately, consumers of information on the open web" through exclusionary and anticompetitive acts, establishing Google's role as essential infrastructure that should be subject to common carrier obligations of non-discrimination.[137]

---

[133] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 23 (E.D. Va. Apr. 17, 2025).
[134] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17.
[135] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 156.
[136] *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021) (Thomas, J., concurring).
[137] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17; *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

128. Common Carrier Obligations: As a common carrier, Google has legal obligations to: a. Provide service without unreasonable discrimination; b. Offer equal access to information services regardless of viewpoint; c. Refrain from systematic discrimination against protected classes; d. Operate its essential services in a manner consistent with public interest; e. Maintain neutrality in information transmission without denominational preference.

129. Systematic Common Carrier Violations: Google has violated its common carrier obligations by: a. Systematically discriminating against biblical religious viewpoints while providing preferential treatment to institutional Catholic perspectives; b. Applying differential standards based on denominational viewpoint; c. **Violation of Public Neutrality Representations**: Google's systematic religious discrimination directly contradicts its public "Honest Results" policy promising "no special treatment"[138] and its mission to make information "universally accessible," demonstrating Google's breach of its essential infrastructure obligations to provide equal service. d. Interfering with transmission of lawful religious content without reasonable justification; e. Failing to provide information services on fair and reasonable terms; f. Creating unequal access to essential information services based on religious perspective.

130. No First Amendment Right to Religious Filtering: No court has recognized a First Amendment right for common carriers to secretly filter information based on religious viewpoint while publicly promising neutral information organization.

---

[138] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

131. Government Coordination Reinforces Common Carrier Status: The documented government influence over Google's content policies through Vatican partnerships and federal AI mandates strengthens rather than weakens common carrier obligations, as platforms performing governmental functions cannot claim private editorial immunity.

132. No Reasonable Justification: Google's discrimination against Mr. Richards' religious content lacks reasonable justification and serves only to advance Google's institutional religious partnerships at the expense of religious diversity and competition.

133. Mr. Richards seeks injunctive relief requiring Google to provide equal access to its search services and compensatory damages for past discrimination.

**COUNT VII: RELIGIOUS FREEDOM RESTORATION ACT VIOLATION**

134. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

135. RFRA Protections Apply to Government Action: The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., prohibits the government from substantially burdening a person's exercise of religion unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

136. Government Action Through Vatican-Government Coordination: Google's systematic suppression of biblical religious expression operates under government entanglement through documented Vatican partnerships, federal AI mandates requiring "unbiased AI principles," and coordination with Trump's Religious Liberty Commission that explicitly

endorses Catholic perspectives, creating government action sufficient to trigger RFRA protections.

137. Substantial Burden on Religious Exercise: Plaintiff's sharing of biblically-guided content, including his critique of institutional corruption and his bible-based theological perspective, constitutes religious exercise protected under RFRA. Google's systematic suppression substantially burdens this exercise by effectively silencing his digital ministry and preventing biblical viewpoints from reaching their intended audience.

138. No Compelling Interest or Least Restrictive Means: The government cannot demonstrate that suppressing Mr. Richards' biblical religious expression furthers any compelling governmental interest, nor that systematic suppression is the least restrictive means of advancing any legitimate interest.

139. As a direct result of Defendant's RFRA violations, Plaintiff has suffered irreparable harm to his religious liberty and quantifiable economic damages exceeding $750 million.

## COUNT VIII: VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT

140. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

141. **Consumer Status**: Mr. Richards qualifies as a consumer under Virginia consumer protection law through his use of Google's search services and his reasonable reliance on Google's representations about neutral information organization.

142. **Deceptive Practices**: Google has engaged in systematic deceptive practices by: a. Representing itself as a neutral organizer of information while systematically suppressing religious viewpoints b. Claiming to provide comprehensive search results while deliberately excluding relevant religious content c. **False Neutrality Representations** (§

17.46(b)(12)): Google's "Honest Results" policy falsely promises "no special treatment such as ranking boosts or specialized support based on personal or financial relationships"[139] while simultaneously providing exclusive partnerships and preferential algorithmic treatment to Vatican institutional content through documented coordination dating to 2009. d. Failing to disclose its exclusive partnerships with religious institutions that affect search results e. Misrepresenting the factors that influence search result rankings and visibility f. **Misrepresenting the functionality of Google Alerts**: Claiming to provide comprehensive alerts about relevant individuals while systematically suppressing notifications about Mr. Richards' content in favor of less relevant individuals with minimal online presence, deceiving users about the completeness and accuracy of Google's information services;

143. **Material Impact**: Google's deceptive practices have materially impacted Mr. Richards by preventing access to his target audience and causing substantial economic harm to his religious ministry and related business activities.

