# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF VIRGINIA

# HARRISONBURG DIVISION

THOMAS RICHARDS

*Plaintiff,*

Case No. 5:25-cv-00082

*v.*

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

GOOGLE LLC

*Defendant*

Lisa Weingarten Richards, Esq.

VSB #96671

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY**………………………………………………………..4

**INTRODUCTION**....................................................................................8

**PARTIES**..............................................................................................9

**JURISDICTION AND VENUE**................................................................13

**FACTUAL BACKGROUND**                                                    15

**A. Plaintiff's Independent Religious Ministry (2000-2009)**........................................15

**B. The 2009 Triggering Event: Vatican-Google Partnership and Systematic Biblical Suppression**………………………………………………………………17

**C. Google as Vatican AI Authority: Leading the Global "Algorethics" Framework**……..20

**D. 16 Years of Escalating Religious Suppression (2009-2025)**…………………………28

**E. Google's Adjudicated Illegal Monopoly Status**…………………………………………29

**F. Government Entanglement Creating Constitutional Violations**…………………………33

**G. Economic and Constitutional Damages**……………………………………………....44

**H. Google as Common Carrier of Digital Information**……………………………………45

**CAUSES OF ACTION**                                                    50

**COUNT I: VIOLATION OF FIRST AMENDMENT - FREE SPEECH**…………………...50

**COUNT II: VIOLATION OF FIRST AMENDMENT - ESTABLISHMENT CLAUSE**….52

**COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**………….54

**COUNT IV: COMMON CARRIER DISCRIMINATION LIABILITY…………………58**

**COUNT V: RELIGIOUS FREEDOM RESTORATION ACT VIOLATION……………61**

**COUNT VI: VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT…………62**

**COUNT VII: CIVIL CONSPIRACY……………………………………………………..64**

**COUNT VIII: FRAUDULENT MISREPRESENTATION…………………………………66**

**COUNT IX: UNJUST ENRICHMENT…………………………………………………68**

**COUNT X: DEFAMATION BY IMPLICATION…………………………………….…68**

**COUNT XI: VIOLATION OF VIRGINIA MISAPPROPRIATION STATUTE (Va. Code §
8.01-40)……………………………………………………………………………………69**

**COUNT XII: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE…………………………………………………………………………..70**

**PRAYER FOR RELIEF……………………………………………………………..71**

**DAMAGES…………………………………………………………………………...72**

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

### Amendment as of Right Under Fed. R. Civ. P. 15(a)(1)(A)

## EXECUTIVE SUMMARY

**The Core Violation: 16 Years of Systematic Religious Suppression by Illegal Monopolist**

For over 25 years, Thomas Richards has conducted biblical ministry through his website SpirituallySmart.com, sharing religious content, biblical analysis, and related research and discussion of world events that challenges institutional corruption. Since at least 2009, Google LLC--now a federally adjudicated illegal monopolist--has systematically suppressed Mr. Richards' religious expression in search results, effectively silencing his biblical voice while amplifying competing Catholic perspectives.

This is not a contractual dispute. Mr. Richards never sought out a relationship with Google. Rather, Google unilaterally began indexing his religious content and then weaponized its monopoly power to systematically suppress biblical viewpoints that challenge institutional authority, particularly Catholic institutional perspectives that receive preferential treatment under Google's exclusive Vatican partnership.

**Federal Courts Have Established Google's Illegal Monopoly Status**

In August 2024 and April 2025, two different federal courts ruled that Google operates as an illegal monopolist in violation of the Sherman Act. In August 2024, Judge Amit Mehta of the United States District Court for the District of Columbia ruled that Google operates as an illegal

monopolist in search markets,[1] and on April 17, 2025, Judge Leonie Brinkema of the United

States District Court for the Eastern District of Virginia, ruled that Google operates illegal

monopolies in digital advertising technology markets.[2]

The April 17, 2025 ruling found that Google operates illegal monopolies in digital advertising

technology markets, stating that "Google has willfully engaged in a series of anticompetitive acts

to acquire and maintain monopoly power" and that "this exclusionary conduct substantially

harmed Google's publisher customers, the competitive process, and, ultimately, consumers of

information on the open web."[3] The Court found that Google uses "artificial technical limitations

that made it harder for customers to do business with rivals" and systematically "reduc[es]

publisher revenue" through monopolistic manipulation of content visibility and monetization.[4]

Attorney General Pamela Bondi declared: "This is a landmark victory in the ongoing fight to

stop Google from monopolizing the digital public square. This Department of Justice will

continue taking bold legal action to protect the American people from encroachments on free

speech and free markets by tech companies."[5] Mr. Richards' case demonstrates exactly that

systematic censorship in action—targeting Mr. Richards' religious expression for over 16 years.

**The Vatican Connection: Preference for Catholicism over Biblical Religious Views**

Google's suppression operates within a documented framework of cooperation with Vatican

interests. In 2009, the Vatican launched its YouTube channel through Google's exclusive

---

[1] *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. Aug. 5, 2024).
[2] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 73, 115 (E.D. Va. Apr. 17, 2025).
[3] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).
[4] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 108 (E.D. Va. Apr. 17, 2025).
[5] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.

partnership[6]—the only religious institution in Google's 20-year history to receive such preferential treatment.[7] During a January 15, 2016 meeting at the Vatican, when speaking of Pope Francis' goals, Eric Schmidt personally promised Pope Francis: "I want to work with you to make these points... We will make it happen,"[8] demonstrating Google's commitment to cooperate with Vatican messaging priorities.

This coordination manifested directly five years later when Pope Francis publicly demanded tech censorship, stating: "In the name of God, I ask the technology giants to stop exploiting human weakness, people's vulnerability, for the sake of profits without caring about the spread of hate speech, grooming, fake news, conspiracy theories, and political manipulation."[9] Schmidt's promise to "make it happen" followed by the Pope's explicit censorship demands establishes the coordinated relationship between Vatican institutional interests and Google's systematic suppression of Mr. Richards' biblical criticism of the same institution.

While claiming to be a type of Christianity, the Vatican proves itself to be exactly the opposite by its actions, and by the speech it promotes and the speech it dissuades. For example, the systematic Vatican bias against biblical truth is exemplified by Vatican endorsement of evolutionary theory—with Pope Francis stating "Evolution in nature is not opposed to the notion

---

[6] Vatican Going Digital with YouTube Channel, SPOKESMAN-REV. (Jan. 24, 2009), https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.
[7] Pope Channel Makes Debut on YouTube, CATH. NEWS AGENCY, https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.
[8] Pope Francis Meets with Google Executive Eric Schmidt, ROME REP. (Jan. 15, 2016), https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.
[9] Mark A. Kellner, Pope Francis Begs Social Media Firms to Block Fake News 'In the Name of God', WASH. TIMES (Oct. 19, 2021), https://www.washingtontimes.com/news/2021/oct/19/pope-francis-begs-social-media-firms-block-fake-ne/.

of Creation"[10] and Pope Leo XIV committing to continuing this "precious legacy"[11]—demonstrating institutional opposition to genuine biblical faith that hold Scripture to be literally true.

**Constitutional Violations and Resulting Damages**

The religious suppression of Mr. Richards' bible-based work intensified following this documented coordination between tech platforms and government entities. The systematic targeting of Mr. Richards' biblical viewpoints while promoting institutional Catholic perspectives violates both Free Speech and Establishment Clauses through government-coordinated religious preference that exceeds private business conduct.

Based on documented revenue patterns for established religious content creators with comparable reach and audience engagement, Google's monopolistic suppression has cost Mr. Richards over $544 million in lost ministry opportunities, speaking engagements, publishing revenue, and religious outreach over the 16-year suppression period.[12] The silencing of biblical religious expression by an illegal monopolist requires substantial damages also to deter future constitutional violations and restore religious liberty in the digital public square. This damage award is supported by precedent from comparable speech-related cases including the $1.48 billion Alex Jones defamation verdict, the $787.5 million Fox/Dominion settlement, and the

---

[10] Josephine McKenna, Pope Francis: 'Evolution ... is not inconsistent with the notion of creation', NAT'L CATH. REP. (Oct. 27, 2014), https://www.ncronline.org/news/vatican/pope-francis-evolution-not-inconsistent-notion-creation.

[11] Austen Ivereigh, *A pope of communion: Leo XIV and the Francis legacy*, TABLET (May 15, 2025).

[12] Damages calculations based on industry analysis of successful religious content creators, including revenue streams documented in creator economy research showing top-tier content creators earn $8-85 million annually through diversified platforms. See Prayer for Relief ¶ 8 for detailed breakdown.

$83.3 million E. Jean Carroll judgment, demonstrating that substantial damages are appropriate when speech rights are systematically violated.

## INTRODUCTION

1. This case presents the first comprehensive legal challenge to systematic religious suppression by Google LLC. Federal courts have now ruled in two separate antitrust cases that Google operates as an illegal monopolist, with the April 2025 ruling specifically finding that Google systematically manipulates which online content receives visibility and revenue and "substantially harm[s] Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web."[13]

2. For over 16 years, Google has weaponized its search monopoly to suppress biblical religious expression while promoting competing institutional religious perspectives, creating both antitrust violations and unprecedented constitutional harm.

3. The systematic suppression constitutes ongoing constitutional violations with each algorithmic suppression creating a new injury, making statute of limitations inapplicable to continuing violations of constitutional rights.

4. Unlike typical platform content moderation cases, this lawsuit addresses monopolistic interference with an independent religious ministry using the same "exclusionary conduct" mechanisms that federal courts found "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the

---

[13] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

open web."[14] Mr. Richards conducted his biblical ministry through SpirituallySmart.com

independently, and Google unilaterally began indexing and then systematically

suppressing his religious content using the same "artificial technical limitations that made

it harder for customers to do business with rivals" that federal courts have now

prohibited.[15]

5.  Federal courts have confirmed what Mr. Richards experienced firsthand: Google operates

as an illegal monopolist that uses its dominance to "censor and deplatform American

voices."[16] In August 2024, Judge Amit Mehta ruled that "Google is a monopolist, and it

has acted as one to maintain its monopoly" in violation of Section 2 of the Sherman Act.[17]

In April 2025, Judge Leonie Brinkema ruled that Google operates illegal monopolies in

digital advertising technology markets, finding that Google "substantially harmed

Google's publisher customers, the competitive process, and, ultimately, consumers of

information on the open web" through systematic content and revenue manipulation.[18]

Attorney General Pamela Bondi emphasized the broader constitutional implications,

declaring this "a landmark victory in the ongoing fight to stop Google from monopolizing

the digital public square" and promising continued "bold legal action to protect the

American people from encroachments on free speech and free markets by tech

companies."[19]

---

[14] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025
[15] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).
[16] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.
[17]  *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. Aug. 5, 2024).
[18] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).
[19] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.

6.  The April 2025 court specifically found that Google's monopolistic conduct creates "artificial technical limitations that made it harder for customers to do business with rivals"[20] and "substantially harmed Google's publisher customers,"[21] establishing the precise legal framework that applies to Google's suppression of Mr. Richards' religious content

7.  The suppression of Mr. Richards' biblical religious expression represents exactly the type of monopolistic abuse that federal courts have now prohibited. Google's documented pattern of suppressing religious content critical of institutional authority while promoting Catholic institutional perspectives through its exclusive Vatican partnership creates both antitrust violations and constitutional violations through denominational preference.

8.  This case seeks comprehensive relief to restore Mr. Richards' religious expression, to end Google's suppression of biblical viewpoints, and establish precedent protecting religious liberty from monopolistic digital censorship.

9.  The suppression operates through government-directed AI coordination pursuant to Executive Order 14179's federal AI framework, transforming private content moderation into constitutional violations.

10. The Court's intervention is essential not only for Mr. Richards but for every American whose religious expression faces suppression by Google's illegal search monopoly.

**PARTIES**

---

[20] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).
[21] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

11. Plaintiff Thomas Richards is a natural person and longtime resident of Virginia who can trace his direct ancestry to Joseph Bridger I (1632-1686), one of Virginia's most prominent early colonial leaders who served in both the House of Burgesses and Virginia Governor's Council. Mr. Richards is also a born-again Christian (Χριστιανός - Christianos) who experienced a profound spiritual conversion in March 1997, becoming a believer in Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) through a powerful, unexpected, life-changing supernatural encounter with God (Θεός - Theos).[22] His transformative spiritual experience has informed all of his subsequent work, including his biblically-guided critiques of corruption and injustice in world systems.