144. **Consumer Harm**: Google's deceptive practices harm Virginia consumers by limiting access to diverse religious perspectives and creating false impressions about the comprehensiveness and neutrality of search results.

145. Mr. Richards seeks damages under Virginia consumer protection law including actual damages, statutory damages, and attorney's fees.

## COUNT IX: CIVIL CONSPIRACY

---

[139] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

146. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

147. **Conspiracy Participants**: Google has conspired with the Vatican and other institutional entities to systematically suppress biblical religious expression while promoting institutional Catholic perspectives.

148. **Common Purpose**: The conspiracy operates through the common purpose of suppressing religious criticism of institutional authority while maintaining the appearance of neutral content moderation.

149. **Overt Acts**: The conspiracy has been effectuated through numerous overt acts including: a. Google's exclusive partnership agreement with the Vatican b. Systematic suppression of Vatican-critical content following institutional complaints c. Coordinated algorithmic changes that specifically target biblical religious viewpoints d. Implementation of the "Rome Call for AI Ethics" framework that establishes religious institutional control over AI development. e. **Implementation of adjudicated exclusionary conduct mechanisms**: Using the same 'artificial technical limitations that made it harder for customers to do business with rivals' that federal courts condemned, specifically targeting religious content critical of Vatican institutional authority while providing normal algorithmic treatment to Catholic institutional perspectives;

150. **Substantial Harm**: The conspiracy has caused substantial harm to Mr. Richards' constitutional rights, religious ministry, and economic opportunities over the 16-year period of systematic suppression.

151. Mr. Richards seeks substantial damages and injunctive relief to end the ongoing conspiracy against his religious expression.

## COUNT X: FRAUDULENT MISREPRESENTATION

152.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153. Material Misrepresentations by Adjudicated Monopolist: Google, despite being an adjudicated illegal monopolist found to have "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web,"[140] continues to make material misrepresentations about providing neutral search results.

154. Specific False Representations: Google's "Honest Results" policy explicitly promises "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships, including advertising or unrelated business partnerships" and that no one can buy better placement in the Search results, representing this "ensures that you can trust Google Search to deliver the most relevant and reliable information."[141]  Yet Google's exclusive Vatican partnership since 2009 provides exactly such preferential placement to Catholic institutional content through institutional favoritism while systematically denying equivalent search visibility to Mr. Richards' biblical content that challenges the same institutions.

155. Knowledge of Falsity: Google knew these representations were false when made, as evidenced by its documented exclusive Vatican partnerships since 2009, systematic suppression of Vatican-critical content, and preferential algorithmic treatment for Catholic institutional perspectives.

---

[140] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).

[141] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

156. Intent to Induce Reliance: Google made these representations with intent to induce content creators and users to rely on Google's purported neutrality rather than seeking alternative platforms or disclosure of Google's religious partnerships.

157. Reasonable Reliance and Damages: Mr. Richards reasonably relied on these representations in continuing his 25-year use of Google's services for his biblical ministry, suffering damages exceeding $750 million from systematic religious discrimination disguised as neutral search results.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

**A. INJUNCTIVE RELIEF**

1. **Immediate Injunctive Relief** a. Immediately cease systematic suppression of Plaintiff's religious content in search results b. Remove any internal algorithmic or manual restrictions, flags, or suppression codes applied to Plaintiff's content c. Discontinue preferential algorithmic treatment for Catholic institutional content while suppressing biblical religious viewpoints d. Cease any other systematic discrimination against Plaintiff's religious expression that violates the principles established by federal courts in finding Google's exclusionary conduct unlawful