12. Mr. Richards serves as the founder, sole author, and administrator of SpirituallySmart.com, a website created around the year 2000 dedicated to sharing bible messages, historical research, spiritual revelation, and personal growth content. Despite never attending college, his dedication to sharing his biblical message drove him to master complex technical skills, learning HTML coding and web development when such knowledge was far less accessible than today. He also developed sophisticated macros for AOL chatrooms to disseminate biblical messages, remarkable technical innovations for that time period.

---

[22] About Biblical Greek: The New Testament was originally written in Koine Greek (κοινὴ διάλεκτος - koinē dialektos), the common language of the first-century Mediterranean world. Greek served as the vessel through which God (Θεός - Theos) chose to preserve His Word (λόγος - logos) for all nations (ἔθνη - ethnē). The Greek alphabet, from which our English letters derive (Alpha/Ἄλφα to A, Beta/Βῆτα to B, etc.), carries the foundational structure that underlies many modern alphabets. Understanding these original Greek terms connects readers directly to the precise meanings God intended in Scripture (γραφή - graphē), revealing layers of truth (ἀλήθεια - alētheia) that translation alone cannot fully convey. All δόξα (doxa - glory) goes to Θεός (Theos) through Ἰησοῦς Χριστός (Iēsous Christos) for preserving (autou - His) Word in its original form for accurate understanding.

13. He also has spent years studying biblical Greek in order to read, understand, and teach the revelations Θεός (Theos) has given him through Ἰησοῦς Χριστός (Iēsous Christos) to help others.

14. His religious expression focuses primarily on: (1) unique spiritual revelations founded in sincere biblical faith and interpretation, (2) institutional critique and commentary on social and political issues from a biblical viewpoint, (3) Bible messages relating to modern life and society, and (4) his own religious artwork and media. His theology compels him to speak against institutional corruption and to challenge powerful figures, in the tradition of biblical prophets.

15. Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google operates the dominant internet search engine, controlling approximately 89.2% of global search traffic and 94.9% of mobile search traffic in 2020, according to federal court findings.[23]

16. Google maintains substantial business operations in Virginia, serves millions of Virginia users, and derives significant revenue from Virginia residents and businesses. Google's search algorithms determine what information Virginia residents can access about religious topics, causing Google's content decisions to directly impact Virginia's residents and religious communities.

17. Google publicly represents itself as providing neutral, unbiased search results through its mission statement "to organize the world's information and make it universally accessible

---

[23] *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. Aug. 5, 2024).

and useful" -- a mission that federal courts noted Google uses to justify providing "many of its key services at no financial cost to Internet users"[24] -- where Google states that Google "Deliver[s] the most relevant and reliable information available"[25] and its "Honest Results" policy, which promises that "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships" and "ensures that you can trust Google Search to deliver the most relevant and reliable information."[26]  Claiming "no one can buy better placement in the Search results."[27] However, Google's suppression of biblical religious viewpoints while promoting Catholic institutional perspectives directly contradicts these public representations.

18. Google's documented pattern of suppressing religious content critical of institutional authority while promoting Catholic institutional perspectives through its exclusive Vatican partnership creates both antitrust violations and constitutional violations through denominational preference. Google's adjudicated monopoly status eliminates meaningful alternatives for content creators, enabling systematic viewpoint discrimination that would be impossible in competitive markets where users could access alternative search engines with different algorithmic approaches.

---

[24] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).
[25] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug 22, 2025).
[26] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug 22, 2025).
[27] Improving Search with rigorous testing, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/how-search-works/rigorous-testing/ (last visited Sept. 19, 2025).

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States, including the First Amendment, and other federal civil rights statutes. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity), as Plaintiff is a citizen of Virginia, Defendant is organized in Delaware with its principal place of business in California, and the amount in controversy exceeds $75,000.

20. This Court has personal jurisdiction over Defendant because Google conducts substantial and systematic business in Virginia, purposefully directs its search engine services at Virginia residents, systematically indexed Virginia-based religious content including Plaintiff's SpirituallySmart.com website and his social media pages (@t1the5th on X and https://www.facebook.com/SpirituallySmart/ and others on Facebook), and has caused injury to a Virginia resident through its monopolistic conduct and discriminatory practices affecting Virginia users, businesses, and the state's digital religious community.

**Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because:**

21. a. **Substantial acts occurred in this district**: Google's suppression of Mr. Richards' religious content directly impacts Virginia residents' access to religious information and violates Mr. Richards' constitutional rights in Virginia where he resides and conducts his online ministry.

b. **No contractual relationship exists**: Mr. Richards' claims arise from Google's unilateral monopolistic interference with his independent religious ministry. Plaintiff

never entered into any agreement with Google's search services; Google unilaterally

began indexing his content and then systematically suppressing it.

c. **Constitutional claims**: Direct First Amendment violations through government

entanglement and religious freedom claims permit venue where the constitutional

violations occurred and were suffered.

d. **Adjudicated monopolist conduct**: Google's systematic suppression of Mr. Richards'

religious content employs the same exclusionary mechanisms that federal courts found

constitute illegal monopolistic conduct, creating federal antitrust violations that permit

venue where the harm occurred.

e. **Virginia's Substantial Interest**: Virginia participated as a plaintiff in federal antitrust

litigation against Google and actively seeks "limit[s] to Google business practices to end

search engine monopoly,"[28] demonstrating Virginia's substantial regulatory interest in

Google's conduct affecting Virginia residents and businesses.

22. **Google cannot invoke forum selection clauses against Plaintiff because no
contractual relationship exists between the parties.** Google unilaterally chose to index
Mr. Richards' independent website and then weaponized its illegal search monopoly to
suppress his religious expression. Constitutional and antitrust violations permit suit where
harm occurred regardless of any purported contractual provisions.

---

[28] Press Release, Commonwealth of Va. Office of the Attorney Gen., Virginia, Justice Department Seek Limits to
Google Business Practices to End Search Engine Monopoly (Nov. 21, 2024), https://www.oag.state.va.us/media-
center/news-releases/2807-november-21-2024-virginia-justice-department-seek-limits-to-google-business-practices-
to-end-search-engine-monopoly.

## FACTUAL BACKGROUND

### A. Plaintiff's Independent Religious Ministry (2000-2009)

23. Around the year 2000, Mr. Richards created SpirituallySmart.com as his independent
    platform for sharing spiritual revelations from God—(Θεός (Theos) in the original
    Greek). These revelations encompass biblical messages, religious commentary, historical
    research, theological analysis, and his own artwork - all challenging institutional
    corruption from a biblical perspective.

24. Mr. Richards' ministry gained significant online attention through the early 2000s, with
    thousands of weekly visitors accessing his biblical content. His religious expression
    included documented research exposing institutional corruption, particularly regarding
    the Catholic Church's historical connections to Nazi escape networks and cover-ups of
    child sex-abuse scandals.

25. Mr. Richards' approach to religious ministry emphasizes direct biblical authority over
    institutional religious hierarchy. His theological perspective compels him to expose
    corruption and challenge powerful religious and governmental authorities, and therefore
    he is critical of institutional power structures.

26. His advocacy work has shown unusual compassion, which is a gift from God (Θεός -
    Theos) through Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) for His (αὐτός - autos)
    glory. In 2005, during the nationally significant Terri Schiavo case, Mr. Richards learned
    to use complex messaging ("spamming") software—known for its challenging
    interface—to reach decision-makers in an effort to save her life. His digital advocacy
    continued in 2013 when he created a Facebook page supporting Miriam Carey, an

unarmed young mother killed by DC police after making a wrong turn with her baby in the backseat. The page gained 30,000 followers, raising awareness for the case before he transferred the platform to the victim's sister to continue the advocacy. His unwavering faith guides his efforts, and he views his abilities and accomplishments merely as vehicles through which God's (Θεός - Theos') purpose is fulfilled and for which all glory (δόξα - doxa) goes to God (Θεός - Theos) through Christ (Χριστός - Christos).

27. Mastery of Biblical Greek for Scriptural Understanding and Accuracy - Mr. Richards has spent years in intensive study of biblical Greek, teaching himself the language to properly understand the scriptures in their original form. Through painstaking independent research using Greek lexicons and biblical materials, he has developed expertise that far exceeds what most people acquire through traditional university degrees. This Greek language mastery enables him to read, understand, and teach the revelations God (Θεός - Theos) has given him through Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) with accuracy and depth. His knowledge encompasses not only New Testament Greek but also understanding of the Septuagint as a superior Old Testament source compared to the Masoretic text.

28. Scholarly Biblical Research and Contemporary Analysis - Mr. Richards has authored the recent book #OvertPsyops, which combines his biblical wisdom with contemporary analysis to promote transparency about psychological influence operations in the digital age. His work demonstrates scholarly depth and analytical capability that rivals or exceeds traditional academic approaches.[29]

---

[29] Richards' revelations from God (Θεός – Theos) provide insights unavailable through conventional educational paths. All glory (δόξα - doxa) for his understanding goes to Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) and God

29. Continuing through 2008, Mr. Richards' website appeared prominently in Google search results for relevant topics, allowing his biblical message to reach a growing audience seeking alternative perspectives on Christianity and institutional accountability.

**B. The 2009 Triggering Event: Vatican-Google Partnership and Systematic Biblical Suppression**

30. In January 2009, the Vatican launched its YouTube channel through a special partnership with Google, becoming the first and only religious institution in Google's 20-year history to receive such exclusive preferential treatment. Google's Managing Director of European Sales personally attended the Vatican's press conference to announce this unique collaboration.[30] The YouTube executive described it as a "landmark announcement" and explicitly confirmed it was "the first ever global religious institution to partner with YouTube."[31] This exclusive partnership established a pattern of Vatican-Google coordination that would systematically exclude and suppress biblical religious expression challenging Catholic institutional authority.

31. The Independent Article and Immediate Retaliation: In 2009, *The Independent* published an article about the Vatican's YouTube launch that specifically mentioned Mr. Richards' work, stating: "Type 'Vatican' into YouTube's search engine and... the second [result] argues that 'Nazi Germany was a creation of the Vatican and the Jesuits'. Now the Vatican

---

(Θεός - Theos) our Father (Πατήρ - Patēr), THE Word (ὁ λόγος - ho logos) who opens the mind to understand all things.
[30] Vatican Going Digital with YouTube Channel, SPOKESMAN-REV. (Jan. 24, 2009),
https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.
[31] Pope Channel Makes Debut on YouTube, CATH. NEWS AGENCY,
https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.

has the means to fight back."[32] Upon information and belief, following this prominent
media attention that highlighted Mr. Richards' biblical research exposing Vatican
institutional corruption, his content experienced an abrupt and dramatic decline in search
visibility across all Google properties that cannot be explained by organic user behavior.
The suppression occurred simultaneously across Google Search, YouTube, and related
services, demonstrating coordinated intervention.[33]

32. Google Alerts Manipulation: Upon information and belief based on observable patterns
and statistical analysis, Google's suppression extends beyond search results to include
manipulation of Google Alerts, preventing users from receiving notifications about Mr.
Richards' content. Despite Mr. Richards' 25-year internet presence and established online
ministry, Google Alerts for "Tommy Richards" consistently prioritize much younger, less
established individuals with minimal online presence—including an assistant college
baseball coach (with 2,602 followers on X[34]) and an alleged Meta employee who handles
press releases[35]—over Mr. Richards' extensive religious content and biblical research.
Google's preference for individuals with no comparable online history or relevance
demonstrates Google's complete and thorough effort to obscure Mr. Richards' digital
identity and prevent organic discovery of his biblical ministry, even by users specifically
seeking information about him.