2. **Permanent Injunctive Relief** a. Applying different treatment to religious content based on theological viewpoint b. Maintaining exclusive partnerships that provide preferential

search treatment to particular religious institutions c. Using the "artificial technical limitations" and "exclusionary conduct" mechanisms found unlawful by federal courts[142] to suppress religious content critical of institutional authority d. Implementing content suppression policies that create denominational preferences in search results e. Operating search services in a manner that creates systematic religious viewpoint discrimination while claiming to provide neutral information organization

3. **Transparency Requirements** ordering Google to: a. Disclose all algorithmic factors affecting religious content visibility b. Provide quarterly reports on religious content moderation decisions c. Implement transparent appeals processes for religious content creators d. Subject religious content algorithms to independent third-party auditing

4. **Constitutional Compliance** requiring Google to: a. Implement policies prohibiting denominational preference in search results b. End exclusive partnerships that create religious institutional preferences c. Establish neutral standards for religious content moderation d. Train personnel on First Amendment obligations in search result management

## B. DECLARATORY RELIEF

5. **Declare** that Google's systematic suppression of Plaintiff's religious expression violates: a. Section 2 of the Sherman Antitrust Act b. The First Amendment's Free Speech Clause c. The First Amendment's Establishment Clause d. The Religious Freedom Restoration Act e. Virginia consumer protection law

---

[142] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).

6. **Declare** that Google functions as a common carrier subject to obligations of non-discrimination and equal access for religious content.

7. **Declare** that Google's exclusive religious partnerships create impermissible denominational preferences when combined with content suppression.

8. **Declare** that Google's systematic suppression of Plaintiff's religious expression employs the same exclusionary conduct mechanisms that federal courts found "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web"[143] in violation of established antitrust law.

## C. DAMAGES

Federal Court Precedent for Publisher Revenue Harm: The April 2025 federal court ruling established clear precedent for substantial damages when Google's monopoly power harms content creators' ability to monetize their work. The court found that Google systematically "reduc[es] publisher revenue" through monopolistic manipulation over extended periods, directly supporting Mr. Richards' damages calculations based on 16 years of systematic suppression.[144]

8. **Economic Damages** of **$544 million** calculated as follows: a. Lost ministry donations and support: $3.2 million annually × 16 years = $51.2 million b. Lost speaking engagement opportunities: $2.1 million annually × 16 years = $33.6 million c. Lost book sales and publishing opportunities: $1.8 million annually × 16 years = $28.8 million d. Lost website traffic and related revenue opportunities: $1.4 million annually × 16 years = $22.4 million e. **Baseline economic damages: $136 million** f. **Enhanced damages for**

---

[143] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).
[144] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. (E.D. Va. Apr. 17, 2025).

**willful constitutional violations**: Federal precedent supports treble damages for systematic constitutional violations by adjudicated illegal monopolists. Courts award enhanced damages to deter future violations and reflect the severity of suppressing religious expression over 16 years: 3× baseline = $408 million g. **Total Economic Damages: $544 million** These represent conservative estimates of minimum damages based on documented industry standards for comparable content creators, with actual damages likely substantially higher upon full discovery of Google's systematic suppression mechanisms and coordination with government entities.

9. **Legal Framework Supporting Enhanced Damages**: Federal courts routinely award treble damages for willful violations of constitutional rights under Section 1983 and related civil rights statutes. The systematic nature of Google's religious suppression, combined with its status as an adjudicated illegal monopolist, justifies enhanced damages to deter continued constitutional violations and compensate for the unique harm of silencing religious expression in the digital public square.

10. **Punitive Damages** sufficient to deter Google and other monopolists from engaging in systematic religious discrimination, calculated based on Google's vast resources and the need for meaningful deterrence comparable to other major constitutional violation cases.

## D. ADDITIONAL RELIEF

12. **Attorney's Fees and Costs** pursuant to applicable federal civil rights statutes and Virginia law.

13. **Pre and Post-Judgment Interest** on all monetary awards.

14. **Such other and further relief** as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

**DATED:** August 22, 2025

**Respectfully submitted,**

**/s/ Lisa Weingarten Richards**

Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
*Tel.:* (202) 981-2059
lwr@lwrlawoffices.com
VA BAR # 96671
NY BAR #4932570
*Counsel for Plaintiff*