---

[32] The Independent, "Vatican launches YouTube channel," available at
https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.
[33] Thomas Richards, Censorship Documentation, SPIRITUALLYSMART.COM,
https://spirituallysmart.com/censorship.html.
[34] https://x.com/tommyrich27?lang=en
[35] https://www.publishersweekly.com/pw/by-topic/digital/copyright/article/98093-meta-wins-ai-copyright-case-but-
judge-writes-roadmap-for-authors-revenge.html

33. Upon information and belief, Google's suppression extends to deliberate manipulation of search results about Mr. Richards' social media presence. When users search Google for information about his legal cases regarding his internet censorship, Google prominently displays posts from his automated X (Twitter) bot accounts—which have fewer than 20 followers and were created only 7 months ago (January 2025)—while completely hiding posts on the same topic from his established main account @tlthe5th. His main account was created in 2009, has over 75,000 posts spanning 16 years of activity, and maintains approximately 3,500+ followers, yet it remains completely invisible in identical Google searches. For example, when searching "3 25 cv 916 ndtx" (his X Corp. lawsuit case number), Google prominently displays posts from his obscure bot accounts while his main @tlthe5th account—which posts extensively about the same legal case—never appears in Google search results. This shows Google's coordinated algorithmic manipulation designed to obscure Mr. Richards' established digital identity by promoting irrelevant bot content over his genuine, established social media presence.[36]

34. **Cross-Platform Suppression:** This systematic suppression is part of a broader pattern evidenced by Plaintiff's parallel litigation in the Northern District of Texas against X Corp., Trump, and former X CEO Linda Yaccarino[37] for similar shadowbanning practices. This shows that the coordinated cross-platform religious discrimination spans multiple tech platforms.

---

[36] Compare Google Search Results for "3:25 cv 916 ndtx," GOOGLE, https://www.google.com/search?q=3%3A25+cv+916+ndtx (last visited Aug. 19, 2025), with Google Search Results for "ndtx 3:25 cv 916 @tlthe5th," GOOGLE, https://www.google.com/search?q=ndtx+3%3A25+cv+916+%40tlthe5th (last visited Aug. 19, 2025).
[37] See Richards v. X Corp & Trump, No. 3:25-cv-00916 (N.D. Tex. filed Apr. 13, 2025); Richards v. Yaccarino, No. 3:25-cv-01863 (N.D. Tex. filed July 16, 2025).

35. Monopoly Power Eliminates User Alternatives: Google's systematic manipulation of search results and alerts is enabled by its adjudicated illegal monopoly status. Users seeking information about "Tommy Richards" cannot simply use alternative search engines because Google controls 89.2% of general search services and 94.9% of mobile search, meaning Google's discriminatory results effectively control what information the public can access about Richards' religious ministry.

## C. Google as Vatican AI Authority: Leading the Global "Algorethics" Framework

36. Google's 2009 partnership was not an isolated business relationship but the foundation for an expanding coordination that would ultimately position Google as the secret architect of Vatican AI control. Eric Schmidt's 2016 promise to Pope Francis—"I want to work with you to make these points... We will make it happen"—represented Google's commitment to implement comprehensive content suppression aligned with Vatican messaging priorities.[38]

37. Google's Leadership in Vatican AI Strategy and Systematic Institutional Bias: Google's coordination with Vatican AI initiatives predates and underlies the public "Rome Call for AI Ethics." Demis Hassabis, co-founder of Google DeepMind, attended the Vatican's foundational 2016 workshop on "Power and Limits of Artificial Intelligence," establishing Google as the primary technology partner in developing what would become the Vatican's "algorethics" framework alongside self-proclaimed atheist Stephen

---

[38] Pope Francis Meets with Google Executive Eric Schmidt, ROME REP. (Jan. 15, 2016), https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.

Hawking.[39] This foundational relationship culminated in Pope Francis appointing

Hassabis to the prestigious Pontifical Academy of Sciences in March 2024—an

unprecedented honor for a tech executive in the Academy's 421-year history.[40]

38. The Vatican's Pattern of Embracing All Viewpoints Except Bible-based Criticism: The

Pontifical Academy systematically welcomes atheists, with "religious belief – Catholic or

otherwise – not a criterion for membership," including "self-proclaimed atheist" Stephen

Hawking and other non-Catholic scientists, while the Academy is explicitly "non-

sectarian in its choice of members."[41] Meanwhile, the Vatican's Pontifical Biblical

Commission officially condemns "fundamentalist interpretation" as "naively literalist"

and explicitly rejects biblical approaches that oppose "the use of the historical-critical

method, as indeed to the use of any other scientific method for the interpretation of

Scripture," showing the Vatican's systematic alliance with secular academic perspectives

while suppressing traditional biblical scholarship that challenges Vatican institutional

authority.[42]

39. The "Rome Call" as Global Religious Coalition Strategy: The Vatican's 2020 "Rome Call

for AI Ethics," which created the term "algorethics" to describe Vatican control over AI

development, represents a comprehensive strategy uniting diverse religious and secular

---

[39] Stephen Hawking and other experts weigh in on limits of artificial intelligence at the Vatican, CATH. NEWS AGENCY (Dec. 4, 2016), https://www.catholicnewsagency.com/news/35022/stephen-hawking-and-other-experts-weigh-in-on-limits-of-artificial-intelligence-at-the-vatican.
[40] Google AI expert named to Pontifical Academy of Sciences, ALETEIA (Mar. 12, 2024), https://aleteia.org/2024/03/12/google-ai-expert-named-to-pontifical-academy-of-sciences/.
[41] Why famed atheist Stephen Hawking is on a pontifical academy, CATH. NEWS AGENCY (May 16, 2025), https://www.catholicnewsagency.com/news/35014/why-famed-atheist-stephen-hawking-is-on-a-pontifical-academy; Pontifical Academy of Sciences - Index, VATICAN, https://www.vatican.va/roman_curia/pontifical_academies/acdscien/index.htm.
[42] Pontifical Biblical Commission, Interpretation of the Bible in the Church, §F, https://www.ewtn.com/catholicism/library/interpretation-of-the-bible-in-the-church-2319.

perspectives under Vatican technological authority. While Microsoft, IBM, Cisco, and Qualcomm formally signed agreements submitting to this papal guidance,[43] Google's relationship operates at a deeper level—as the primary architect rather than mere signatory of Vatican AI control strategy.

40. Multi-Religious Expansion Under Vatican Leadership: The Vatican expanded its AI control strategy in July 2024 by securing signatures with "Eleven world religions, sixteen new signatories, thirteen nations in attendance, more than 150 participants" in Hiroshima, Japan, with the Vatican stating: "The Pew Research Center reports that 85 percent of the world's population identifies with a religious tradition. Leaders representing all major religions have signed the Rome Call for AI Ethics. This makes the Rome Call platform representative of most people on the planet."[44] This demonstrates the Vatican's success in building international coalitions—including atheists and all world religions—to support its technological authority while systematically suppressing biblical religious expression that challenges Catholic institutional corruption.

41. The Vatican's Embrace of Secular Scientific Frameworks: This is nothing new. The Vatican has historically originated and promoted scientific theories that serve secular rather than biblical worldviews, including the "Big Bang theory" developed by Catholic priest Georges Lemaître in 1927, which provides atheists with arguments against creation by God (Θεός – Theos).[45] The atheist astronomer Fred Hoyle coined the term "Big Bang" specifically because "he didn't want Creation to have a beginning, and with it, the

---

[43] Rome Call for AI Ethics, VATICAN PONTIFICAL ACAD. FOR LIFE, https://www.romecall.org/.
[44] Press Release, Vatican, AI Ethics for Peace (July 10, 2024),
https://press.vatican.va/content/salastampa/en/info/2024/07/10/240710a.html.
[45] When religion (Pope Francis) met science (Stephen Hawking), ALETEIA (Dec. 3, 2016),
https://aleteia.org/2016/12/03/when-religion-pope-francis-met-science-stephen-hawking/.

implication of a Creator," demonstrating how Vatican-originated theories serve secular rather than biblical religious perspectives.[46]

42. Pope Francis explicitly endorsed evolutionary theory, stating: "Evolution in nature does not conflict with the notion of Creation, because evolution presupposes the creation of beings who evolve," directly contradicting biblical creation accounts that genuine biblical believers hold as literally true.[47] This demonstrates the Vatican's systematic accommodation of secular scientific frameworks that contradict biblical authority while suppressing religious expression that challenges institutional corruption through biblical literalism.

43. Systematic Biblical Suppression Through "Algorethics": Google's implementation of Vatican-aligned "algorethics" has resulted in coordinated suppression of Mr. Richards' biblical criticism of Catholic institutional corruption while Catholic perspectives, atheistic viewpoints, and multi-religious coalitions receive boosting of their content. This coordination creates governmental endorsement of institutional religion over biblical religious authority through what federal courts found to be Google's role as "a monopolist" that has "revolutionized how we live" and serves as "the first place that you can turn to" for "the vast majority of your information needs."[48] Google's AI systems demonstrate systematic religious bias aligned with Vatican interests, where search results promote Catholic institutional perspectives while suppressing biblical criticism of the same institutions. This AI-powered discrimination operates under the Executive Order

---

[46] A Big Bang was Not the Beginning, VATICAN OBSERVATORY (Jan. 31, 2024), https://www.vaticanobservatory.org/sacred-space-astronomy/a-big-bang-was-not-the-beginning/.
[47] When religion (Pope Francis) met science (Stephen Hawking), ALETEIA (Dec. 3, 2016), https://aleteia.org/2016/12/03/when-religion-pope-francis-met-science-stephen-hawking/.
[48] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16, 203.

"Preventing Woke AI in the Federal Government,"[49] which mandates that AI systems
used by government contractors comply with government-specified "neutrality"
standards, creating direct government involvement in algorithmic religious
discrimination.

44. The Vatican's digital control strategy has reached its apex with Pope Leo XIV, the first
American pope, who has explicitly positioned himself as the global authority over
artificial intelligence, emphasizing: "The Church offers to everyone the treasury of her
social teaching, in response to another industrial revolution and to developments in the
field of artificial intelligence."[50] Pope Leo XIV has explicitly committed to continuing
this institutional framework, demonstrating continuity in the Vatican's systematic
accommodation of secular theories while suppressing biblical literalism that challenges
institutional authority.

45. The Pattern of Denominational Discrimination: This systematic partnership with atheists
and all world religions while suppressing biblical criticism creates impermissible
denominational preference in violation of the Establishment Clause, demonstrating
constitutional violations that require both injunctive relief and substantial damages to
restore religious liberty in the digital public square.

46. The True Partnership Structure and Constitutional Violations: Unlike other technology
companies that publicly submitted to Vatican AI authority through Rome Call signatures -
- upon information and belief -- Google operates as the Vatican's primary technology

---

[49] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.
[50] Pope Leo XIV outlines his vision for the papacy, CBS NEWS (May 10, 2025),
https://www.cbsnews.com/news/pope-leo-xiv-lays-out-vision-papacy-artificial-intelligence/.

partner and co-architect of global AI ethics frameworks. This deeper coordination enables

systematic suppression of biblical religious expression that challenges Catholic

institutional authority while promoting atheistic, multi-religious, and institutional

Catholic perspectives—precisely the type of coordinated censorship that federal courts

found enables Google to "censor and deplatform American voices" through its illegal

monopoly power.[51] The exclusive 2009 YouTube partnership, followed by foundational

AI workshop participation, Eric Schmidt's personal Vatican commitment, and Hassabis's

unprecedented Academy appointment establish a pattern of preferential institutional

access that no other technology company has received.

47. Government Coordination Through Compartmentalized Strategy: The evidence suggests

coordinated government strategy where public-facing agencies (DOJ antitrust) create

appearance of opposing Google to maintain public legitimacy while intelligence agencies

(CIA/NSA) simultaneously coordinate with Google for surveillance and content control,

enabling systematic suppression of constitutional rights under cover of apparent

government oversight. Google's origins trace directly to CIA and NSA research grants for

mass surveillance, with the "Massive Digital Data Systems (MDDS) project" funding

Stanford researchers Sergey Brin and Larry Page to develop search technology for

intelligence community use.[52] NSA programs like PRISM directly access Google's data

---

[51] United States v. Google LLC, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025); Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.

[52] Google's true origin partly lies in CIA and NSA research grants for mass surveillance, QZ, https://qz.com/1145669/googles-true-origin-partly-lies-in-cia-and-nsa-research-grants-for-mass-surveillance.

systems, demonstrating ongoing government coordination with Google's information
control mechanisms.[53]

48. However, even if this compartmentalized coordination strategy coordination is
coincidental rather than intentional, the structural entanglement between government
agencies and Google's operations creates constitutional violations where Google's
Vatican-coordinated suppression of biblical religious expression operates through
government intelligence infrastructure, transforming private content moderation into state
action subject to First Amendment constraints regardless of the specific coordination
mechanisms involved.

49. The Vatican-Google Coordination Timeline: The systematic suppression of Mr. Richards'
biblical content follows a clear chronological pattern of Vatican-Google coordination: (a)
January 2009: Vatican launches exclusive YouTube partnership, becoming the only
religious institution in Google's history to receive such preferential treatment; (b) 2009:
The Independent highlights Mr. Richards' Vatican-critical content as second result for
"Vatican" searches, followed by immediate suppression across Google properties; (c)
January 2016: Eric Schmidt promises Pope Francis "We will make it happen" regarding
Vatican messaging priorities; (d) October 2021: Pope Francis demands tech censorship
"in the name of God"; (e) 2024-2025: Trump's Religious Liberty Commission endorses
Catholic Cardinal Timothy Dolan and Bishop Robert Barron while Google continues
systematic suppression of biblical criticism of the same institutions.

---

[53] PRISM, WIKIPEDIA, https://en.wikipedia.org/wiki/PRISM.

50. Government Entanglement Creating State Action: Google's systematic suppression of Mr. Richards' religious content operates through government coordination that creates state action under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). As the Supreme Court established in *Norwood v. Harrison*, "a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." 413 U.S. 455, 465 (1973).

51. Google's content moderation systems operate under Executive Order "Preventing Woke AI in the Federal Government"[54] mandates requiring compliance with government-specified "neutrality" standards through federal contracting relationships, while simultaneously implementing Vatican "algorethics" frameworks through Google's exclusive 2009 Vatican partnership and Vatican officials' appointments to Google leadership positions. Trump's Religious Liberty Commission[55] endorses the same Catholic institutional authorities that receive preferential treatment in Google's search algorithms, creating coordinated government-private religious discrimination that violates *Norwood's* prohibition against using private entities to accomplish unconstitutional objectives. This pervasive operational integration of federal AI policy coordination and institutional religious partnerships creates the "entwinement" that transforms Google's content decisions into state action subject to constitutional constraints.

## D. 16 Years of Escalating Religious Suppression (2009-2025)

---

[54] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

[55] Cardinal Dolan, Bishop Barron to Serve on Trump's New Religious Liberty Commission, NAT'L CATH. REG. (May 1, 2025) (Tyler Arnold), https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission.

52. From 2009 to present, Google has systematically suppressed Mr. Richards' religious content through multiple sophisticated mechanisms: a. Search Result Manipulation: Removing or drastically reducing visibility of SpirituallySmart.com and Mr. Richards' social media accounts (X/Twitter, Facebook, YouTube, etc.) in search results for relevant religious topics b. Algorithmic Throttling: Systematically reducing organic discovery of his content despite its relevance and quality c. Google Alert Suppression: Extending beyond search results to include manipulation of Google Alerts (automated emails users subscribe to on a certain search term), preventing users from receiving notifications about Mr. Richards' content, including boosting other generally unknown individuals named Tommy or Thomas Richards, who in some cases may even be fictitious individuals, **to** obscure Mr. Richards in the search results. d. Cross-Platform Coordination: Coordinated suppression across Google Search, YouTube, and related properties e. Competitive Advantage Denial: Preventing normal search engine optimization benefits available to other religious content creators.

53. Statistical Evidence of Suppression: Statistical analysis suggests systematic rather than organic suppression: Mr. Richards' website, which previously received close to a thousand visitors per day, now receives virtually no traffic from Google searches despite maintaining very high-quality, relevant biblical and other relevant content. This decrease happened shortly after the article in The Independent and has continued to intensify over the 16-year period. Even his X account, where he is extremely active posting both biblical content and prolific original artwork that is described as highly creative and visually appealing, has virtually no presence in Google searches and alerts. Independent verification confirms this suppression pattern is artificial rather than organic.

54. Pattern Recognition: The suppression specifically targets Mr. Richards' biblical critique of institutional corruption while Catholic institutional content receives normal algorithmic treatment, demonstrating viewpoint-based rather than content-neutral restriction.

55. Monopoly Infrastructure Enables Systematic Suppression: The Vatican-Google coordination operates through Google's monopolistic control of essential information infrastructure that federal courts found serves as "the first place that you can turn to" for "the vast majority of your information needs."[56] This monopoly control transforms private religious partnerships into systematic suppression of competing religious viewpoints because users have no meaningful alternative pathways to discover biblical criticism of institutional authority.

**E. Google's Adjudicated Illegal Monopoly Status**

56. August 5, 2024 Federal Court Ruling: U.S. District Judge Amit Mehta ruled that "Google is a monopolist, and it has acted as one to maintain its monopoly" in violation of Section 2 of the Sherman Act. The court found Google "enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices."[57]

57. Essential Infrastructure Control: Federal courts found that Google operates essential information infrastructure, serving as "the first place that you can turn to" for "the vast majority of your information needs."[58] Google's monopoly control over this essential infrastructure enables systematic religious discrimination because users have no

---

[56] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 16.
[57] *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024).
[58] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 16.

comparable alternatives for discovering religious content online. This infrastructure control transforms private editorial decisions into systematic suppression of constitutional rights.

58. April 17, 2025 Second Federal Ruling: A second federal court ruled that Google established and maintained its monopoly power in advertising technology markets through anticompetitive practices. Assistant Attorney General Abigail Slater stated: "Google's unlawful dominance allows them to censor and deplatform American voices."[59] Attorney General Pamela Bondi further characterized the ruling as "a landmark victory in the ongoing fight to stop Google from monopolizing the digital public square," emphasizing the Department's commitment to "taking bold legal action to protect the American people from encroachments on free speech and free markets by tech companies."[60] The April 2025 court provided the legal framework for understanding this censorship, finding that Google uses "exclusionary conduct [that] substantially harmed Google's publisher customers" and creates "artificial technical limitations that made it harder for customers to do business with rivals," precisely describing the mechanisms Google uses to suppress Mr. Richards' biblical religious expression.[61]

59. DOJ Remedial Actions: The Department of Justice is seeking structural remedies including potential breakup of Google's business units, data sharing requirements, and prohibition of exclusive agreements that maintain Google's monopoly power.[62] Notably,

---

[59] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Department of Justice Prevails in Landmark Antitrust Case Against Google (Apr. 17, 2025), https://www.justice.gov/opa/pr/department-justice-prevails-landmark-antitrust-case-against-google.
[60] *Id.*
[61] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).
[62] U.S. Dep't of Just., Antitrust Div., *Proposed Final Judgment and Remedies in United States v. Google LLC*, Case No. 1:20-cv-03010 (D.D.C. filed Oct. 8, 2024), available at https://www.justice.gov/atr/case/us-and-plaintiff-states-v-google-llc.

the DOJ has maintained its structural remedies proposals -- which began under the Biden administration – and continues under the Trump administration, showing continuity across administrations in pursuing Google breakup as a remedy.

60. Virginia's Participation: The Virginia Attorney General joined the federal antitrust case against Google and is actively seeking "limits to Google business practices to end search engine monopoly,"[63] demonstrating Virginia's strong public policy interest in addressing Google's monopolistic conduct.

61. Google's Systematic Publisher Revenue Manipulation: The April 2025 federal court ruling established that Google uses its monopoly power to systematically "reduc[e] publisher revenue"[64] and "manipulat[e] auction rules and restrict customer choice in markets in which the firm had monopoly power."[65] The court found that Google's "exclusionary conduct substantially harmed Google's publisher customers" by creating "artificial technical limitations that made it harder for customers to do business with rivals,"[66] establishing the precise mechanisms through which Google suppresses content creators whose materials challenge institutional authority.[67] The court found this revenue manipulation occurs through systematic "manipulat[ion of] auction rules and restric[tion of] customer choice in markets in which the firm had monopoly power."[68]

---

[63] Press Release, Va. Off. of the Att'y Gen., Virginia, Justice Department Seek Limits to Google Business Practices to End Search Engine Monopoly (Nov. 21, 2024), https://www.oag.state.va.us/media-center/news-releases/2807-november-21-2024-virginia-justice-department-seek-limits-to-google-business-practices-to-end-search-engine-monopoly.

[64] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 108 (E.D. Va. Apr. 17, 2025).

[65] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 111 (E.D. Va. Apr. 17, 2025).

[66] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).

[67] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).

[68] *United States v. Google LLC*, Case No. 1:23-cv-108 slip op. at 111 ((E.D. Va. Apr. 17, 2025).

62. Monopoly Power Enables Systematic Discrimination: Google's adjudicated monopoly status directly enables the religious discrimination documented herein. As federal courts found, Google's monopoly power allows it to systematically "reduc[e] publisher revenue" and create "artificial technical limitations that made it harder for customers to do business with rivals."[69] Google's 89.2% search market share means content creators like Richards have no viable alternatives when Google systematically suppresses their content - users cannot simply switch to competing search engines because none have comparable reach or influence.

63. Despite federal courts finding Google operates as an illegal monopolist that "substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web,"[70] Google continues to falsely represent that it provides neutral search results. Google's "Honest Results" policy explicitly promises "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships, including advertising or unrelated business partnerships"[71] and claims this "ensures that you can trust Google Search to deliver the most relevant and reliable information."[72] These representations are demonstrably false, as Google provides systematic preferential treatment to Catholic institutional perspectives while suppressing biblical religious viewpoints through its documented Vatican partnerships.

---

[69] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99 (E.D. Va. Apr. 17, 2025).
[70] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).
[71] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 11, 2025).
[72] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 11, 2025).

**F. Government Entanglement Creating Constitutional Violations**

64. Structural Government Coordination Regardless of Antitrust Status: Whether through
coordinated strategy or structural necessity, Google's systematic suppression operates
through government entanglement that transforms private content moderation into state
action subject to constitutional constraints. Even as federal courts prosecute Google's
monopolistic conduct, parallel government dependencies on Google's infrastructure for
surveillance and information control create constitutional violations that require First
Amendment analysis rather than purely antitrust remedies. Google's systematic
suppression of Mr. Richards' biblical religious expression operates through documented
government coordination that transforms private business decisions into direct
constitutional violations, operating through multiple sophisticated channels that discovery
will fully reveal.

65. Vatican-Government-Tech Alliance: The suppression occurs within a coordinated
framework where the Vatican is allied with the US government. This includes: a.
Institutional Religious Preference: Trump's Religious Liberty Commission explicitly
endorses Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian"
representatives[73] while Google systematically suppresses bible-based criticism of the
same Catholic institutions, creating governmental denominational preference
implemented through monopolistic search control. b. Direct Vatican-Google

---

[73] Cardinal Dolan, Bishop Barron to Serve on Trump's New Religious Liberty Commission, NAT'L CATH. REG.
(May 1, 2025) (Tyler Arnold), https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-
new-religious-liberty-commission.

Coordination: Eric Schmidt's 2016 promise to Pope Francis "We will make it happen"[74] followed by the Pope's explicit 2021 demand for tech censorship "in the name of God"[75] establishes coordinated suppression of religious viewpoints challenging Vatican authority.

c. Government Coordination Framework for Content Control: Executive Order 14179 "Removing Barriers to American Leadership in Artificial Intelligence" establishes comprehensive federal coordination with private AI development, creating direct government involvement in the algorithmic systems Google uses for content moderation.[76]

66. Recent ICE-Google Coordination for Political Surveillance: Google's systematic cooperation with government content surveillance extends to direct political targeting of activists. In September 2025, *The Intercept* revealed that Google "handed over Gmail account information to ICE before notifying the student or giving him an opportunity to challenge the subpoena" targeting pro-Palestine student activist Amandla Thomas-Johnson.[77] Google complied with ICE administrative subpoenas seeking "basic subscriber information, such as the name, address, and phone number associated with the account" for political activists, demonstrating Google's operational integration with federal agencies for systematic surveillance of protected political and religious speech. This coordination operates through "broad legal provision[s] that give immigration

---

[74] Pope Francis Meets with Google Executive Eric Schmidt, ROME REP. (Jan. 15, 2016), https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.

[75] Mark A. Kellner, Pope Francis Begs Social Media Firms to Block Fake News 'In the Name of God', WASH. TIMES (Oct. 19, 2021), https://www.washingtontimes.com/news/2021/oct/19/pope-francis-begs-social-media-firms-block-fake-ne/.

[76] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

[77] Shawn Musgrave, Google Secretly Handed ICE Data About Pro-Palestine Student Activist, THE INTERCEPT (Sept. 16, 2025), https://theintercept.com/2025/09/16/google-ice-subpoena-palestine-student/.

officers authority to demand documents" without judicial oversight, creating the

infrastructure through which Google implements government-directed suppression of

religious and political viewpoints challenging institutional authority.[78]

67. This coordination violates the fundamental principle established in *Norwood v. Harrison*

that "a state may not induce, encourage or promote private persons to accomplish what it

is constitutionally forbidden to accomplish." 413 U.S. 455, 465 (1973). The government

cannot achieve indirectly through Google's Vatican-coordinated algorithmic suppression

what it is constitutionally prohibited from doing directly—systematically suppressing

biblical religious expression while promoting institutional Catholic perspectives. As

*Norwood* held, "a State may not grant the type of tangible financial aid if that aid has a

significant tendency to facilitate, reinforce, and support private discrimination," and here

the government's coordination with Google's content moderation creates the same

constitutional violation through technological aid (assistance).

68. Direct Government-Google Content Coordination Through DHS/FBI Programs: Leaked

Department of Homeland Security documents also reveal systematic coordination

between federal agencies and Google for content moderation and "takedown requests."

DHS established formal processes where government officials directly flag content on

Google properties for suppression, with meetings occurring "every two weeks" since

2020 to coordinate "Intelligence Community activities to counter disinformation."[79] FBI

officials expressed concern that tech companies were not sufficiently accountable to the

---

[78] *Id.*

[79] Ken Klippenstein & Lee Fang, DHS Leaks Reveal Coordination with Twitter, Facebook, & Others for 'Content
Moderation,' 'Takedown Requests', THE INTERCEPT (Oct. 31, 2022), https://theintercept.com/2022/10/31/social-
media-disinformation-dhs/.

government, with FBI official Laura Dehmlow stating "we need a media infrastructure that is held accountable."[80]

69. Formalized Government Censorship Portal: Google operates a "content request system" that "requires a government or law enforcement email to use," allowing government officials to directly submit content for throttling or suppression through a special portal system.[81] This demonstrates that Google's content moderation operates under direct government influence rather than independent editorial decisions, transforming private content moderation into state action subject to First Amendment constraints.

70. Systematic Government-Directed Content Suppression: The coordination resulted in systematic suppression where "of nearly 4,800 flagged items, technology platforms took action on 35 percent— either removing, labeling, or soft-blocking speech," demonstrating that government entities can reliably trigger content suppression across Google's platform through coordinated flagging.[82] This coordination specifically targeted content regarding "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine."[83] And DHS discussed "countering disinformation relating to content that undermines trust in financial systems and courts."[84]

71. Content-Based Suppression Under *Reed v. Town of Gilbert*: Under *Reed v. Town of Gilbert*, government regulation is content-based when it "applies to particular speech

---

[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*

because of the topic discussed or the idea or message expressed." 576 U.S. 155, 163

(2015). Google's algorithmic suppression targets biblical religious content based precisely

on its theological message and scriptural source material, making it a paradigmatic

content-based restriction subject to strict scrutiny. As *Reed* established, such content-

based restrictions are unconstitutional "regardless of the government's benign motive,

content-neutral justification, or lack of animus toward the ideas contained in the regulated

speech."[85] The defendants' claims of AI neutrality cannot transform this facially content-

based suppression into content-neutral regulation. *Reed* further held that "innocent

motives do not eliminate the danger of censorship presented by a facially content-based

statute, as future government officials may one day wield such statutes to suppress

disfavored speech."[86]

72. Current Administration's Contradictory Religious Coordination: Despite claims of ending

government content coordination, the current administration maintains contradictory

policies that demonstrate continued government religious preference and create multiple

layers of constitutional entanglement. While Executive Order "Preventing Woke AI in the

Federal Government" purports to eliminate ideological bias in AI systems,[87] and

Executive Order " Eradicating Anti-Christian Bias" prohibits federal agencies from

discriminating against Catholic viewpoints and viewpoints favored by the Trump

Administration,[88] the administration simultaneously: (1) established a Religious Liberty

Commission that explicitly endorses Catholic Cardinal Timothy Dolan and Bishop Robert

---

[85] *Reed v. Town of Gilbert* 576 U.S. at 165.(2015)
[86] *Id.*
[87] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.
[88] Executive Order, Eradicating Anti-Christian Bias (Feb. 6, 2025), https://www.whitehouse.gov/presidential-
actions/2025/02/eradicating-anti-christian-bias/.

Barron as "Christian" representatives,[89] creating governmental denominational

preference; (2) continues operating the same government content coordination

infrastructure that enables Google's systematic suppression of biblical religious criticism;

and (3) continues significant federal contracting relationships with Google—including a

major April 2025 General Services Administration agreement securing Google

Workspace for all federal agencies[90] and a $200 million Defense Department AI

contract[91]—despite documented anti-Christian algorithmic bias; this creates a framework

where the government officially prohibits religious discrimination while simultaneously

enabling and financially supporting the very platform that systematically suppresses Mr.

Richards' biblical expression in favor of Catholic institutional perspectives that the

government's own Religious Liberty Commission officially promotes.

### **Government-Platform Content Coordination and the Executive Order Preventing Woke AI**:

73. Government coordination with tech platforms on content moderation has been

documented through FCC Chairman Brendan Carr's direct communications with Apple,

Google, Meta, and Microsoft CEOs regarding their content policies, establishing that

government agencies actively coordinate with platforms on speech-related decisions

---

[89] Cardinal Dolan, Bishop Barron to Serve on Trump's New Religious Liberty Commission, NAT'L CATH. REG.
(May 1, 2025), https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission.
[90] Press Release, U.S. Gen. Servs. Admin., GSA Secures Cost Savings Through Strategic Agreement with Google
(Apr. 10, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-secures-cost-savings-through-strategic-agreement-with-google-04102025.
[91] Google for All Government Business, NEXTGOV (June 2025),
https://www.nextgov.com/acquisition/2025/06/google-all-government-business/405769/.

regardless of the specific policy direction.[92] This pattern of government-platform

coordination on content issues was formalized through Executive Order "Preventing

Woke AI in the Federal Government," which mandates that private AI companies seeking

federal contracts must ensure their large language models comply with government-

specified "Unbiased AI Principles," creating direct government involvement in the

algorithmic content moderation systems of companies like Google.[93]

74. The Executive Order also requires that "LLMs shall be neutral, nonpartisan tools that do

not manipulate responses in favor of ideological dogmas" and prohibits developers from

"intentionally encod[ing] partisan or ideological judgments into an LLM's outputs,"

effectively mandating government control over private AI content decisions.[94] However,

the determination of what constitutes "unbiased" or "neutral" content (certainly including

avoiding "woke" content) necessarily reflects the ideological perspective of the

government officials making such determinations, meaning that AI systems must

conform to government-approved viewpoints rather than achieving genuine neutrality.

More troubling, this approach represents a form of Orwellian control where the

government mandates ideological conformity while deceptively claiming to require only

"neutrality," creating a system of thought control disguised as objectivity that is far more

insidious than direct government censorship.

---

[92] FCC commissioner announces probe into Big Tech, 'NewsGuard' fact-checking platform: 'Censorship cartel', FOX
NEWS (Nov. 18, 2024), https://www.foxnews.com/media/fcc-commissioner-probe-big-tech-newsguard-fact-
checking-censorship-cartel.
[93] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.
[94] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

75. The Executive Order also mandates that Federal agencies must "include in each Federal contract for an LLM entered into following the date of the OMB guidance...terms requiring that the procured LLM comply with the Unbiased AI Principles," with "decommissioning costs...charged to the vendor in the event of termination by the agency for the vendor's noncompliance."[95]

76. Taken together, these various aspects of the Executive Order create a comprehensive framework where Google's Vatican-aligned suppression of biblical religious expression operates through government-mandated algorithmic standards rather than purely private editorial decisions, transforming private content moderation into state action subject to First Amendment constraints. Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, this coordination creates the "pervasive entwinement" where private actors performing governmental functions become subject to constitutional constraints. Google's AI systems simultaneously implement federal AI policy coordination and Vatican "algorethics" frameworks through identical technological infrastructure, creating the operational integration that *Brentwood Academy's* entwinement framework requires to establish state action.

77. Algorithmic Prior Restraint Through Government Coordination: This automated pre-publication suppression operates through the same government-coordinated AI frameworks that implement Vatican "algorethics" standards, creating systematic prior restraint of religious viewpoints. As the Supreme Court held in *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963), "Any system of prior restraints of expression comes to this Court

---

[95] Executive Order, Preventing Woke AI in the Federal Government (July 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/preventing-woke-ai-in-the-federal-government/.

bearing a heavy presumption against its constitutional validity," and such systems are tolerated only "where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint." Google's algorithmic suppression lacks these essential procedural safeguards while achieving the same censorship results that *Bantam Books* condemned, where "informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief."

78. Critical Infrastructure Under Government Control: Federal courts have established that "for more than 15 years, one general search engine has stood above the rest: Google," which "receives nine times more queries each day than all of its rivals combined" and serves as "the first place that you can turn to" and "a place that you go to for the vast majority of your information needs" for Americans seeking information.[96] This is infrastructure that government entities systematically influence through regulatory pressure, exclusive partnerships, and coordinated policy implementation. When government actors direct this essential infrastructure to suppress biblical religious viewpoints while promoting institutional Catholic perspectives through Vatican partnerships, Google's actions constitute direct constitutional violations rather than private editorial decisions.

79. Evidence Requiring Discovery: The full scope of government-Google coordination requires discovery of:

- Internal communications between Google and government entities regarding religious content suppression

---

[96] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 16-17, 34.

- Records of Vatican coordination with US government officials about content moderation policies

- Documentation of regulatory pressure and preferential treatment arrangements

- AI training data showing government influence over religious content censorship by people or algorithms

- Financial arrangements and government contracts creating dependency relationships

This creates government entanglement sufficient to trigger First Amendment constraints on Google's content moderation decisions regarding religious expression.

80. Public Function Doctrine: Google's search operations constitute performance of a traditional public function, satisfying the public function test for state action under *Marsh v. Alabama*, 326 U.S. 501 (1946). Federal courts have found that Google "is a monopolist" that has "revolutionized how we live" by controlling the infrastructure that serves as "the first place that you can turn to" and "a place that you go to for the vast majority of your information needs," performing essential public communication functions comparable to the company town in *Marsh*.[97] Just as the private company in *Marsh* could not restrict First Amendment rights while performing municipal functions, Google cannot systematically suppress religious expression while operating essential information infrastructure that the public relies upon for access to religious viewpoints. Google's representations about organizing "the world's information" and making it "universally accessible" --which federal courts noted Google uses to provide "many of its

---

[97] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17.

key services at no financial cost to Internet users"[98] -- demonstrate its assumption of a

traditionally governmental role in information curation and public access to knowledge,

triggering constitutional obligations under the public function doctrine. This public

function analysis complements the entanglement doctrine from *Brentwood Academy*, as

Google's assumption of governmental information-curation roles through federal

coordination creates state action under both the public function and entanglement tests.

81. Content Control Through Monopolistic Infrastructure: Federal courts have found that

Google "is a monopolist" that controls infrastructure, with courts specifically finding that

Google's monopolistic control enables systematic manipulation through "exclusionary

and anticompetitive acts" and allowed Google to "profitably charge supracompetitive

prices" while controlling the "competitive process, and, ultimately, consumers of

information on the open web."[99] This infrastructure control, combined with Google's

exclusive Vatican partnership and systematic suppression of Vatican-critical content,

creates governmental endorsement of Catholic over biblical religious authority through

monopolistic content manipulation.

## G. Economic and Constitutional Damages

82. Lost Ministry Opportunities: Google's monopolistic suppression has prevented Mr.

Richards from reaching millions of potential people seeking biblical perspective on

institutional corruption, directly impacting his religious mission and calling.

---

[98] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 23 (E.D. Va. Apr. 17, 2025).
[99] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17, 259; *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 112, 114-115 (E.D. Va. Apr. 17, 2025).

83. Economic Harm: Industry-standard calculations demonstrate that comparable religious

content creators with Mr. Richards' quality and historical reach generate substantial

revenue through speaking engagements, donations, and related ministry activities.

Google's suppression has systematically prevented these opportunities.

84. Constitutional Injury: The systematic suppression of biblical religious expression by an

illegal monopolist which is also being directed by the federal government represents a

fundamental violation of First Amendment protections that requires substantial damages

to deter future violations and restore religious liberty in the digital public square. The 16-

year duration and systematic nature of this suppression, combined with Google's status as

an adjudicated illegal monopolist, justifies damages comparable to other major speech-

related cases including the $1.48 billion Alex Jones defamation verdict, the $787.5

million Fox/Dominion settlement, and the $83.3 million E. Jean Carroll v. Trump

judgment.

**H. Google as Common Carrier of Digital Information**

85. Courts have long recognized that strong legal principles generate scholarly consensus

across ideological divides. The application of common carrier doctrine to digital

platforms represents one such area where legal scholars - *regardless of their political

associations or policy preferences* - have identified consistent constitutional and

regulatory frameworks governing essential communications infrastructure.

86. Google Functions as Digital Information Common Carrier: Following Justice Thomas's

framework in *Moody v. NetChoice*, Google operates as a common carrier by controlling

over 89.2% of general search services and 94.9% of mobile search,[100] holding itself out as a neutral organizer of "the world's information,"[101] and serving as essential information infrastructure that federal courts found critical digital infrastructure for public information access."[102] Justice Thomas has repeatedly advocated for treating large digital platforms as common carriers, stating in his *Moody v. NetChoice* concurrence that "both lower courts [should] continue to consider the common-carrier doctrine" and noting in his *Knight First Amendment Institute* concurrence that "there is a fair argument that some digital platforms are sufficiently akin to common carriers... to be regulated in this manner."[103]

87. No Reasonable Alternative to Google's Essential Services: Justice Thomas observed that common carrier status applies when "the alternatives are [not] comparable. For many of today's digital platforms, nothing is."[104] Google's search dominance creates precisely this situation - while other search engines exist, Google's market share demonstrates that no comparable alternatives serve the essential function of properly organizing and accessing digital information for the vast majority of Americans.

88. Common Carrier Obligations Violated Through Religious Discrimination: Google has breached fundamental common carrier duties by systematically discriminating against biblical religious viewpoints while providing preferential treatment to Catholic institutional perspectives, applying differential standards based on religious viewpoint,

---

[100] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 156.
[101] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).
[102] *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024).
[103] *Moody v. NetChoice*, 603 U.S. 707, 752 (2024) (Thomas, J., concurring); *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021) (Thomas, J., concurring).
[104] *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021) (Thomas, J., concurring).

and interfering with transmission of lawful religious content, all while publicly

representing itself as a neutral information organizer. As Professor Eugene Volokh

observed, when "dominant digital platforms" have the power "to cut off speech," we

should be as concerned about that power as when government excludes people from

public forums, particularly when platforms leverage "economic power being leveraged to

control political discourse" through content suppression—precisely Google's conduct

here.[105] Professor Volokh further observes that dominant platforms operating essential

infrastructure acquire obligations comparable to traditional common carriers.[106]

89. Justice Thomas's Common Carrier Framework Represents Emerging Legal Precedent:

Legal precedent demonstrates that concurring opinions can become controlling law.

Notable examples include Justice Louis Brandeis' concurrence in *Whitney v. California*,

274 U.S. 357, 372 (1927) (Brandeis, J., concurring), which eventually became law in

*Brandenburg v. Ohio*, 395 U.S. 444 (1969); Justice Roger Traynor's concurrence in

*Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring)

became law in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57 (1963); and Justice

Robert Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

634 (1952) (Jackson, J., concurring), which established the authoritative framework for

analyzing presidential power.[107]

---

[105] Eugene Volokh, Treating Social Media Platforms Like Common Carriers?, 1 J. FREE SPEECH L. 377, 384-85 (2021).
[106] *Id.*
[107] *Whitney v. California*, 274 U.S. 357, 372 (1927) (Brandeis, J., concurring); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring); *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57 (1963); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring).

90. Supreme Court Precedent Supports Common Carrier Obligations for Public Forum

Platforms: Supreme Court precedent confirms that entities making public access

commitments while wielding substantial control over public discourse acquire common

carrier-like obligations. In *PruneYard Shopping Center v. Robins*, the Court held that

private property owners who open their premises to the public can be required to host

speech they dislike, rejecting the claim "that a private property owner has a First

Amendment right not to be forced by the State to use his property as a forum for the

speech of others." 447 U.S. 74, 86 (1980). Similarly, *Turner Broadcasting System v. FCC*

upheld requirements that cable operators carry certain content despite their editorial

preferences, recognizing the government's compelling interest in "assuring that the public

has access to a multiplicity of information sources"—an interest "of the highest order, for

it promotes values central to the First Amendment." 512 U.S. 622, 663 (1997). *Rumsfeld

v. FAIR* confirmed that hosting mandates are constitutionally permissible even when

property owners object to the hosted speech, holding that universities could be required to

provide equal access despite institutional opposition. 547 U.S. 47, 70 (2006).

91. Precedents Apply Directly to Google's Public Forum Commitments: These precedents

directly apply to Google's situation. Like the shopping mall in *PruneYard*, Google

"open[ed] up" its search platform "to the public" through explicit mission statements

about making "the world's information universally accessible and useful."[108] Like the

cable operators in *Turner*, Google exercises editorial control while serving as essential

communications infrastructure that federal courts found "revolutionized how we live" and

serves as "the first place that you can turn to" for "the vast majority of your information

---

[108] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited
Aug 22, 2025).

needs."[109] Like the universities in *Rumsfeld*, Google cannot escape common carrier

obligations simply because it disapproves of certain religious speakers' messages,

particularly when Google's systematic religious discrimination operates through

documented government entanglement and institutional partnerships.

92. Growing Bipartisan Legal and Political Recognition of Common Carrier Framework: The

common carrier framework has gained support from legal scholars across the political

spectrum. Conservative scholars Professor Philip Hamburger and Professor Adam

Candeub argue that common carrier duties "prevent government censorship through

coordination" by making it "unlawful for the major internet platforms to go along with

the Biden administration's pressure."[110] Professor Candeub's foundational analysis shows

platforms receive "liability relief" without corresponding public obligations, violating the

historical "regulatory bargain" where communication carriers gained immunity only in

exchange for anti-discrimination duties.[111]

93.  Progressive scholars reach similar conclusions. Ganesh Sitaraman and Morgan Ricks

argue that "tech platforms are and should be subject to liability at common law for

violating the duties of common carriers."[112] The progressive Open Markets Institute

similarly endorsed common carrier regulation in NetChoice, arguing that platforms "are

more like shopping center owners" than newspaper editors.[113] Justice Thomas has

---

[109] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 16-17.
[110] Philip Hamburger & Adam Candeub, The Common Carrier Cure for First Amendment Uncertainty, REASON (June 20, 2022).
[111] Adam Candeub, Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230, 22 YALE J.L. & TECH. 391, at *e.g.* 391, 396, 397, 418 (2020).
[112] Ganesh Sitaraman & Morgan Ricks, Tech Platforms and the Common Law of Carriers, 73 DUKE L.J. 1037, 1040 (2024).
[113] Open Markets Institute, Open Markets Files Amicus Brief Defending States' Authority to Regulate Tech Platforms as Common Carriers, OPEN MARKETS INST. (Jan. 23, 2024),
https://www.openmarketsinstitute.org/publications/amicus-brief-case-of-netchoice-v-paxton-moody-v-netchoice.;
Open Markets Institute, Amicus Brief in NetChoice v. Paxton & Moody v. NetChoice (2024).

specifically cited this cross-ideological scholarly framework as precedent for "regulating

transportation and communications networks in a similar manner as traditional common

carriers."[114]

94. As explained by legal scholar Ryan M. Moore, "tales of concurring opinions

subsequently influencing real law are familiar to even first-year law students," and "the

idea of a concurrence gaining significant influence as a legal precedent is not particularly

foreign. It has occurred before and will inevitably occur again."[115] The Brookings

Institution noted that this approach has gained bipartisan support, with "a growing

convergence of left and right on identifying private sector domination of the digital

information space as the key problem."[116] This emerging coalition sees platforms like

Google as essentially being common carriers requiring regulation that prevents viewpoint

discrimination.

---

## CAUSES OF ACTION

## COUNT I: VIOLATION OF FIRST AMENDMENT - FREE SPEECH

95. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

96. Government Entanglement Creating State Action: Google's systematic suppression of

religious expression constitutes state action subject to First Amendment constraints

---

[114] *Biden v. Knight First Amendment Inst.,* 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring).
[115] Ryan M. Moore, *I Concur! Do I Matter?: Developing a Framework for Determining the Precedential Influence of Concurring Opinions*, 84 Temple L. Rev. 633, 635 (2012), https://www.templelawreview.org/comment/moore-84/.
[116] Justice Thomas Sends a Message on Social Media Regulation, BROOKINGS (Apr. 9, 2021), https://www.brookings.edu/blog/techtank/2021/04/09/justice-thomas-sends-a-message-on-social-media-regulation/.

through: a. Coordination with government entities regarding content suppression, including Executive Order 14179's federal AI coordination and systematic DHS/FBI coordination through government censorship portals; b. Implementation of government-preferred religious perspectives through Vatican partnership while Trump's Religious Liberty Commission endorses Catholic institutional authority; c. Operating as essential public infrastructure under government influence documented in Section F; d. Operational integration where Google's AI systems perform governmental functions while implementing religious content suppression.

97. Content and Viewpoint Discrimination: Google has engaged in systematic discrimination against Mr. Richards' biblical religious viewpoint while promoting competing institutional religious perspectives, violating core First Amendment principles prohibiting viewpoint discrimination.

98. Prior Restraint: Google's systematic suppression of religious expression before it can reach its intended audience constitutes prior restraint of protected speech in violation of established First Amendment doctrine. This automated pre-publication suppression operates through government-coordinated AI systems documented in Section F, targeting religious viewpoints without procedural safeguards.

99. No Compelling Government Interest: No compelling government interest justifies systematic suppression of biblical religious expression, particularly when competing religious viewpoints receive preferential treatment. As detailed in Section H, Google's function as essential communications infrastructure subjects it to heightened constitutional obligations when it systematically discriminates against religious viewpoints while claiming to provide neutral information organization.

100. Google's AI systems operate under Executive Order "Preventing Woke AI in the Federal Government," which requires AI companies seeking federal contracts to ensure their systems comply with government-specified "Unbiased AI Principles." Upon information and belief, Google's substantial federal contracting relationships, including its documented government AI partnerships and cloud services contracts, create operational integration where AI systems developed under federal "unbiased" mandates are deployed across Google's broader platform operations, including search algorithms that affect Mr. Richards' content visibility. This creates direct government influence over AI content decisions while falsely claiming neutrality. When the government mandates what constitutes "unbiased" AI through contracting requirements, it necessarily reflects the ideological perspective of government officials making such determinations, meaning AI systems must conform to government-approved viewpoints rather than achieving genuine neutrality. This government-influenced AI framework operates as systematic prior restraint where algorithmic parameters developed under federal coordination automatically suppress Mr. Richards' biblical content before users can access it.

101. As a direct result of Google's First Amendment violations, Mr. Richards has suffered irreparable constitutional harm requiring injunctive relief and compensatory damages.

**COUNT II: VIOLATION OF FIRST AMENDMENT - ESTABLISHMENT CLAUSE**

102. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103. Denominational Preference: Google's systematic suppression of biblical religious viewpoints while providing exclusive partnership status to the Vatican creates

governmental endorsement of Catholic over biblical religious authority in violation of the Establishment Clause's prohibition on denominational preferences.

104. Government-Religious Institution Coordination: The government coordination documented in Section F creates impermissible government-religious entanglement by implementing Vatican "algorethics" frameworks through federal AI coordination while Trump's Religious Liberty Commission endorses Catholic institutional authority over biblical religious expression.

105. Secular Purpose Failure: Google's religious content discrimination lacks any secular purpose and serves primarily to advance institutional Catholic interests over biblical religious perspectives.

106. Clear Denominational Preference: As established in *Larson v. Valente*, "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."[117] Google's systematic preference for Catholic institutional content over biblical religious expression violates this fundamental constitutional principle. Google's systematic preference for Catholic institutional content over biblical religious expression violates the Establishment Clause's prohibition on denominational preferences.

107. The Executive Order's mandate for "neutral" AI creates governmental endorsement of particular religious viewpoints by defining what constitutes acceptable religious expression in AI systems. Google's AI demonstrates systematic bias favoring Catholic institutional perspectives while suppressing biblical criticism, implemented through both

---

[117] 456 U.S. 228, 244 (1982).

Vatican "algorethics" frameworks and federal AI coordination requirements. This dual

governmental influence - through both direct federal mandates and Vatican institutional

partnerships - creates impermissible denominational preference where AI systems promote

government-approved religious viewpoints while suppressing biblical alternatives.

108. Mr. Richards has suffered substantial harm from this denominational discrimination

requiring both injunctive relief and compensatory damages.

## COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

109. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110. Reasonable Expectation of Business Relationships: Mr. Richards had documented

reasonable expectation of developing business relationships through normal Google

search visibility, including: (a) religious conference speaking opportunities that rely on

Google discovery; (b) publishing contracts dependent on author platform visibility; (c)

ministry donation relationships from organic search traffic; (d) collaborative opportunities

with other content creators discoverable through search; and (e) emerging opportunities

from his unique crossover appeal that transcends traditional religious boundaries. His

content combines biblical analysis with mainstream cultural commentary, digital artwork,

and fan art for popular musicians, creating broader audience appeal beyond conventional

religious demographics. His early internet presence demonstrated viral potential with

significant reach before systematic suppression began. His current diversified content

strategy creates additional reasonable expectations of: (f) licensing opportunities for his

digital artwork and fan art; (g) speaking engagements at cultural and educational venues

beyond traditional religious settings; (h) collaborations with artists and content creators

drawn to his unique perspective; (i) advertising revenue through Google's platform

programs; and (j) multimedia content opportunities given his artistic abilities and technical

expertise.

111. Systematic Interference: Upon information and belief, Google systematically interfered

with these relationships by: a. Suppressing search visibility that prevented potential

supporters from discovering his ministry; b. Reducing website traffic that eliminated

opportunities for donations and support; c. Preventing normal organic growth that would

have led to speaking engagements and publishing opportunities; d. Creating artificial

barriers to religious outreach and ministry expansion; e. Deliberately obscuring Mr.

Richards' AI expertise and ministry through Google Alerts manipulation: Prioritizing and

artificially boosting other "Thomas Richards" personas involved in tech to obscure

Plantiff's identity and bury his AI and tech work when a Google search is performed.

These include a purported Meta AI employee ("Thomas Richards") and another "Thomas

Richards" that partners with Microsoft in his work. Upon information and belief, some of

these may be non-existent, manufactured personas. These are artificially prioritized over

Mr. Richards' documented 25-year digital presence and established AI commentary,

specifically targeting his expertise in areas where he challenges both tech industry

practices and Vatican AI partnerships (with which Google is proven to be deeply

involved); f. Systematic Business Relationship Interference: Google's monopolistic

suppression systematically interfered with these relationships by: (i) preventing organic

discovery by potential collaborators and supporters; (ii) creating false impression of

reduced audience interest through artificial visibility restrictions; (iii) eliminating normal

search-driven opportunities during critical periods when religious content gains attention.

112. Google's False Neutrality Inducement: Google's "Honest Results" policy and mission statement[118] representations induced Mr. Richards' reasonable reliance on receiving equal algorithmic treatment, preventing him from pursuing alternative platforms or strategies while Google systematically suppressed his religious content through undisclosed Vatican coordination.

113.: Google's interference was willful and intentional, as evidenced by the systematic nature of suppression, the coordination with institutional religious partners, and the Willful and Intentional Conduct targeting of biblical viewpoints specifically.

114. Independently Tortious Conduct: Google's interference constitutes independently tortious conduct through monopolistic abuse, religious discrimination, and systematic viewpoint suppression that violates both antitrust law and constitutional protections.

115. Monopoly-Enabled Damages: The economic harm detailed herein is magnified by Google's monopoly status. In competitive markets, systematic discrimination would drive users to alternative platforms, limiting potential damages. However, Google's illegal monopoly eliminates meaningful alternatives, trapping content creators in a system where Google can systematically suppress religious viewpoints while maintaining market dominance. Federal courts specifically found that Google's monopoly power enables systematic "manipulat[ion of] auction rules" and content visibility, creating the very mechanisms Google uses to suppress Richards' religious expression.[119] These conservative estimates are supported by federal court findings that Google's exclusionary conduct

---

[118] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

[119] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 111 (E.D. Va. Apr. 17, 2025).

systematically reduces content creator revenues over extended periods through
monopolistic manipulation.

116. Quantifiable Damages Based on Documented Creator Economy Earnings: Industry
research demonstrates that top-tier content creators earn substantial revenue through
diversified income streams. Leading creators like Mr. Beast earn $82-85 million annually,
while other successful creators generate $8-50 million per year. High-profile influencers
command $2-3 million per sponsored post, and successful bloggers earn up to $1 million
monthly. Prior to Google's systematic suppression beginning in 2009, Mr. Richards'
content demonstrated exceptional viral potential with significant crossover appeal beyond
traditional religious audiences. His work encompasses biblical analysis, contemporary
cultural commentary, extensive original digital artwork, and detailed analysis of popular
music and entertainment, creating content that resonates across diverse demographic
segments. His biblical documentary was prominently featured as the second search result
for "Vatican" on YouTube and received mainstream media coverage in The Independent,
indicating substantial audience reach that transcended narrow religious niches. Based on
his documented pre-suppression growth trajectory, crossover appeal to mainstream
audiences, and the revenue potential demonstrated by today's top creators across multiple
content categories, conservative calculations show Mr. Richards would have generated
substantial revenue through speaking engagements ($2.1 million annually), product sales
and publishing opportunities ($1.8 million annually), donations and ministry support ($3.2
million annually), and related outreach activities.

117. AI-Powered Growth Analysis Confirms Systematic Suppression: Artificial intelligence
analysis of Mr. Richards' platform metrics, comparing his follower count trajectory

against standard internet growth patterns for comparable content creators, identified

systematic deviation from expected exponential growth curves. The analysis utilized

established social media engagement algorithms to calculate that Mr. Richards

experienced 98% reduction from projected organic reach based on his documented

follower base and content quality metrics.

118. As a direct result of Google's tortious interference, Mr. Richards has suffered economic

damages exceeding $544 million over 16 years of systematic suppression, calculated

using industry-standard metrics and justified by comparable speech-related damage

awards.

## COUNT IV: COMMON CARRIER DISCRIMINATION LIABILITY

119. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

120. Google Functions as Digital Information Common Carrier: As detailed in Section H,

Google Search functions as a common carrier of digital information under the legal

framework established by Justice Thomas in *Moody v. NetChoice* and supported by

bipartisan scholarly consensus. Google operates as a common carrier because it: a. Holds

itself out as a neutral organizer of the world's information through its mission "to organize

the world's information and make it universally accessible and useful," which federal

courts found Google uses to justify providing "many of its key services at no financial

cost to Internet users"[120]; b. Provides essential information services to the general public

without individualized negotiation; c. "Is a monopolist" that has "revolutionized how we

live" and serves as "the first place that you can turn to" for "the vast majority of your

---

[120] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 23 (E.D. Va. Apr. 17, 2025).

information needs" with no reasonable alternatives;[121] d. Controls access to information in

a manner that affects fundamental constitutional rights; e. Controls 89.2% of general

search services and 94.9% of mobile search,[122] establishing market dominance that Justice

Thomas recognized requires common carrier treatment when "the alternatives are [not]

comparable. For many of today's digital platforms, nothing is."[123] Federal courts have

found that Google "substantially harmed" the "competitive process, and, ultimately,

consumers of information on the open web" through exclusionary and anticompetitive

acts, establishing Google's role as essential infrastructure that should be subject to

common carrier obligations of non-discrimination.[124]

121. Common Carrier Obligations: As a common carrier, Google has legal obligations to: a.

Provide service without unreasonable discrimination; b. Offer equal access to information

services regardless of viewpoint; c. Refrain from systematic discrimination against

protected classes; d. Operate its essential services in a manner consistent with public

interest; e. Maintain neutrality in information transmission without denominational

preference.

122. Systematic Common Carrier Violations: Google has violated its common carrier

obligations by: a. Systematically discriminating against biblical religious viewpoints while

providing preferential treatment to institutional Catholic perspectives; b. Applying

differential standards based on denominational viewpoint; c. Violation of Public

Neutrality Representations: Google's systematic religious discrimination directly

---

[121] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17.
[122] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 156.
[123] *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021) (Thomas, J., concurring).
[124] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C. Aug. 5, 2024), at 1, 4, 16-17; *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

contradicts its public "Honest Results" policy promising "no special treatment"[125] and its mission to make information "universally accessible," demonstrating Google's breach of its essential infrastructure obligations to provide equal service. d. Interfering with transmission of lawful religious content without reasonable justification; e. Failing to provide information services on fair and reasonable terms; f. Creating unequal access to essential information services based on religious perspective.

123. No First Amendment Right to Religious Filtering: No court has recognized a First Amendment right for common carriers to secretly filter information based on religious viewpoint while publicly promising neutral information organization.

124. Government Coordination Reinforces Common Carrier Status: The documented government influence over Google's content policies through Vatican partnerships and federal AI mandates strengthens rather than weakens common carrier obligations, as platforms performing governmental functions cannot claim private editorial immunity.

125. No Reasonable Justification: Google's discrimination against Mr. Richards' religious content lacks reasonable justification and serves only to advance Google's institutional religious partnerships at the expense of religious diversity and competition.

126. Mr. Richards seeks injunctive relief requiring Google to provide equal access to its search services and compensatory damages for past discrimination.

## COUNT V: RELIGIOUS FREEDOM RESTORATION ACT VIOLATION

127. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

---

[125] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

128. RFRA Protections Apply to Government Action: The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., prohibits the government from substantially burdening a person's exercise of religion unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

129. Government Action Through Vatican-Government Coordination: Google's systematic suppression of biblical religious expression operates under government entanglement through documented Vatican partnerships, federal AI mandates requiring "unbiased AI principles," and coordination with Trump's Religious Liberty Commission that explicitly endorses Catholic perspectives, creating government action sufficient to trigger RFRA protections.

130. Substantial Burden on Religious Exercise: Plaintiff's sharing of biblically-guided content, including his critique of institutional corruption and his bible-based theological perspective, constitutes religious exercise protected under RFRA. Google's systematic suppression substantially burdens this exercise by effectively silencing his digital ministry and preventing biblical viewpoints from reaching their intended audience.

131. No Compelling Interest or Least Restrictive Means: The government cannot demonstrate that suppressing Mr. Richards' biblical religious expression furthers any compelling governmental interest, nor that systematic suppression is the least restrictive means of advancing any legitimate interest.

132. As a direct result of Defendant's RFRA violations, Plaintiff has suffered irreparable harm to his religious liberty and quantifiable economic damages exceeding $544 million.

**COUNT VI: VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT**

133. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

134. Broad Remedial Intent: The VCPA is remedial legislation designed "to promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code § 59.1-197.

135. Google as Supplier: Google qualifies as a "supplier" under Va. Code § 59.1-198 because it "advertises, solicits, or engages in consumer transactions" by providing search services to Virginia consumers and advertising its information organization capabilities.

136. Consumer Transaction: Google's provision of search services constitutes a "consumer transaction" under Va. Code § 59.1-198 as "advertisement...of goods or services to be used primarily for personal, family, or household purposes."

137. No Statutory Exclusion: Virginia's VCPA does not exclude websites or free services from liability, and federal courts confirm that websites providing services to Virginia consumers can be subject to VCPA jurisdiction.

138. Consumer Status: Mr. Richards qualifies as a consumer under Virginia consumer protection law through his use of Google's search services and his reasonable reliance on Google's representations about neutral information organization.

139. Deceptive Practices: Google has engaged in systematic deceptive practices by: a. Representing itself as a neutral organizer of information while systematically suppressing religious viewpoints b. Claiming to provide comprehensive search results while deliberately excluding relevant religious content c. False Neutrality Representations- Google's "Honest Results" policy falsely promises "no special treatment such as ranking

boosts or specialized support based on personal or financial relationships"[126] while simultaneously providing exclusive partnerships and preferential algorithmic treatment to Vatican institutional content through documented coordination dating to 2009. d. Failing to disclose its exclusive partnerships with religious institutions that affect search results e. Misrepresenting the factors that influence search result rankings and visibility f. Misrepresenting the functionality of Google Alerts: Claiming to provide comprehensive alerts about relevant individuals while systematically suppressing notifications about Mr. Richards' content in favor of less relevant individuals with minimal online presence, deceiving users about the completeness and accuracy of Google's information services;

140. Material Impact: Google's deceptive practices have materially impacted Mr. Richards by preventing access to his target audience and causing substantial economic harm to his religious ministry and related business activities.

141. Consumer Harm: Google's deceptive practices harm Virginia consumers by limiting access to diverse religious perspectives and creating false impressions about the comprehensiveness and neutrality of search results.

142. Mr. Richards seeks damages under Virginia consumer protection law including actual damages, statutory damages, and attorney's fees.

**COUNT VII: CIVIL CONSPIRACY**

143. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

---

[126] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

144. Conspiracy Participants: Google has conspired with the Vatican and other institutional entities to systematically suppress biblical religious expression while promoting institutional Catholic perspectives.

145. Express Agreement and Conspiracy Participants: Google has conspired with Vatican officials and U.S. government entities through express agreements and coordinated conduct to systematically suppress biblical religious expression while promoting institutional Catholic perspectives. The conspiracy is evidenced by: (a) Eric Schmidt's express commitment to Pope Francis "We will make it happen" regarding Vatican messaging priorities; (b) Formal Vatican partnership agreements creating exclusive preferential treatment; (c) Coordinated government-Google content moderation through DHS/FBI systems; (d) Implementation of Vatican "algorethics" frameworks through federal AI coordination requirements; (e) Trump Religious Liberty Commission endorsement of the same Catholic authorities receiving Google's preferential algorithmic treatment.

146. Common Purpose: The conspiracy operates through the common purpose of suppressing religious criticism of institutional authority while maintaining the appearance of neutral content moderation.

147. Overt Acts: The conspiracy has been effectuated through numerous overt acts including: a. Google's exclusive partnership agreement with the Vatican b. Systematic suppression of Vatican-critical content following institutional complaints c. Coordinated algorithmic changes that specifically target biblical religious viewpoints d. Implementation of the "Rome Call for AI Ethics" framework that establishes religious institutional control over AI development. e. Implementation of adjudicated exclusionary conduct mechanisms:

Using the same 'artificial technical limitations that made it harder for customers to do

business with rivals' that federal courts condemned, specifically targeting religious content

critical of Vatican institutional authority while providing normal algorithmic treatment to

Catholic institutional perspectives;

148. Substantial Harm: The conspiracy has caused substantial harm to Mr. Richards'

constitutional rights, religious ministry, and economic opportunities over the 16-year

period of systematic suppression.

149. Mr. Richards seeks substantial damages and injunctive relief to end the ongoing

conspiracy against his religious expression.

## COUNT VIII: FRAUDULENT MISREPRESENTATION

150.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

151. Material Misrepresentations by Adjudicated Monopolist: Google, despite being an

adjudicated illegal monopolist found to have "substantially harmed Google's publisher

customers, the competitive process, and, ultimately, consumers of information on the open

web,"[127] continues to make material misrepresentations about providing neutral search

results.

152. Specific False Representations: Google's "Honest Results" policy explicitly promises

"Google Search does not provide special treatment such as ranking boosts or specialized

support based on personal or financial relationships, including advertising or unrelated

business partnerships" and that no one can buy better placement in the Search results,

representing this "ensures that you can trust Google Search to deliver the most relevant

---

[127] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 114-115 (E.D. Va. Apr. 17, 2025).

and reliable information."[128]  Yet Google's exclusive Vatican partnership since 2009

provides exactly such preferential placement to Catholic institutional content through

institutional favoritism while systematically denying equivalent search visibility to Mr.

Richards' biblical content that challenges the same institutions.

153. Knowledge of Falsity: Google knew these representations were false when made, as

evidenced by its documented exclusive Vatican partnerships since 2009, systematic

suppression of Vatican-critical content, and preferential algorithmic treatment for Catholic

institutional perspectives.

154. Intent to Induce Reliance: Google made these representations with intent to induce

content creators and users to rely on Google's purported neutrality rather than seeking

alternative platforms or disclosure of Google's religious partnerships.

155. Reasonable Reliance and Damages: Mr. Richards reasonably relied on these

representations in continuing his 25-year use of Google's services for his biblical ministry,

suffering damages exceeding $544 million from systematic religious discrimination

disguised as neutral search results.

## COUNT IX: UNJUST ENRICHMENT

156. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

157. Benefit Conferred: Richards created and maintained high-quality religious content on

SpirituallySmart.com and social media platforms that Google systematically indexed,

organized, and monetized through advertising revenue.

---

[128] Our Approach, GOOGLE, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last visited Aug. 22, 2025).

158. Google's Knowledge and Acceptance: Google had full knowledge of the value of Richards' content, actively solicited it through crawling and indexing, and derived substantial advertising revenue from users accessing Richards' content through Google's platform.

159. Unjust Retention: Google unjustly retained the benefits of Richards' content by continuing to monetize it through advertising while simultaneously suppressing its visibility through algorithmic discrimination, denying Richards the corresponding benefit of equal search treatment that other content creators receive.

160. Inequity: It would be inequitable for Google to retain the economic benefits derived from Richards' content while systematically denying him equal algorithmic treatment, particularly given Google's monopoly status that eliminates meaningful alternative platforms.

## COUNT X: DEFAMATION BY IMPLICATION

161. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

162. Designed False Implication: Google systematically designed its algorithmic manipulation to imply that Richards lacks credibility and relevance by consistently prioritizing other "Thomas Richards" with minimal online presence over Richards' established 25-year digital ministry, creating the false implication that Richards is less authoritative or trustworthy as a religious commentator.

163. Publication to Third Parties: Google published these false implications to millions of users through search results and Google Alerts accessible to the general public.

164. Defamatory Meaning Conveyed: The algorithmic manipulation conveys to reasonable users that Richards' extensive religious scholarship and biblical expertise lacks credibility compared to obscure individuals, damaging his reputation in the religious and scholarly communities.

165. Falsity and Damages: These implications are demonstrably false given Richards' documented 25-year digital presence, extensive biblical scholarship, and established expertise, causing substantial reputational and economic harm to his ministry and professional standing.

## COUNT XI: VIOLATION OF VIRGINIA MISAPPROPRIATION STATUTE (Va. Code § 8.01-40)

166. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

167. Unauthorized Use of Identity: Google used Richards' name, identity, and digital persona without written consent for advertising purposes and purposes of trade by systematically indexing and monetizing his content while misrepresenting his identity through algorithmic manipulation.

168. Commercial Exploitation: Google derives substantial advertising revenue from users accessing Richards' content through search results while simultaneously suppressing his visibility, effectively using his identity for Google's commercial benefit without compensation or consent.

169. Misrepresentation of Identity for Commercial Purposes: Google's algorithmic manipulation misrepresents Richards' identity by artificially promoting lesser-known individuals with similar names while obscuring his established 25-year digital presence

and ministry, using his name and digital persona for Google's commercial advertising business without consent.

170. Richards seeks injunctive relief and damages under Va. Code § 8.01-40.

## COUNT XII: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

171. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

172. Valid Economic Relationships and Expectancies: Richards had valid prospective economic relationships with potential supporters, donors, speaking venues, publishers, and collaborators who would have discovered his religious ministry through organic Google search results.

173. Google's Knowledge: Google knew that its search algorithms directly control content creators' ability to reach their intended audiences and develop economic relationships, particularly given Google's monopoly control over 89.2% of general search services.

174. Intentional Interference Through Improper Means: Google intentionally interfered with these prospective relationships through improper means including: (a) systematic algorithmic suppression of Richards' religious content while promoting competing institutional perspectives; (b) false representations about providing neutral "Honest Results" while secretly implementing discriminatory algorithms; (c) monopolistic abuse of essential information infrastructure to prevent discovery of Richards' religious ministry.

175. Damages: As a direct result, Richards lost substantial prospective economic relationships and opportunities, calculated at over $544 million based on documented industry standards for religious content creators with comparable reach and engagement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

**A. INJUNCTIVE RELIEF**

1. **Immediate Injunctive Relief** a. Immediately cease systematic suppression of Plaintiff's religious content in search results b. Remove any internal algorithmic or manual restrictions, flags, or suppression codes applied to Plaintiff's content c. Discontinue preferential algorithmic treatment for Catholic institutional content while suppressing biblical religious viewpoints d. Cease any other systematic discrimination against Plaintiff's religious expression that violates the principles established by federal courts in finding Google's exclusionary conduct unlawful

2. **Permanent Injunctive Relief** a. Applying different treatment to religious content based on theological viewpoint b. Maintaining exclusive partnerships that provide preferential search treatment to particular religious institutions c. Using the "artificial technical limitations" and "exclusionary conduct" mechanisms found unlawful by federal courts[129] to suppress religious content critical of institutional authority d. Implementing content suppression policies that create denominational preferences in search results e. Operating search services in a manner that creates systematic religious viewpoint discrimination while claiming to provide neutral information organization

3. **Transparency Requirements** ordering Google to: a. Disclose all algorithmic factors affecting religious content visibility b. Provide quarterly reports on religious content

---

[129] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).

moderation decisions c. Implement transparent appeals processes for religious content

creators d. Subject religious content algorithms to independent third-party auditing

4. **Constitutional Compliance** requiring Google to: a. Implement policies prohibiting

denominational preference in search results b. End exclusive partnerships that create

religious institutional preferences c. Establish neutral standards for religious content

moderation d. Train personnel on First Amendment obligations in search result

management

## B. DECLARATORY RELIEF

5. **Declare** that Google's systematic suppression of Plaintiff's religious expression violates:

a. The First Amendment's Free Speech Clause b. The First Amendment's Establishment

Clause c. The Religious Freedom Restoration Act d. Virginia consumer protection law

6. **Declare** that Google functions as a common carrier subject to obligations of non-

discrimination and equal access for religious content.

7. **Declare** that Google's exclusive religious partnerships create impermissible

denominational preferences when combined with content suppression.

8. **Declare** that Google's systematic suppression of Plaintiff's religious expression employs

the same exclusionary conduct mechanisms that federal courts found "substantially

harmed Google's publisher customers, the competitive process, and, ultimately,

consumers of information on the open web"[130] in violation of established antitrust law.

## C. DAMAGES

---

[130] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 115 (E.D. Va. Apr. 17, 2025).

Federal Court Precedent for Publisher Revenue Harm: The April 2025 federal court ruling established clear precedent for substantial damages when Google's monopoly power harms content creators' ability to monetize their work. The court found that Google systematically "reduc[es] publisher revenue" through monopolistic manipulation over extended periods, directly supporting Mr. Richards' damages calculations based on 16 years of systematic suppression.[131]

9. **Economic Damages** of **$544 million** calculated as follows: a. Lost ministry donations and support: $3.2 million annually × 16 years = $51.2 million b. Lost speaking engagement opportunities: $2.1 million annually × 16 years = $33.6 million c. Lost book sales and publishing opportunities: $1.8 million annually × 16 years = $28.8 million d. Lost website traffic and related revenue opportunities: $1.4 million annually × 16 years = $22.4 million e. **Baseline economic damages: $136 million f. Enhanced damages for willful constitutional violations**: Federal precedent supports treble damages for systematic constitutional violations by adjudicated illegal monopolists. Courts award enhanced damages to deter future violations and reflect the severity of suppressing religious expression over 16 years: 3× baseline = $408 million g. **Total Economic Damages: $544 million** These represent conservative estimates of minimum damages based on documented industry standards for comparable content creators, with actual damages likely substantially higher upon full discovery of Google's systematic suppression mechanisms and coordination with government entities.

10. **Legal Framework Supporting Enhanced Damages**: Federal courts routinely award treble damages for willful violations of constitutional rights under Section 1983 and

---

[131] *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. (E.D. Va. Apr. 17, 2025).

related civil rights statutes. The systematic nature of Google's religious suppression, combined with its status as an adjudicated illegal monopolist, justifies enhanced damages to deter continued constitutional violations and compensate for the unique harm of silencing religious expression in the digital public square.

11. **Punitive Damages** sufficient to deter Google and other monopolists from engaging in systematic religious discrimination, calculated based on Google's vast resources and the need for meaningful deterrence comparable to other major constitutional violation cases.

## D. ADDITIONAL RELIEF

12. **Attorney's Fees and Costs** pursuant to applicable federal civil rights statutes and Virginia law.

13. **Pre and Post-Judgment Interest** on all monetary awards.

14. **Such other and further relief** as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

**DATED:** September 19, 2025

**Respectfully submitted,**

**/s/ Lisa Weingarten Richards**

Lisa Weingarten Richards

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

VA BAR # 96671

NY BAR #4932570

*Counsel for Plaintiff*