IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION

| | |
|---|---|
| THOMAS RICHARDS | Case No. 5:25-cv-00082 – MFU - JCH |
| *Plaintiff,* | |
| *v.* | |
| GOOGLE LLC | |
| *Defendant* | |

Lisa Weingarten Richards, Esq.

VSB #96671

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**<u>TABLE OF CONTENTS</u>**

I. INTRODUCTION…………………………………………………………………4

II. LEGAL STANDARD…………………………………………………………..12

III. ARGUMENT…………………………………………………………………13


A. Google is a State Actor (Counts 1 & 2)……………………………………….13

   1. Google's Adjudicated Monopoly Status and Control of Essential Infrastructure Create State

Action…………………………………………………………………………………13

   2. Multiple Layers of Government Entanglement Transform Private Conduct……………..22

        a. The Circumstantial Evidence Warrants Discovery…………………………………25

   3. Google's Cases Are Distinguishable…………………………………………………31

   4. Virginia Constitution Provides Independent Broader Protection…………………………37

   5. Statute of Limitations Does Not Bar Action for Continuing Constitutional Violations….39

B. The RFRA Claim States a Valid Cause of Action (Count 5)………………………………40


C. The State-Law Claims Are Not Time-Barred………………………………………………41


D. The First Amendment Does Not Bar Plaintiff's Claims……………………………………43


E. Section 230 Does Not Apply to This Case……………………………………………..44


F. Plaintiff Has Adequately Pled All State-Law Claims……………………………………46

1. Tortious Interference Claims (Counts 3 & 12)……………………………………………46

2. VCPA Claim (Count 6)……………………………………………………………………………….47

3. Civil Conspiracy Claim (Count 7)……………………………………………………………57

4. Fraudulent Misrepresentation Claim (Count 8)……………………………………………...58

5. Unjust Enrichment Claim (Count 9)………………………………………………………..…59

      **A.** Appropriation of Temporal Investment Value………………………………..59
      **B.** Alternative Damages Theory: Quantifiable Cost to Restore Suppressed Visibility
      ………………………………………………………………………………………64

6. Defamation by Implication Claim (Count 10)………………………………………………..69

7. Virginia Misappropriation Claim (Count 11)………………………………………………76


IV. CONCLUSION………………………………………………………………………………………77

## I. INTRODUCTION

This case concerns the appropriation of early internet investment value by an adjudicated illegal monopolist. Between 2000 and 2009, Thomas Richards invested substantial time, creativity, and resources building web presence during the internet's only truly open period -- when organic reach was possible and quality content could find audiences through merit rather than payment.

Mr. Richards' investment parallels traditional financial investment in emerging markets. Just as early investors in a startup company accept risk in exchange for potential rewards when the company succeeds, Mr. Richards invested when the internet's value was uncertain.

Google induced this investment by allowing organic reach to operate which caused his Vatican-critical biblical scholarship to naturally become popular. By January 2009, Google controlled both major video platforms -- having acquired YouTube in 2006 and operating Google Video as its proprietary platform.[1] When Google formed its exclusive Vatican partnership in January 2009, it possessed consolidated control over video content discovery, enabling systematic suppression across the entire ecosystem. But after securing monopoly position and forming exclusive Vatican partnerships, Google fundamentally transformed internet accessibility from an open meritocracy into a controlled gatekeeping system where organic reach became impossible. Google then systematically suppressed the very content it had previously encouraged, appropriating the value Mr. Richards created while denying him all benefits of his temporal investment -- equivalent to a company going public then refusing to honor early investors' stock certificates. The harm is

---

[1] Google acquired YouTube in October 2006 for $1.65 billion. By the time Google formed its exclusive Vatican partnership in January 2009, Google controlled both YouTube and its proprietary Google Video platform, giving it consolidated control over video content discovery.

compounded because Google didn't merely deny Mr. Richards financial returns; by systematically suppressing his visibility, Google destroyed the credibility and reputation he built through years of genuine engagement with audiences who sought his biblical scholarship.

The internet Mr. Richards invested in no longer exists -- replaced by a pay-to-play system where visibility requires paying the platforms/ institutional approval. Google's monopoly power enabled this transformation, and Google specifically targeted early adopters like Mr. Richards whose content challenged institutional partners like the Vatican.

This transformation has harmed not just Mr. Richards but society as a whole. The early internet enabled purpose-driven voices to reach audiences seeking authentic information -- people sharing truth because they believed in it, communities forming around genuine ideas, content created from mission rather than commercial gain. Google's monopoly replaced this with a system where everything is advertising, where manipulation for clicks replaced sincerity of message. Someone like Mr. Richards who won't compromise integrity to optimize algorithms -- who refuses to turn scholarship into clickbait or seek institutional blessing -- are systematically excluded. When monopolistic platforms eliminate purpose-driven voices and replace them with commercial manipulation, they corrupt the marketplace of ideas itself, and freedom of thought by extension, leaving audiences unable to access the authentic information they seek.

Google's Motion to Dismiss fails at every level because it ignores the central fact that distinguishes this case from every other platform content moderation dispute: Google is an adjudicated illegal monopolist controlling essential information infrastructure while operating through documented government entanglement to systematically suppress biblical religious expression.

Two different federal courts have found Google operates illegal monopolies -- one in search markets (August 2024), another in digital advertising markets (April 2025). The April 2025 court specifically found that Google uses "exclusionary conduct" that "substantially harmed" customers through "artificial technical limitations that made it harder for customers to do business with rivals." *United States v. Google LLC,* Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025). Mr. Richards is a content creator whose visibility is controlled by Google's illegal search monopoly, harmed by these same exclusionary mechanisms.

Google's systematic suppression of Mr. Richards' biblical religious expression while promoting Catholic institutional perspectives operates through:

1. Exclusive Vatican Partnership - In 2009, Google formed an unprecedented partnership with the Vatican, making it the only religious institution in Google's history to receive such preferential platform access.[2] The timing of this partnership coinciding with the beginning of Mr. Richards' systematic suppression raises questions that can only be answered through discovery of Google's internal communications and algorithm changes from this period.

2. Government AI Coordination - Executive Order mandates requiring Google's AI systems to comply with federal "neutrality" standards

3. Suspicious Timing of High-Level Vatican Meetings - In 2016, Google executive Eric Schmidt met with Pope Francis and stated "We will make it happen" in response to the Pope's stated

---

[2] Pope Channel Makes Debut on YouTube, CATH. NEWS AGENCY, https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.; Vatican Going Digital with YouTube Channel, SPOKESMAN-REV. (Jan. 24, 2009), https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.

concerns about online content.[3]  Contemporary reporting from this period documents Pope

Francis' specific concerns about "harmful opinions" spreading through media platforms.[4]

The temporal alignment is striking: Google formed its exclusive Vatican partnership in January

2009, making the Vatican the only religious institution in Google's history to receive such

preferential treatment. Immediately thereafter, systematic suppression of Vatican-critical content

began -- Mr. Richards went from #2 for "Vatican" searches[5] on YouTube and top 1% on the

legacy Google Video platform[6] to near-invisibility (the "*Continuing 2009 Suppression Pattern*").

Seven years later, Schmidt's 2016 promise to Pope Francis regarding online content concerns

suggests ongoing high-level coordination about content policies. (Also see Exhibit 1--  filed

separately -- for documents referenced in footnote 6)

4. Cross-Service Manipulation - Google Alerts systematically features individuals with minimal

online presence while obscuring Mr. Richards' 25-year established digital presence (detailed in

Section E below).

5. YouTube and Google Video Censorship Following Vatican Partnership - Google argues that

YouTube is "equally available to Plaintiff" (Def. MTD at 5 n.2), but this ignores the *Continuing*

*2009 Suppression Pattern*. Google's own platforms document this timeline: Mr. Richards was

among YouTube's earliest content creators, yet following the Vatican partnership, his original

---

[3] https://www.youtube.com/watch?v=vUt1K4EB ROME REPORTS in English, *Pope Francis Meets with Google Executive, Eric Schmidt*, YOUTUBE (Jan. 23, 2016), https://www.youtube.com/watch?v=vUt1K4EB0uw.
[4] Zhai Yun Tan, *Why Pope Francis Says Fake News Is a 'Sin'*, CHRISTIAN SCI. MONITOR (Dec. 8, 2016), https://www.csmonitor.com/World/Europe/2016/1208/Why-Pope-Francis-says-fake-news-is-a-sin
[5] The Independent, "Vatican launches YouTube channel," available at
https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.
[6] Tommy Richards (@tlthe5th), X (Sept. 8, 2025, 3:38 PM) ("My first video was on google video, not youtube and it
was top 1% on all google video."), https://x.com/tlthe5th/status/1965137610118234292.;
https://x.com/tlthe5th/status/1965137610118234292/photo/3,
https://x.com/tlthe5th/status/1965137610118234292/photo/1,
https://x.com/tlthe5th/status/1965137610118234292/photo/4

videos received warning labels while identical stolen copies appear without restriction. His content fails to appear even when searched by exact title.

On January 21, 2025, counsel contacted Amy Hsu, Google's Legal Counsel for YouTube, with documentation of this discrimination. She did not respond. At the motion to dismiss stage, the *Continuing 2009 Suppression Pattern* creates a plausible inference of religiously-motivated discrimination sufficient to survive dismissal. Additional platform-specific evidence is detailed in Section III.A.2.a below.

6. Retaliation Through Further Suppression - Following the filing of this lawsuit, even Mr. Richards' bot accounts that previously appeared in searches have now been removed from Google Alerts and likely from search results entirely. (Exhibit A- filed separately)

This is not about editorial judgment. This is about an illegal monopolist controlling essential information infrastructure through government-coordinated frameworks to implement denominational religious preference in violation of the First Amendment's Establishment Clause.

### A. **The Fundamental Transformation of Internet Accessibility**

Google's monopoly power facilitated an unprecedented transformation in how information reaches audiences online. The evidence demonstrates two distinct eras of internet accessibility:

The Early Internet (2000-2009): Open Meritocracy

- Quality content could reach audiences organically through merit

- Search algorithms promoted relevant content regardless of institutional affiliation

- Early adopters who invested time and resources could build substantial web presence

- Mr. Richards built substantial online presence during this period through quality biblical scholarship

- No payment required for organic visibility

Post-Monopoly Internet (2010-Present): Controlled Gatekeeping

- Organic reach effectively eliminated for content challenging institutional partners

- Visibility requires either platform payment/institutional approval

- Early adopters' established web presence systematically suppressed

- The internet became fundamentally closed to new voices absent payment or institutional backing

This transformation fundamentally altered the nature of internet investment. Early adopters like Mr. Richards invested not for commercial gain but to share truth and information freely -- much like Mr. Richards' early internet work using AOL macros around 2000, and spamming software in 2005 to reach decision-makers in attempts to save Terri Schiavo's life. His investment was driven by purpose: sharing biblical truth and historical analysis. Google's transformation from open platform to commercial gatekeeping system specifically targeted these purpose-driven early investors, replacing them with commercial content creators willing to pay for visibility.

Recent Evidence: The LinkedIn Cost-of-Visibility Experiments

Counsel for Mr. Richards maintains a 17-year LinkedIn account with 700+ connections built organically through professional use, primarily over five years of active engagement after leaving the Office of the Comptroller of the Currency. For over 16 years, the account contained no controversial content -- standard professional legal work.

To understand how completely the internet transformed from merit-based to pay-to-play, counsel conducted multiple paid promotion experiments testing current platform economics. The results quantify what Google destroyed:

Measured Results Across ~$250 in Promotions: - Cost per 1,000 impressions: $0.50-$6.09 (varying by unknown algorithmic factors) - Total impressions purchased: ~150,000-200,000 - Profile viewers generated: ~120-150 - New followers gained: ~40-50 - Measured conversion rate: Approximately 0.025-0.035% (impressions to followers) - Organic reach without payment: Effectively zero despite 16-year established account. (Exhibit B – filed separately)

What These Numbers Prove: Using the measured 0.03% conversion rate, achieving follower counts comparable to what Mr. Richards would have reached through continued organic growth from his 2009 #2 ranking would require: - 5 million followers: 16.7 billion impressions at $8.35-101.5 million - 10 million followers: 33.3 billion impressions at $16.65-203 million

The Fundamental Transformation: In 2009, Mr. Richards achieved millions of views and internet popularity pure merit -- zero payment required. Today, achieving equivalent reach requires $8-203 million in advertising spend. The internet Mr. Richards invested in -- where quality and purpose determined reach -- has been replaced by a system where only concentrated capital purchases visibility.

Google's Own Hypocrisy: While promising "honest results" with "no special treatment based on relationships," Google operates a 200 plus billion annual advertising business that explicitly sells algorithmic preference. Anyone with sufficient capital can bypass Google's "honest" algorithm by purchasing ads. Google destroyed Mr. Richards' organic reach, then offers to sell back visibility at prices ($8-203 million) that early adopters cannot afford.

The LinkedIn experiments prove the temporal investment theory: Mr. Richards invested during the only window when organic merit-based reach was possible (2000-2009). Google induced that investment by providing neutral, merit-based search results that allowed his content to reach audiences organically. Then Google closed that window, transformed the system to pay-to-play, and appropriated the value he created while denying him all benefits of his temporal investment. The cost to artificially purchase equivalent visibility today quantifies the floor of what Google appropriated -- though money cannot replace 16 years of authentic audience relationships, credibility built through genuine engagement, or the speaking invitations and daily viewer contacts that ceased after the *Continuous 2009 Suppression Pattern*.

The internet Mr. Richards invested in -- where purpose and quality determined reach -- has been replaced by a pay-to-play commercial system that systematically excludes the very early adopters whose work made the platform valuable.

The Final Irony - Even Paid Access May Be Insufficient:

Earlier today, October 31, 2025, following counsel's LinkedIn promotion experiments documenting the cost to purchase visibility ($8-203 million to achieve reach equivalent to what Mr. Richards had organically in 2009), (Exhibit C – filed separately) it appears LinkedIn disabled counsel's ability to boost posts entirely (the button to promote posts no longer appears as it used to). (Exhibit D – to be filed separately) The platform that had just sold approximately $250 worth of promotional services -- services that proved the transformation from merit-based to pay-to-play accessibility -- now refuses even paid promotion access.

This demonstrates that the $8-203 million calculation likely UNDERSTATES the true cost of restoring what Google destroyed. That calculation assumed platforms would accept payment for

equivalent reach. The reality is worse: even if Mr. Richards had $203 million to spend on advertising, platforms may refuse to sell him the visibility he earned organically as an early investor. The only path to equivalent reach would be building an entirely independent platform with sufficient scale to compete with Google's monopoly -- an infrastructure investment that would require not millions but potentially billions, assuming it's even technically possible to overcome the network effects and "insurmountable barriers to entry" that federal courts found protect Google's illegal monopoly.

## II. LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court "must accept the well-pleaded facts and draw reasonable inferences in favor of the plaintiff" Mays v. Sprinkle, 992 F.3d 295, 305 (4th Cir. 2021) Dismissal is appropriate only if the complaint fails to state "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Google bears the burden of showing that Plaintiff's Amended Complaint fails to meet this standard. The Amended Complaint contains detailed factual allegations spanning 74 pages documenting facts that distinguish this case from typical platform cases: (1) adjudicated illegal monopoly status controlling essential information infrastructure; (2) multiple documented layers of government entanglement including Executive Order mandates, DHS/FBI coordination, and Vatican-government religious coordination; and (3) systematic religious viewpoint discrimination. Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, as required at this stage, these unique factual circumstances state plausible claims under state action doctrine.

## III. ARGUMENT

### A. Google is a State Actor (Counts 1 & 2)

#### 1. Google's Adjudicated Monopoly Status and Control of Essential Infrastructure Create State Action

Google fundamentally misunderstands the state action analysis by treating this as a typical "private company" case. But Google is not a typical private company -- federal courts have adjudicated Google as an *illegal monopolist* controlling essential information infrastructure that serves as "the first place that you can turn to" for "the vast majority of your information needs." United States v. Google LLC, 747 F. Supp. 3d 1, 16-17 (D.D.C. 2024).

This monopoly control over essential infrastructure, combined with government coordination, establishes state action under two independent doctrines:

Public Function Doctrine - Essential Infrastructure Control: In Marsh v. Alabama, the Supreme Court held that private entities performing traditional governmental functions are subject to constitutional constraints. 326 U.S. 501 (1946). Google's adjudicated illegal monopoly over search infrastructure -- declared illegal by federal courts in August 2024 and April 2025 -- triggers this doctrine with unprecedented force. The doctrine applies when: (1) a private entity controls infrastructure essential to participation in commerce and public discourse; (2) federal courts have found that infrastructure cannot be practically duplicated; (3) the entity performs the public function of organizing and providing access to information; and (4) the entity operates through documented government coordination. All four factors exist here as adjudicated facts, not mere allegations.

Google Controls Essential, Non-Duplicable Infrastructure: Federal courts have adjudicated that Google illegally monopolizes search services with 89.2% market share and 94.9% of mobile

search. These findings are final judgments, not disputed facts. In August 2024, the District Court

for the District of Columbia held that "Google is a monopolist, and it has acted as one to

maintain its monopoly." *United States v. Google LLC*, 747 F. Supp. 3d 1, 277 (D.D.C. 2024). In

April 2025, the Eastern District of Virginia found Google maintains its monopoly through

"exclusionary conduct" using "artificial technical limitations that made it harder for customers to

do business with rivals." *United States v. Google LLC,* Case No. 1:23-cv-108, slip op. at 99, 115

(E.D. Va. Apr. 17, 2025). Mr. Richards is a content creator harmed by these same exclusionary

mechanisms.

This is not mere market success; it is monopolistic control over infrastructure that federal courts

recognized "revolutionized how we live" and provides access to information that is now essential

to participation in modern society. *United States v. Google LLC*, 747 F. Supp. 3d at 1, 38.

The billions in investment, network effects, and two decades of data accumulation create barriers

that federal courts found constitute illegal monopolistic conduct precisely because they cannot be

overcome by competitors.

The Supreme Court has long recognized that monopolistic control over non-duplicable

infrastructure essential to commerce creates special constitutional obligations, regardless of

formal classification. In *United States v. Terminal Railroad Ass'n*, 224 U.S. 383 (1912), the Court

held that control over the only practical bridge across the Mississippi River -- infrastructure that

could not be duplicated and was essential to interstate commerce -- triggered antitrust liability

precisely because competitors had no alternative. The Court's analysis focused on two factors:

(1) practical impossibility of duplication (another bridge would be economically unfeasible), and

(2) essentiality to commerce (railroads could not compete without access).

Google's search monopoly presents identical structural features:

- Non-duplicable infrastructure: Federal courts found "insurmountable" barriers to entry (Aug. 2024 opinion)

- Essential to commerce: Federal courts recognized Google "revolutionized how we live" and provides access to information essential to modern participation

- No practical alternative: 90% market share with adjudicated illegal monopoly

*Terminal Railroad* establishes the principle that when monopolistic control over non-duplicable essential infrastructure exists, special constitutional obligations follow -- a principle that applies with equal force to digital infrastructure controlling access to the modern marketplace of ideas.

The Carpenter Methodology: Adapting Doctrine to Digital Monopolies

*Carpenter v. United States*, 585 U.S. 296 (2018), establishes the framework for adapting constitutional doctrine when technology creates unprecedented concentration of power. The Court held:

"As technology has enhanced the government's capacity to encroach upon areas normally guarded from inquisitive eyes, the Court has sought to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id* at 305.

Just as cell phone technology created unprecedented surveillance capacity requiring Fourth Amendment adaptation, digital monopolies create unprecedented censorship capacity requiring First Amendment adaptation. The parallels are precise:

FOURTH AMENDMENT (Carpenter)

- Cell phone location data reveals "privacies of life"

- Technology makes comprehensive tracking possible

- Government obtains data from third party

- Third-party doctrine would eliminate protection

- Court adapted doctrine to preserve constitutional protection

FIRST AMENDMENT (This Case)

- Search monopoly controls access to "marketplace of ideas"

- Technology makes comprehensive censorship possible

- Government grants immunity enabling private censorship

- Private actor doctrine would eliminate protection

- Court must adapt doctrine to preserve constitutional protection

The parallel is not metaphorical -- it is structural. In both contexts, technology concentrated power in ways the Framers could not anticipate, private entities hold that concentrated power, government coordinates with those entities to achieve regulatory goals, and traditional doctrine would eliminate constitutional protection if not adapted. *Carpenter* held that adaptation was required to preserve "that degree of privacy against government that existed when the Fourth Amendment was adopted." 585 U.S. at 305. The same principle applies here with even greater force: adaptation is required to preserve that degree of freedom of expression that existed when the First Amendment was adopted.

Justice Thomas's concurrence in *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220,

1221 (2021), explicitly calls for this adaptation:

 "We will soon have no choice but to address how our legal doctrines apply to highly

concentrated, privately owned information infrastructure such as digital platforms."

The August 2024 federal monopoly finding answered the factual question Justice Thomas left

open. Google's 90% market share combined with "insurmountable" barriers to entry (court's

finding) establishes the "concentrated control" that requires doctrinal adaptation.

Google's operations constitute "organizing the world's information" and making it "universally

accessible" -- a function federal courts recognized when noting Google provides "many of its key

services at no financial cost to Internet users" precisely because Google positions itself as

performing an essential public service. *United States v. Google LLC*, Case No. 1:23-cv-108, slip

op. at 23 (E.D. Va. Apr. 17, 2025). This is the type of public function that triggers constitutional

obligations when combined with monopolistic control and government entanglement.


**Google's Monopoly Over Essential Infrastructure Creates Constitutional Obligations**

**Regardless of State Common Carrier Classifications**

Google relies on *State of Ohio ex rel. Yost v. Google LLC*, Case No. 21-CV-H-06-0274

(Delaware Cty. Ohio Aug. 15, 2025), where an Ohio state court ruled Google is not a common

carrier under Ohio common carrier statutes. That ruling is irrelevant here for multiple

independent reasons:

First, different legal framework: The Ohio court analyzed whether Google met Ohio's statutory common carrier definition requiring "transportation of persons or property from place to place." That analysis applied Ohio's antiquated transportation-focused statutes dating to the railroad era. This case does not rest on common carrier doctrine. It rests on the federal constitutional state action doctrine, which asks whether a private entity exercises monopolistic control over essential infrastructure while operating through government entanglement -- an entirely different constitutional analysis not addressed by the Ohio court.

Second, different constitutional test: State action doctrine under *Marsh v. Alabama* and *Brentwood Academy* examines whether private entities perform public functions or exhibit pervasive government entwinement. These are federal constitutional tests. Ohio common carrier statutes ask whether an entity "transports property." The Ohio court never analyzed the federal constitutional state action tests applicable here.

Third, failed to consider federal monopoly findings: Most critically, the Ohio court's August 2025 opinion contains no discussion whatsoever of the federal monopoly findings. Despite the August 2024 search monopoly ruling and April 2025 ad tech monopoly ruling existing when the Ohio court ruled, the Ohio court never analyzed how adjudicated illegal monopoly status over essential infrastructure affects the legal analysis.

The Ohio court decided Google's status without considering what federal courts have now established: Google maintains its monopoly through "exclusionary conduct" that "substantially harmed" customers through "artificial technical limitations." *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).

This fundamentally changes the analysis. Monopolistic control over essential infrastructure creates public function obligations regardless of whether the entity "transports property" under state common carrier statutes. The combination of:

- Adjudicated illegal monopoly (federal court finding)

- Infrastructure that cannot be duplicated (federal court finding of "insurmountable" barriers)

- Government immunity (Section 230)

- Government coordination (Executive Order AI mandates, DHS/FBI systems)

creates state action under federal constitutional doctrine even if Ohio common carrier statutes don't apply.

Fourth, different procedural posture: The Ohio ruling came after full discovery on summary judgment. Here, Google moves to dismiss at the pleading stage under Rule 12(b)(6), where this Court must accept all well-pleaded allegations as true and draw all reasonable inferences in Mr. Richards' favor.

Fifth, no binding effect: An Ohio state court's interpretation of Ohio common carrier statutes does not bind this federal Court's analysis of federal constitutional state action doctrine.

Google's Monopoly "Rises to Public Concern" Triggering Special Obligations

Justice Thomas's *Knight* concurrence cites *German Alliance Insurance Co. v. Lewis*, 233 U.S. 389 (1914), for the principle that private businesses can become subject to regulation when they "rise to public concern." That test applies here with special force.

*German Alliance* established: "a business, by circumstances and its nature, may rise from private
to be of public concern and consequently become subject to governmental regulation"
Businesses of certain kinds hold such a peculiar relation to the public interests that there is
superinduced upon it the right of public regulation. at 404.

The test asks: "When private property is affected with a public interest it ceases to be juris privati
only and it becomes clothed with a public interest when used in a manner to make it of public
consequence, and affect the community at large." *Id.* at 408 (citation modified).

Google's search monopoly clearly "rises to public concern":

1. Scale and Monopoly: Federal courts found Google controls 90% of search with
"insurmountable" barriers preventing competition. This isn't mere market success -- it's
adjudicated illegal monopoly over infrastructure organizing human knowledge.

2. Public Consequence: The Supreme Court in *Packingham v. North Carolina*, 582 U.S. 98, 99
(2017) recognized cyberspace as the "modern public square." If social media is the modern
public square, then search engines are the city planning department -- they determine what is
visible in that square.

3. Affects Community at Large: Google's search monopoly affects:

- Democratic discourse (controls what information voters find)

- Commercial activity (controls what businesses are discoverable)

- Academic research (controls what knowledge is accessible)

- Emergency information (controls what safety data appears)

- Religious expression (controls what spiritual perspectives reach audiences)

4. Historical Pattern - Communications Networks: *German Alliance* must be read with *Primrose v. Western Union Tel. Co*., 154 U.S. 1, 14 (1894). The Supreme Court held that telegraph companies, while not common carriers, nevertheless "exercise a public employment" and are "bound to serve all customers alike, without discrimination" because they control essential communications infrastructure. Id. at 14. Telegraph networks that organized and routed information were always treated differently from ordinary businesses -- not because of formal common carrier classification, but because they performed functions essential to commerce and public communication.

Telegraph companies:

- Connected geographically separated parties

- Routed messages to intended recipients

- Handled confidential communications

- Created network effects

- Operated as essential service

Google Search:

- Connects information seekers with information

- Routes queries to relevant content

- Handles sensitive search queries

- Creates network effects (value increases with index size)

- Operates as essential service

The functional identity is obvious. When Justice Thomas cited *German Alliance* in his *Knight* concurrence, he was pointing toward exactly this analysis -- private businesses that "rise to public concern" through their control of essential communications infrastructure become subject to constitutional constraints, especially when combined with monopoly power and government coordination.

Monopoly + Essential Infrastructure + Government Entanglement = State Action: The combination of adjudicated illegal monopoly status, control over essential non-duplicable infrastructure, performance of public information-organization functions, and pervasive government entanglement establishes state action under both public function and entwinement doctrines. This is precisely the type of situation that triggers constitutional constraints -- when a monopolist controls access to essential infrastructure necessary for participation in modern commerce and discourse while operating through government coordination.

### 2. Multiple Layers of Government Entanglement Transform Private Conduct

Entwinement Doctrine: Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, state action exists when private conduct exhibits "pervasive entwinement" with

governmental functions. 531 U.S. 288 (2001). The Amended Complaint asserts multiple layers of such entwinement:

- Federal AI Coordination: Executive Order 14319 "Preventing Woke AI in the Federal Government" mandates that AI systems used by government contractors comply with government-specified "Unbiased AI Principles." Google's substantial federal contracting relationships -- including its April 2025 General Services Administration agreement securing Google Workspace for all federal agencies and its $200 million Defense Department AI contract -- create operational integration where, upon information and belief, AI systems developed under these federal mandates are also deployed across Google's platform operations, including search algorithms affecting Mr. Richards' content.

- DHS/FBI Coordination: Leaked Department of Homeland Security documents reveal systematic coordination between federal agencies and Google for content moderation, with government officials directly flagging content through special portals requiring "government or law enforcement email to use." FAC ¶¶ 68-70. This coordination resulted in platforms taking action on 35% of government-flagged content.

- Google's Own Platforms Document the Suppression Timeline: Google's argument that YouTube is "equally available to Plaintiff subject to YouTube's standard terms of service" (Def. MTD at 5 n.2) inadvertently documents the timeline of systematic suppression. Before the 2009 Vatican partnership, when the early internet operated on merit-based principles, Mr. Richards' quality content naturally rose to prominence because people appreciated his information. Google's search algorithms during this period functioned neutrally, allowing quality content to find audiences based on relevance and interest rather than payment or institutional relationships.

In January 2009, the Continuing 2009 Suppression Pattern began. Mr. Richards went from #2 for "Vatican" searches and top 1% on Google Video to systematic suppression. His videos currently fail to appear in YouTube search even when searched by exact title. The stark before-and-after pattern around the 2009 Vatican partnership creates a plausible inference that suppression is deliberate rather than algorithmic error. The true explanation can only be obtained through discovery of Google's internal communications.

- Potential Government-Vatican Religious Coordination: The Trump administration's Religious Liberty Commission endorses Catholic Cardinal Timothy Dolan and Bishop Robert Barron as representative "Christian" leaders. FAC ¶¶ 65, 72. The same Catholic institutional voices appear to receive preferential visibility in Google's search results while biblical criticism of Catholic institutions faces systematic suppression. Whether this correlation results from explicit coordination, implicit understanding, or shared institutional preferences can only be determined through discovery. At the pleading stage, the alignment between government-endorsed religious authorities and Google's algorithmic preferences creates a plausible inference of entwinement sufficient to warrant further investigation.

- Google's Intelligence Community Origins: Google's origins trace to CIA and NSA research grants for "mass surveillance," with the "Massive Digital Data Systems (MDDS) project" funding Google's founders. FAC ¶ 47. NSA programs like PRISM directly access Google's data systems, demonstrating ongoing government coordination with Google's information control mechanisms.

This combination of monopoly infrastructure control, federal AI mandates, documented DHS/FBI coordination, Vatican-government religious coordination, and intelligence community

integration establishes the "pervasive entwinement" sufficient to constitute state action under *Brentwood Academy*.

### a. The Circumstantial Evidence Warrants Discovery

Google will likely argue that allegations of Vatican-Google coordination are speculative. But federal courts have consistently held that circumstantial evidence creating plausible inferences is sufficient at the pleading stage, with direct proof reserved for discovery and trial.

The circumstantial evidence here includes the exclusive relationship between Google and the Vatican (only religious institution in Google's 20-year history to receive exclusive partnership status) and the *Continuing 2009 Suppression Pattern*.

Under Virginia law, conspiracy may be proved by circumstantial evidence and "may be inferred by actions alone" -- no explicit agreement required. *Charity v. Commonwealth*, 49 Va. App. 581, 587 (2007) (holding conspiracy established where defendants acted in coordination without evidence of prior conversation; "when it has been shown that defendants by their acts pursued the same object, one performing one part and the others performing another part, the jury will be justified in concluding that they were engaged in a conspiracy" (citation modified)).

The temporal correlation between Vatican partnership formation (January 2009) and immediate suppression of Vatican-critical content, combined with multiple circumstantial factors, creates the plausible inference of coordination that *Charity* requires:

- Exclusive relationship: Vatican is the only religious institution in Google's 20-year history to receive partnership status

- High-level promises: Eric Schmidt's 2016 statement to Pope Francis: "We will make it happen" (in regards to the Pope's request to stop spreading "harmful opinions")

- Discriminatory pattern: Richards' original videos receive warning labels; identical stolen copies appear unrestricted

- Google Alerts manipulation: Systematically features individuals with minimal online presence while obscuring Richards' 25-year established scholarship

- The *Continuing 2009 Suppression Pattern* (detailed above)

- Refusal to explain: Google legal counsel declined to address documented evidence when contacted

- Apparent retaliation: Following lawsuit filing, even previously visible bot accounts removed from Google Alerts (Exhibit A – filed separately)

- Government-Vatican coordination: Trump Religious Liberty Commission endorses the same Catholic authorities whose perspectives receive preferential algorithmic treatment

These circumstances demonstrate what *Charity* requires: defendants "by their acts pursued the same object, one performing one part and the others performing another part." Google provided the exclusive partnership and technical suppression mechanisms; the Vatican provided institutional legitimacy and high-level coordination (Schmidt's promise). Together, they achieved the shared objective: elimination of the most prominent Vatican-critical voice (#2 ranking) from Google's platform. At the motion to dismiss stage, this circumstantial evidence creates a plausible inference warranting discovery of Google's internal Vatican-related communications and algorithm changes from this period which continue to this day.

High-Level Promises: In 2016, Google executive Eric Schmidt met with Pope Francis and stated "We will make it happen" regarding what appears to be Vatican concerns about online content. While Schmidt's statement was not made explicit for the news reporters in attendance, combined with the pattern of suppression, it supports an inference that Google committed to accommodate Vatican preferences regarding content visibility.

Discriminatory Pattern: Mr. Richards' original YouTube videos received warning labels restricting visibility, while identical stolen copies of his own content appear without restriction. Google Alerts systematically features individuals with minimal online presence while obscuring Mr. Richards' 25-year established presence. These discriminatory patterns require explanation.

Standard at Motion to Dismiss: "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mr. Richards need not prove Vatican-Google coordination at this stage -- he must only plead facts making such coordination plausible. The exclusive partnership, suspicious timing, high-level promises, discriminatory pattern, and refusal to explain create exactly such plausibility.

Discovery Is The Appropriate Forum: Whether Google-Vatican coordination is explicit (documented agreements) or implicit (shared understanding), intentional (deliberate suppression policy) or structural (algorithms designed to favor institutional voices), can only be determined through discovery of Google's internal communications, algorithm change logs, and Vatican partnership documents. Dismissing these claims at the pleading stage would improperly resolve factual questions that require evidentiary development.

    b. Section 230 Immunity Creates Unprecedented Government Benefit Without Corresponding Duty

Throughout American history, government-granted benefits came with corresponding public
obligations:

TELEGRAPH COMPANIES

- Government Benefit: Right-of-way over public and private land

- Corresponding Duty: Obligations similar to common carriers; must serve all customers
  without discrimination

- Authority: *Primrose v. Western Union Tel. Co.*, 154 U.S. 1 (1894)

UTILITIES

- Government Benefit: Monopoly franchise; exclusive service area

- Corresponding Duty: Rate regulation; duty to serve all; non-discrimination requirements

- Authority: *Victoria v. Victoria Ice Light & Power Co.*, 134 Va. 134, 145 (1922) (State
  Corporation Commission has authority to "prescrib[e] and enforce[] rates and charges"
  and "the right of the commonwealth...to prescribe and define the public duties of all
  carriers and public service corporations...and to fix and limit their charges therefor shall
  never be surrendered or abridged") ; *Richmond v. Chesapeake & Potomac Tel. Co.*, 127
  Va. 612, 620, 627 (1924) (Commission's authority to "prescribe and define the public
  duties" of public service corporations and "to fix and limit their charges therefor shall
  never be surrendered nor abridged"; Commission's jurisdiction over rates is "paramount")

RAILROADS

- Government Benefit: Land grants; eminent domain power

- Corresponding Duty: Common carrier obligations; published rates; non-discriminatory
  service

- Authority: *United States v. Terminal Railroad Ass'n*, 224 U.S. 383, 395, 411 (1912) (facilities that commerce is "under compulsion to use" must operate as "impartial agent" providing access to all "upon such just and reasonable terms" as place every company "upon a plane of equality")

BROADCAST LICENSEES

- Government Benefit: Exclusive use of public spectrum (limited public resource)
- Corresponding Duty: Public interest obligations; fairness doctrine (historically)
- Authority: *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 383, 389-90 (1969) (broadcast frequencies are "public trust"; licensee must act as "proxy or fiduciary" for community; "no one has a First Amendment right to a license or to monopolize a radio frequency"; "it is the right of the viewers and listeners, not the right of the broadcasters, which is paramount").

GOOGLE (SECTION 230)

- Government Benefit: Federal immunity from state law liability; freedom from publisher responsibility; ability to moderate content without legal consequences; protection while operating as adjudicated monopoly

- Corresponding Duty: NONE - No duty of non-discrimination; no transparency requirements; no due process for censored speakers

- Result: Unprecedented inversion of historical pattern

The Regulatory Gap Proves the Constitutional Problem

Google will argue that internet platforms are not regulated like utilities, therefore no duties apply. This argument inverts causation. The absence of regulation for monopolistic internet platforms does not eliminate constitutional obligations -- it creates them.

Throughout American history, when private entities controlled essential infrastructure affecting the public interest, government imposed regulatory duties to protect the public. Telegraph companies were regulated. Telephone companies were regulated. Broadcast licensees were regulated. Utilities were regulated. Each received government benefits (rights-of-way, spectrum, franchises) and corresponding public obligations.

Internet platforms represent an unprecedented inversion: They receive the greatest government benefit in history (blanket immunity from state law liability via Section 230), achieve monopoly control over essential infrastructure (adjudicated by federal courts), yet bear zero regulatory obligations. No rate regulation. No duty to serve. No non-discrimination requirements. No transparency. No due process for censored speakers.

This regulatory gap -- combined with adjudicated monopoly status, government immunity, and government coordination -- is precisely why constitutional constraints must apply. The absence of statutory regulation makes constitutional doctrine more necessary, not less. When government grants monopoly-enabling immunity without imposing corresponding regulatory duties, constitutional state action doctrine fills the gap to prevent precisely the concentrated private power over public functions that has emerged here.

The Fourth Circuit recognized this principle: "regulation serves as a substitute for competition in natural monopolies." and "regulation is necessary as a "substitute for competition." *Time Warner Entm't*, 506 F.3d at 308, 309. Where neither competition nor regulation exists -- as with Google's

adjudicated monopoly protected by Section 230 immunity -- constitutional constraints must substitute for both.

This inversion is historically unprecedented. Government has never granted such sweeping immunity without corresponding public obligations. The combination of:

1. Monopoly power (adjudicated by federal courts)

2. Essential infrastructure that cannot be duplicated (federal court findings)

3. Government immunity (Section 230)

4. Government coordination (Executive Order AI mandates, DHS/FBI systems)

creates exactly the type of concentrated private power over public functions that triggers state action doctrine.

### 3. Google's Cases Are Distinguishable

Google cites cases like *Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020), and *Lewis v. Google LLC* for the proposition that search platforms cannot be state actors. Those cases are fundamentally distinguishable because they were decided before federal courts adjudicated Google's illegal monopoly status. *Prager* was decided in February 2020 -- four years before the August 2024 and April 2025 federal court findings establishing Google's monopoly power, 90%+ market share, and systematic foreclosure of competition. Beyond the absence of monopoly findings, *Prager* and similar cases:

- Involved no analysis of Section 230 immunity as creating state action when combined with monopoly power

- Involved no documented government AI coordination through Executive Orders

- Did not address systematic religious discrimination

- Involved no exclusive religious institution partnerships

- Involved no DHS/FBI content moderation coordination

The legal landscape has fundamentally changed. Federal courts have now adjudicated Google's illegal monopoly status and found systematic harm through exclusionary conduct. The August 2024 court found that Google maintains its monopoly through conduct that harms competition. *United States v. Google LLC*, 747 F. Supp. 3d at 115. The April 2025 court found that Google's "exclusionary conduct substantially harmed" customers through "artificial technical limitations." *United States v. Google LLC*, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025).

Mr. Richards is a content creator harmed by these same exclusionary mechanisms. His systematic exclusion operates through the precise "artificial technical limitations" that federal courts found constitute illegal monopolistic conduct. When an adjudicated illegal monopolist controlling essential infrastructure operates through government coordination to discriminate based on religious viewpoint, that conduct triggers constitutional constraints.

The combination of factors present here -- adjudicated monopoly status, Section 230 immunity, government coordination, and religious discrimination -- was never before the court in *Prager* or similar cases. Those cases therefore do not control where, unlike there, the private entity operates

as an adjudicated monopoly exercising governmental functions under unprecedented federal

immunity.

Systematic Comparison: Why This Case Is Different

The following comparative analysis demonstrates that this case presents factors never before

combined in any platform case:

MONOPOLY STATUS

- This Case: Federal court adjudication (August 2024 & April 2025) - 90.01% market share

- Halleck: No monopoly finding; limited to public access channels on Time Warner's
  Manhattan cable system; *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 810,
  814 (2019) (rejecting state action claim where MNN operated local public access TV
  channels; Court held that "the fact that the government licenses, contracts with, or grants
  a monopoly to a private entity does not convert the private entity into a state actor --
  unless the private entity is performing a traditional, exclusive public function";
  distinguished from utilities because "a variety of private and public actors have operated
  public access channels" including "private cable operators; private nonprofit
  organizations; municipalities; and other public and private community organizations")

- Prager: No monopoly adjudication; case decided before federal courts found Google's
  illegal monopoly status; *Prager Univ. v. Google LLC*, 951 F.3d 991, 995, 998 (9th Cir.
  2020) (decided February 2020, pre-dating August 2024 and April 2025 monopoly
  findings; court acknowledged YouTube's "ubiquity" as "paradigmatic public square on

the Internet" but held this "does not alter our public function analysis" because YouTube "merely operates a platform"; case involved no findings of monopoly power, no analysis of Section 230 immunity as creating state action, and no government coordination in content moderation)

ABILITY TO DUPLICATE

- This Case: Federal court found "insurmountable" barriers to entry; cannot be duplicated

- Halleck: Can be duplicated - other cable access channels exist

- Prager: Can be duplicated - competing video platforms operate successfully

ESSENTIAL INFRASTRUCTURE

- This Case: Controls essential non-duplicable infrastructure (like Terminal Railroad bridge)

- Halleck: Optional platform - not essential to participation in society

- Prager: Optional platform - multiple video hosting alternatives exist

GOVERNMENT IMMUNITY

- This Case: Section 230 immunity

- Halleck: No government immunity

- Prager: Section 230 immunity (but no monopoly + no govt coordination)

GOVERNMENT COORDINATION

- This Case: Executive Order AI mandates + DHS/FBI content moderation coordination

- Halleck: No documented government coordination

- Prager: No documented government coordination

RELIGIOUS INSTITUTION PARTNERSHIP

- This Case: Exclusive Vatican partnership (only religious institution in 20-year history)

- Halleck: No religious partnerships

- Prager: No exclusive religious partnerships

COMMON CARRIER HISTORICAL ANALOGY

- This Case: Functions like telegraph networks (organize/route information)

- Halleck: No common carrier analogy

- Prager: No common carrier analogy

CONTROLS "MODERN PUBLIC SQUARE"

- This Case: Gateway to the square (*Packingham* recognized cyberspace as public square)

- Halleck: Local access only

- Prager: Partial (one platform among many)

DECIDED BEFORE MONOPOLY FINDING

- This Case: N/A - benefits from federal monopoly findings

- Halleck: Yes - decided before any monopoly adjudication

- Prager: Yes - decided before any monopoly adjudication

"RISES TO PUBLIC CONCERN" TEST

- This Case: Satisfies *German Alliance* test (monopoly + essential infrastructure + public consequence)

- Halleck: Failed test - optional local service

- Prager: Failed test - competitive market

THE CUMULATIVE DIFFERENCE IS DISPOSITIVE. *Halleck* and *Prager* involved platforms without monopoly power, without essential infrastructure, without government coordination, and were decided before federal courts adjudicated Google's illegal monopoly status. This case presents the unique convergence that Justice Thomas anticipated in *Knight*: "concentrated control" over "privately owned information infrastructure" that cannot be duplicated and operates through government coordination.

Most critically: *Halleck* itself recognized an exception: "Under the laws in certain States... a local government may decide to itself operate the public access channels... or could take appropriate steps to obtain a property interest in the public access channels. Depending on the circumstances, the First Amendment might then constrain the local government's operation." 587 U.S. at 817-818.

Google's search index is infrastructure the government would operate if it didn't exist privately -- exactly like telegraph networks that were regulated as common carriers despite private ownership.

**4. Virginia Constitution Provides Independent Broader Protection**

Virginia Constitution, Article I, Section 12:

"That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press..."

This provision provides independent state constitutional grounds for relief with several critical distinctions from the federal First Amendment:

1. Mandatory Language: The text states speech freedoms "can never be restrained except by despotic governments" -- stronger than federal text.

2. Broader Scope: Protects sentiments on "all subjects" -- more expansive than federal interpretation.

3. "Great Bulwarks of Liberty" Language: This unique phrasing indicates special constitutional solicitude for speech rights under Virginia law.

4. Independent Interpretation: Virginia courts interpret the Virginia Constitution independently from federal precedent. State constitutional provisions are not mere echoes of federal protections.

Application to This Case:

Under Virginia constitutional law, the "rises to public concern" doctrine from *German Alliance* may be more readily applied. When a monopolistic private entity:

- Controls 90% of access to information (federal court finding)

- Receives government immunity (Section 230)

- Operates through government coordination (Executive Order AI mandates, DHS/FBI systems)

- Cannot be practically duplicated (federal court finding of "insurmountable" barriers)

- Controls the gateway to the "modern public square" (*Packingham*)

Virginia's Constitution -- with its unique "great bulwarks of liberty" language and prohibition on restraints "except by despotic governments" -- may provide broader state action doctrine than federal law.

Virginia's "Common Benefit" Provision:

Virginia Constitution Article I, Section 3 states that government is "instituted for the common benefit, protection, and security of the people." When a private monopoly controls the primary means of democratic discourse, it implicates the "common benefit" beyond purely private concerns. This provides independent state constitutional grounds for finding state action.

These Virginia constitutional provisions require factual development through discovery and must not be dismissed at the pleading stage.

### 5. Statute of Limitations Does Not Bar Action for Continuing Constitutional Violations

Google argues the statute of limitations bars claims dating to 2009. This argument fails for three independent reasons:

Continuing Violation Doctrine: Each algorithmic suppression of Mr. Richards' content constitutes a new constitutional injury. The Amended Complaint discusses ongoing suppression "From 2009 to present" (FAC ¶ 52), with specific recent examples including:

- Google Alerts manipulation prioritizing other "Tommy Richards" personas over Mr. Richards' established 25-year presence (FAC ¶ 32)

- Cross-platform suppression where bot accounts created 7 months ago appeared in searches but have now been removed following this lawsuit (FAC ¶ 33) (Exhibit A – filed separately)

- Systematic search result manipulation continuing through the present

- Apparent retaliation following the filing of this lawsuit, with even previously visible bot accounts now removed from Google Alerts (Exhibit A – filed separately)

The Supreme Court has held that where a defendant's "unlawful practice... continues into the *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982). Here, Google's algorithmic suppression of Mr. Richards' religious content is not a single discrete act but a continuing practice -- each day the algorithms operate to exclude his viewpoint constitutes a fresh violation.

Discovery Rule/Fraudulent Concealment: Mr. Richards could not have discovered the systematic nature of religiously-motivated suppression until recent revelations exposed the coordinated Vatican partnership's effects operating through Google's adjudicated illegal monopoly. Google's "Honest Results" policy falsely promised "no special treatment such as ranking boosts or specialized support based on personal or financial relationships" while simultaneously providing exclusive Vatican partnerships. FAC ¶¶ 17, 63, 152.

The limitations period did not begin until: (1) federal courts adjudicated Google's illegal monopoly status in 2024-2025; (2) the Rome Call for AI Ethics' full scope became publicly documented; and (3) Google Alerts analysis revealed the systematic pattern. Under fraudulent concealment principles, the statute of limitations was tolled throughout Google's active concealment.

Federal Question Tolling: Constitutional violations by government actors operating through private monopolists do not accrue until the full scope of government entanglement becomes discoverable. The 2024-2025 federal court findings revealing Google's monopolistic harm, combined with Executive Order 14319's July 2025 AI mandates, are recent developments that triggered the statute of limitations.

### B. The RFRA Claim States a Valid Cause of Action (Count 5)

Google argues RFRA only applies to "Government" action. But RFRA applies when government action substantially burdens religious exercise -- even when implemented through private actors. The government cannot achieve through Google what it is constitutionally prohibited from doing directly.

Here, the government's coordination with Google creates RFRA violations through:

- Executive Order mandating AI "neutrality" standards while Google implements Vatican-coordinated religious suppression

- Trump Religious Liberty Commission endorsing the same Catholic authorities receiving preferential algorithmic treatment

- DHS/FBI coordination for content moderation affecting religious expression

This government-directed framework substantially burdens Mr. Richards' religious exercise by systematically suppressing his biblical expression while promoting competing institutional perspectives. RFRA prohibits such government action regardless of whether implemented directly or through coordinated monopolistic platforms.

At minimum, the RFRA claim requires factual development through discovery regarding the extent of government direction over Google's religious content decisions, making dismissal inappropriate.

C. The State-Law Claims Are Not Time-Barred

Google argues all state-law claims are time-barred based on allegations dating to 2009. This argument fails because the Amended Complaint alleges continuing violations through the present, not one-time historical conduct.

Continuing Tort Doctrine: Under Virginia law, when a defendant's wrongful conduct is continuous rather than a single discrete act, the statute of limitations does not begin until the conduct ceases. "If the plaintiff can show that the illegal act did not occur just once, but rather 'in a series of separate acts[,] and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation.'" *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1167 (4th Cir. 1991); *accord A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011).

The Amended Complaint alleges systematic, ongoing suppression "From 2009 to present" through multiple mechanisms:

- Continuing search result manipulation

- Ongoing Google Alerts discrimination

- Cross-platform suppression of current social media content

- Real-time algorithmic throttling

- Recent apparent retaliation following lawsuit filing

These are not "continuing ill effects of an original violation" but rather "a series of separate acts" of suppression occurring daily through Google's automated systems. Each algorithmic decision to suppress Mr. Richards' content is a separate tortious act within the limitations period.

Fraudulent Concealment Tolls Statutes: Google's false "Honest Results" promises actively concealed the Vatican partnership's discriminatory effects, tolling all state-law statutes of limitations until Mr. Richards discovered the systematic coordination.

### D. The First Amendment Does Not Bar Plaintiff's Claims

Google argues that its search result rankings constitute protected editorial speech under Moody v. NetChoice. This argument misunderstands both Moody and the nature of Mr. Richards' claims.

Moody Does Not Apply to Illegal Monopolists: The Supreme Court in Moody analyzed content moderation by platforms operating in competitive markets. The Court's First Amendment analysis may have assumed platforms face competitive pressure that disciplines editorial decisions. Here, by contrast, Google operates as an adjudicated illegal monopolist with no meaningful competition. When monopolists use exclusionary conduct to harm content creators -- as federal courts found Google does -- First Amendment protection does not shield such anticompetitive discrimination.

The federal courts specifically found that Google's conduct "substantially harmed" those dependent on its infrastructure through "artificial technical limitations." When a monopolist uses

its control over essential infrastructure to discriminate, that is anticompetitive conduct, not

protected editorial speech.

Government Coordination Eliminates First Amendment Defense: When platforms operate under

government direction -- as Google does through Executive Order AI mandates, DHS/FBI

coordination, and Vatican-government religious coordination -- the First Amendment protects

users' speech rights, not platforms' censorship decisions. Google cannot claim editorial immunity

for implementing government-preferred religious viewpoints.

Google's Own Promises Waive First Amendment Defense: Google publicly promises "Honest

Results" with "no special treatment" based on relationships. These promises constitute

commitments that Google cannot now disclaim by invoking the First Amendment. Enforcing

Google's own neutrality promises does not violate the First Amendment.

### E. **Section 230 Does Not Apply to This Case**

Google's Section 230 defense fails for multiple independent reasons:

Section 230 Doesn't Immunize Monopolistic Conduct: Federal courts found Google's

exclusionary conduct systematically harms content creators through monopolistic manipulation.

Section 230 does not shield illegal monopolistic conduct. The statute immunizes editorial

decisions about third-party content, not anticompetitive exclusion of content creators from

essential infrastructure.

Constitutional Claims Aren't "Publisher Liability": Mr. Richards' constitutional claims do not

seek to hold Google liable as a publisher. They seek to constrain government-coordinated

religious discrimination implemented through monopolistic infrastructure. Section 230 does not override First Amendment protections.

Mr. Richards Is the Content Creator, Not Third Party: Section 230 immunizes platforms from liability for "information provided by another information content provider." 47 U.S.C. § 230(c)(1). Mr. Richards created his own content on his own website. Google unilaterally chose to index that content and then systematically suppress it. This falls outside Section 230's framework, which contemplates platform hosting of user-generated content.

 Google Alerts Discrimination Exceeds Section 230: Google Alerts is a notification service promising to inform users about specific topics. When Google systematically manipulates which "Tommy Richards" gets featured in those notifications -- promoting individuals with no comparable online presence while suppressing the actual subject -- Google acts as a discriminatory communications service, not a protected publisher making editorial decisions about third-party content.

The systematic manipulation of Google Alerts demonstrates active discrimination rather than passive content moderation. Despite Mr. Richards' 25-year established digital presence, extensive biblical scholarship, and documented online authority, Google Alerts consistently features:

- A baseball coach with minimal online presence

- A Meta employee with no comparable digital footprint

- Other individuals whose relevance to "Tommy Richards" searches is demonstrably less than Mr. Richards' established presence (Exhibit E – filed separately)

This manipulation extends beyond search results into Google's notification services, demonstrating coordinated suppression across Google's ecosystem.

Moreover, even assuming Section 230 could apply to some of Google's conduct, the statute's protection requires good faith. Section 230(c)(2)(A) protects restriction of content the provider considers objectionable only when undertaken "in good faith." 47 U.S.C. § 230(c)(2)(A). Google's systematic religious viewpoint discrimination through exclusive Vatican partnerships while simultaneously promising users "Honest Results" with "no special treatment such as ranking boosts or specialized support based on personal or financial relationships" is not good faith content moderation. When a platform publicly promises neutrality and algorithm- driven results, then systematically manipulates those results based on institutional partnerships to suppress competing religious viewpoints, it acts in bad faith. Section 230 does not immunize such conduct.

Following the filing of this lawsuit, Google has apparently retaliated by removing even Mr. Richards' bot accounts from Google Alerts -- accounts that previously appeared despite having far less content and history than his main presence.

## F. **Plaintiff Has Adequately Pled All State-Law Claims**

### 1. **Tortious Interference Claims (Counts 3 & 12)**

Google argues Mr. Richards fails to identify specific business relationships. But the Amended Complaint details:

- Religious conference speaking opportunities dependent on Google discovery (FAC ¶ 110)

- Publishing contracts dependent on author platform visibility (FAC ¶ 110)

- Ministry donation relationships from organic search traffic (FAC ¶ 110)

- Collaborative opportunities with content creators discoverable through search (FAC ¶ 110)

- Licensing opportunities for digital artwork (FAC ¶ 110)

These allegations satisfy Rule 8's pleading requirements. Discovery will develop the specific opportunities Google's suppression prevented.

Google's Knowledge: Google operates search algorithms determining which content receives visibility. Google's adjudicated monopoly status means Google knows its suppression decisions determine whether content creators can develop business relationships.

Improper Means: Google's exclusionary conduct -- found illegal by federal courts -- constitutes independently tortious conduct sufficient to establish improper means. The same "artificial technical limitations" that federal courts in the DOJ antitrust matter against Google prohibited in antitrust context constitute improper means for tortious interference.

Causation: But for Google's systematic suppression, Mr. Richards' high-quality religious content would have received normal algorithmic treatment, generating the business opportunities available to comparable content creators.


**2. VCPA Claim (Count 6)**

Google argues that Mr. Richards is not a "consumer" under the VCPA because: (1) he hasn't articulated how Google is a "supplier" in a "consumer transaction"; (2) his use of Google Search is not "primarily for personal, family, or household purposes" since he uses it for "advocacy work" and earning revenue as a content creator; and (3) providing search results is not an

"advertisement...of goods or services." Def. MTD at 19-20. Each argument fails under binding Fourth Circuit precedent.

A. Mr. Richards Is a Consumer Under the VCPA

i. The Fourth Circuit Has Held That Free Ad-Supported Websites Create Commercial Relationships With Users

In *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344 (4th Cir. 2020), the Fourth Circuit addressed whether free websites monetized through advertising create commercial relationships with users under Virginia law. The defendant operated stream-ripping websites that were "free to use, and no cash is exchanged." *Id.* at 353. The court held that "the mere absence of a monetary exchange does not automatically imply a non-commercial relationship." *Id.*

The Fourth Circuit recognized that modern websites routinely offer free services while generating revenue through advertising, stating: "It is hardly unusual for websites to be free to use in today's Internet because many corporations 'make money selling advertising space, by directing ads to the screens of computers employing their software.'" *Id.* (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 926-27 (2005)).

The court found that "the visitors' acts of accessing the Websites (and downloading the generated files) are themselves commercial relationships" because the operator "made a calculated business choice not to directly charge visitors in order to lure them to his Websites." *Id.* The operator collected user data (IP addresses, location information) and "ultimately profits from visitors by selling directed advertising space and data collected to third-party brokers, thus purposefully availing himself of the privilege of conducting business within Virginia." *Id.*

Critically, the Fourth Circuit held this business model constituted "transacting any business" under Virginia's long-arm statute, Va. Code § 8.01-328.1(A)(1). *Id.* at 351 n.7. The court rejected the defendant's attempt to "distance himself from this commercial arrangement by contending that any commercial relationship that may exist lies with advertising brokers, as opposed to directly with the advertisers or visitors." *Id.* at 353-54. The court held that because the operator "facilitates targeted advertising by collecting and selling visitors' data" and "earns revenues precisely because the advertising is targeted to visitors," a commercial relationship exists. *Id.*

ii. Google's Business Model Is Identical to Kurbanov's Websites

Google Search operates under the identical business model that the Fourth Circuit analyzed in *Kurbanov*:

- Free to use with no monetary exchange: Like Kurbanov's websites, Google Search charges users no fees

- Calculated business choice: Google has made a "calculated business choice not to directly charge visitors in order to lure them" to its search platform, generating over $234 billion annually through advertising instead of charging users

- Data collection: Google collects extensive user data including search queries, browsing history, location data, and IP addresses

- Targeted advertising: Google sells advertising space and uses collected data for geo-targeted advertising directed at specific jurisdictions including Virginia

- Profits from user activity: Google "profits from visitors by selling directed advertising space and data collected" to advertisers, precisely as in *Kurbanov*

Under *Kurbanov*, these facts establish that Mr. Richards' use of Google Search involves a commercial relationship under Virginia law. The Fourth Circuit's holding that "the mere absence of a monetary exchange does not automatically imply a non-commercial relationship" directly defeats any argument that search users cannot be consumers because they pay no cash. 963 F.3d at 353.

iii. Google Is a "Supplier" Providing "Consumer Services" in a "Consumer Transaction"

Google argues Mr. Richards "merely quotes the statute" without explaining how Google qualifies as a "supplier" or how this constitutes a "consumer transaction." Def. MTD at 19-20. This argument ignores both the VCPA's statutory text and binding Fourth Circuit precedent.

First, Google is a "supplier" under Va. Code § 59.1-198. The statute defines "supplier" as "a seller, lessor, or professional who advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor, or licensor who advertises and sells, leases, or licenses goods or services to be resold, leased, or sublicensed by other persons." Va. Code § 59.1-198. Google advertises its search services to Virginia consumers, solicits their use, and engages in transactions providing those services. Under *Kurbanov*, operating a free website monetized through advertising constitutes "conducting business" and creates commercial relationships with users. 963 F.3d at 353. Google is unquestionably a supplier under the VCPA.

Second, Mr. Richards uses Google's services for purposes that are "primarily for personal, family, or household purposes" under Va. Code § 59.1-198. Religious ministry, monitoring one's own spiritual content, and researching biblical topics are quintessentially personal activities. The VCPA protects exactly these types of personal uses of consumer services.

Third, Google's argument that search results are not "advertisement...of goods or services" misconstrues the statute. The VCPA reaches "a sale, lease, assignment, award by chance, or other disposition of an item of goods, a consumer service" - not merely advertisements. Va. Code § 59.1-198. Google provides search services and Google Alerts services. These are consumer services under the statute regardless of whether they constitute advertisements.

iv. Mr. Richards Uses Google's Services for Personal Purposes

Google argues that Mr. Richards' use cannot be "primarily for personal, family, or household purposes" because his allegations reference "advocacy work" and earning "substantial revenue" as a content creator. Def. MTD at 20. This argument fails.

Religious ministry is quintessentially personal, not commercial. Mr. Richards operates SpirituallySmart.com "as his independent platform for sharing spiritual revelations from God" and conducting his "biblical ministry." FAC ¶¶ 4, 23. His primary purpose has always been sharing spiritual truth and biblical scholarship -- this is a calling, not a business. The fact that a minister may receive support enabling full-time ministry does not transform religious calling into commercial enterprise. Ministers have always relied on congregation support; that doesn't make ministry "business" rather than personal calling.

The harm Google caused demonstrates the personal nature of Mr. Richards' ministry. Google's suppression didn't just deny revenue -- it silenced his spiritual message, prevented audiences from finding biblical truth they sought, and destroyed the credibility he built through 25 years of genuine scholarship. These harms are fundamentally personal: the inability to fulfill his calling, the frustration of his religious mission, the destruction of his reputation as a biblical scholar. That

Google's suppression also prevented ministry opportunities that might have generated

sustainability support does not make the underlying ministry commercial rather than personal.

Mr. Richards uses Google Search for personal purposes: monitoring his own ministry's visibility,

researching religious topics, tracking discourse about his faith-based content. FAC ¶ 32. He

subscribes to Google Alerts for personal notifications about his ministry's reach. *Id.* These are

paradigmatic 'personal, family, or household purposes' under the VCPA.

The statute protects services "to be used primarily for personal, family, or household purposes."

Va. Code § 59.1-198 (emphasis added). Mr. Richards' primary purpose in using Google's services

is personal: expressing his religious views, monitoring his spiritual message's reach, and

researching topics for his biblical ministry. That his ministry work might incidentally generate

support for sustainability does not change the primarily personal nature of his use.

Critically, Mr. Richards has not yet generated revenue from his ministry work—not because his

content lacked value, but because he invested during the internet's formation period (2000-2009)

when monetization infrastructure barely existed. Like early investors in a startup who accept

years without returns in exchange for future value when the company succeeds, Mr. Richards

invested time and creativity during the internet's "pre-IPO" phase. Google induced this

investment by promoting his content to #2 ranking for "Vatican" searches and top 1% creator

status, then systematically suppressed that content precisely when the internet matured into a

commercial platform where such visibility could generate sustainability. Google's argument that

his use cannot be "primarily for personal, family, or household purposes" because of potential

revenue (Def. MTD at 20) fails: Mr. Richards' use of Google Search remains entirely personal—

monitoring his religious message's reach, researching biblical topics, fulfilling his spiritual calling to share truth. The fact that Google's suppression prevented his early investment from ever generating returns does not transform his personal religious use into commercial activity. If anything, Google's appropriation of temporal investment value—taking the benefits of early adoption while denying corresponding returns—demonstrates the personal, non-commercial nature of his mission-driven work.

Google's argument proves too much. Under Google's theory, any individual who maintains a blog, creates online content, or operates a personal website while hoping to sustain it through donations would be excluded from VCPA protection. This would gut the statute's protections for millions of internet users who use "free" services for personal expression while hoping their work might become self-sustaining.

B. Google's "Honest Results" Policy Constitutes a Specific, Actionable Misrepresentation

Google argues that Mr. Richards has failed to plead a fraudulent misrepresentation with the particularity required by Rule 9(b). Def. MTD at 23-24. This argument fails because the Amended Complaint identifies with specificity the false representation, when it was made, who made it, and what was obtained thereby.

The specific false representation: Google's "Honest Results" policy explicitly promises: "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships" and assures users "you can trust Google Search to deliver the most relevant and reliable information." FAC ¶¶ 17, 152.

When it was made: This policy was published and in effect during the suppression period from 2009 to present. FAC ¶¶ 52, 152.

Who made it: Google LLC made these representations through its publicly accessible policies. FAC ¶¶ 17, 152.

What was obtained: Google obtained Mr. Richards' continued use of Google Search services, his data and attention that Google monetizes for advertising revenue, and his forbearance from investing resources in alternative platforms based on Google's false promises of neutrality. FAC ¶ 155.

Why it was false: Google provides exactly such "special treatment" through its exclusive Vatican partnership -- the only religious institution in Google's 20-year history to receive preferential treatment. FAC ¶¶ 52-65. While promising "no special treatment based on personal or financial relationships," Google simultaneously maintains exclusive partnerships providing ranking boosts and specialized support based on institutional relationships.

Google's argument that it "does not make any factual allegations that this representation was false" ignores the extensive allegations documenting Google's exclusive Vatican partnership and systematic preferential treatment. Def. MTD at 24. The Amended Complaint contains detailed allegations about how Google's conduct directly contradicts its "Honest Results" promises.

C. Mr. Richards Adequately Pleads Reliance and Damages

Google argues that Mr. Richards fails to plead reliance because he "merely asserts" reliance without alleging when he saw the allegedly false statements. Def. MTD at 24. This argument fails because reliance can be established through market-wide reliance on Google's neutrality representations, not just individual awareness of specific policy documents.

i. Market Reliance on Google's Neutrality Promises

Google's "Honest Results" policy and neutrality representations are not isolated statements to
individual consumers -- they are foundational market-wide representations that induced universal
reliance across the entire digital ecosystem. This is analogous to "fraud on the market" theory in
securities law, where materialized misrepresentations are presumed to be reflected in market
behavior, obviating the need to prove individual reliance on specific statements.[7]

Google's monopoly status -- 89.2% market share in search and 94.9% in mobile search -- exists
precisely because the market as a whole relied on Google's promises of neutral, comprehensive,
unbiased search results. Users, content creators, businesses, and institutions built their entire
online strategies around the fundamental premise that Google provides "honest results" with "no
special treatment based on personal or financial relationships." FAC ¶¶ 17, 152.

Mr. Richards, like millions of content creators, relied on this market-wide understanding of
Google's neutrality in:

- Creating content optimized for Google's search algorithms

- Investing 25 years building an online presence discoverable through Google Search

- Foregoing investment in alternative distribution channels

- Using Google Search and Google Alerts as primary discovery mechanisms

This reliance was reasonable precisely because Google's neutrality promises were market-wide
representations that established Google's dominant position. The entire digital content ecosystem

---

[7] While fraud-on-the-market theory originates in securities law, see *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47
(1988), the underlying principle -- that market-wide misrepresentations induce collective reliance obviating proof of
individual awareness of specific statements -- applies with equal force to consumer protection claims involving
monopolistic platforms where the entire market operates on the premise of the defendant's false neutrality promises.
Here, Google's monopoly status is itself evidence that the market collectively relied on Google's neutrality
representations in making Google the dominant search platform.

operates on the premise that Google provides neutral search -- a premise Google actively

cultivated through its public "Honest Results" policy and similar representations.

ii. Individual Reliance Is Also Adequately Pled

Even if market-wide reliance were insufficient (it is not), Mr. Richards adequately pleads

individual reliance. Mr. Richards relied on Google's "Honest Results" promises in continuing his

25-year use of Google Search services for biblical ministry, foregoing alternative platforms

based on Google's neutrality promises. FAC ¶ 155. He uses Google Search to monitor his

content's visibility and subscribed to Google Alerts for notifications. FAC ¶ 32.

Google's argument that Mr. Richards must plead the exact date he viewed the "Honest Results"

policy imposes pleading requirements beyond what Rule 8 or Rule 9(b) demand. Google's policy

is publicly available and has been in effect throughout the relevant period. Moreover, Google's

neutrality representations extend beyond the written policy to include Google's entire public

posture as a neutral information organizer -- representations disseminated through press releases,

public statements, marketing materials, and the very design of Google Search itself.

iii. Damages Are Adequately Pled

Mr. Richards suffered over $544 million in lost ministry opportunities from Google's systematic

suppression. FAC ¶ 116. The VCPA provides for recovery of "actual damages, or $500,

whichever is greater," plus reasonable attorneys' fees. Va. Code § 59.1-204(A)-(B). If the

violation was willful, the court may award up to three times actual damages. *Id.*

Google's false "Honest Results" promises combined with its exclusive Vatican partnership while

systematically suppressing competing biblical perspectives demonstrates willful deceptive

practices warranting treble damages under the VCPA.

**3. Civil Conspiracy Claim (Count 7)**

Google argues Mr. Richards fails to plead a civil conspiracy. But the Amended Complaint details circumstantial evidence sufficient to survive dismissal and warrant discovery:

The Circumstantial Evidence:

- Exclusive 2009 Vatican partnership  --  the only religious institution in Google's 20-year history to receive preferential platform treatment

- High-level coordination  --  Eric Schmidt's 2016 statement to Pope Francis: "We will make it happen" regarding Vatican concerns about online content

- Suspicious timing  --  systematic suppression of Mr. Richards' Vatican-critical content beginning immediately after the 2009 partnership formed (he went from #2 for "Vatican" searches to near-invisibility)

- Cross-platform coordination  --  DHS/FBI content moderation systems affecting religious expression

- Government-Vatican alignment  --  Trump Religious Liberty Commission endorses the same Catholic authorities receiving preferential algorithmic treatment

Plausibility Standard Satisfied: At the motion to dismiss stage, plausibility -- not proof -- is the standard. The temporal correlation between Vatican partnership formation (January 2009) and immediate systematic suppression of the most prominent Vatican-critical voice (#2 ranking) creates the plausible inference of coordinated action that Rule 8 requires. Federal courts routinely permit discovery based on such circumstantial evidence of "suspicious timing."

Discovery Will Reveal Full Scope: While direct documentary proof of the agreement remains in Google's exclusive possession, the circumstantial evidence warrants discovery of:

- Internal Google communications regarding Vatican partnership obligations

- Algorithm changes implemented between 2009-2010 affecting religious content

- Communications between Google executives and Vatican officials regarding content policies

- Internal assessments of Mr. Richards' content before and after 2009

- Documents reflecting how Vatican partnership affected content moderation decisions

The allegations establish an agreement to systematically suppress biblical religious expression while promoting institutional Catholic perspectives -- an independently tortious purpose implemented through the same exclusionary conduct federal courts found illegal.


4. **Fraudulent Misrepresentation Claim (Count 8)**

Google's "Honest Results" policy constitutes a specific, material misrepresentation. The policy explicitly promises: "Google Search does not provide special treatment such as ranking boosts or specialized support based on personal or financial relationships" and ensures "you can trust Google Search to deliver the most relevant and reliable information." FAC ¶¶ 17, 152.

False When Made: Google knew these representations were false when made because Google maintained exclusive Vatican partnerships since 2009 providing exactly the "special treatment" the policy disclaims.

Reliance: Mr. Richards reasonably relied on these representations in continuing his 25-year use of Google's services for biblical ministry, foregoing alternative platforms based on Google's neutrality promises.

Damages: Google's systematic suppression caused over $544 million in lost ministry opportunities calculated using industry-standard metrics for comparable religious content creators. FAC ¶ 116.

FRCP Rule 9(b) Satisfied: The Amended Complaint identifies the specific false representation (Honest Results policy), when it was made (published policy in effect during suppression period), who made it (Google LLC), and what was obtained thereby (monopolistic control enabling religious discrimination).

### 5. Unjust Enrichment Claim (Count 9)

Google argues Mr. Richards conferred no benefit because Google suppressed his content, claiming this creates a "contradiction" since suppressed content generates no traffic. Def. MTD at 32-33. This argument misunderstands both unjust enrichment doctrine and Google's own business model.

### A. Appropriation of Temporal Investment Value

Google enriches itself by appropriating Mr. Richards' early internet investment without providing the corresponding benefits:

Early Adopter Investment (2000-2009): Mr. Richards invested substantial time, creativity, and resources creating quality biblical content during the internet's formative period. This investment created commercial value -- established search authority, recognized expertise, built audience

relationships. Google actively promoted this content, placing him #2 for "Vatican" searches, precisely because Google benefited from organizing and indexing quality content that attracted users to its platform.

Induced Reliance:

Google induced this investment through explicit promises of neutral, merit-based search results. Mr. Richards reasonably relied on these representations when investing resources in web presence rather than traditional publishing or ministry channels.

The financial investment analogy is precise: Google operated like a startup company soliciting early investors by promising that merit would determine returns. Mr. Richards "invested" not with money but with something more valuable -- years of time, creativity, and purpose-driven work to share biblical truth. His early internet work, including, for example: using AOL macros around 2000 to share his personal testimony and bible messages; and using very difficult "spamming" software in 2005 to reach decision-makers attempting to save Terri Schiavo's life, exemplifies the purpose-driven nature of early internet investment. These early adopters took risks creating content when the internet's future was uncertain, just as financial investors buy stock in emerging companies. Google's "prospectus" promised neutral, merit-based results -- the equivalent of promising fair treatment for early investors. But after securing monopoly position and transforming the internet into a commercial enterprise, Google systematically excluded purpose-driven early investors like Mr. Richards, replacing them with commercial content creators. Google effectively went public, achieved massive commercial success ($307 billion in 2023 revenue), but refused to honor the "stock certificates" of early investors who made the platform valuable. For Mr. Richards, the harm extends beyond financial loss: Google destroyed

the credibility and visibility he built over 25 years, making his years of work invisible to the audiences who sought his biblical scholarship.

Appropriation Without Compensation: After Mr. Richards' investment was made and the internet's open period closed, Google systematically suppressed his content while retaining all benefits:

- Google continues using Mr. Richards' content for indexing and search organization

- Google profits from the search authority early adopters like Mr. Richards created

- Google maintains the audience and infrastructure built partly through early adopters' work

- Google denies Mr. Richards the visibility benefits his early investment earned

Temporal Impossibility of Alternative Remedy: *Mr. Richards cannot recreate his early investment because the open internet no longer exists.* The current pay-to-play system -- proven by LinkedIn's $50 promotion experiment -- makes organic reach impossible. Google's unjust enrichment is permanent: Google keeps all value from early adopters' temporal investment while those adopters can never recreate comparable presence.

Moreover, on October 31, 2025, LinkedIn disabled counsel's ability to purchase promotional services entirely -- proving that even the calculated $8-203 million cost to artificially restore visibility may understate the true impossibility, as platforms may refuse to sell access at any price

Inequity: Google specifically induced early adoption by promoting quality content, then used monopoly power to close the open internet and suppress early adopters who challenge

institutional partners. This appropriation of temporal investment value -- taking benefits earned during the open internet period while denying corresponding visibility in the closed monopoly period -- constitutes unjust enrichment requiring restitution.

Google's "Contradiction" Argument Fails to Understand the Benefit Conferred

Google argues that because it suppressed Mr. Richards' content, resulting in his website receiving "virtually no traffic from Google searches," he cannot have conferred a benefit. Def. MTD at 32-33 (citing FAC ¶ 53). This argument misunderstands the nature of the benefit and reveals Google's fundamental misconception of unjust enrichment.

First, Google benefited from indexing Mr. Richards' content regardless of subsequent traffic. Google unilaterally chose to index SpirituallySmart.com and organize its 25 years of biblical content within Google's search infrastructure. This made Google Search more comprehensive and valuable to users. Google's monopoly status -- 89.2% market share -- exists precisely because users believe Google indexes and organizes "the world's information." Every indexed website, including Mr. Richards' extensive biblical scholarship, contributes to Google's value proposition as a comprehensive search engine. The fact that Google then chose to discriminate in how it displayed that content does not negate the initial benefit of having comprehensive, high-quality content to index, such as Mr. Richards'.

Second, Google benefited specifically from suppressing Mr. Richards' Vatican-critical content. Google's exclusive Vatican partnership -- the only religious institution in Google's 20-year history to receive such preferential treatment -- creates substantial value for Google's institutional relationships. By systematically suppressing Vatican-critical perspectives while promoting

Catholic institutional content, Google maintained and enhanced its valuable Vatican partnership. The benefit to Google is not the traffic to Mr. Richards' site but rather the discriminatory suppression itself, which serves Google's institutional religious partnerships. Google obtained value from the power to suppress -- a power that only exists because Google first indexed the content.

Third, Google benefits from searches related to Mr. Richards' content even while suppressing his site. When users search for "Vatican," "Catholic Church history," "biblical criticism," or related topics that Mr. Richards' content addresses, Google displays search results and advertisements. Google derives advertising revenue from these searches regardless of whether Mr. Richards' specific website appears prominently. Google obtained the benefit of comprehensive indexed content (including Mr. Richards' 25 years of biblical scholarship) to attract users to these searches, then discriminatorily suppressed Mr. Richards' site in the results while still monetizing the search itself.

Fourth, the benefit is Google's monopolistic control over information access. By indexing Mr. Richards' content, Google gained control over whether and how that content reaches the public. Google then exercised that control to implement religious viewpoint discrimination. The benefit is the power itself -- the ability to make Mr. Richards dependent on Google's platform for visibility while discriminating against him. Federal courts found Google uses precisely this type of control to "substantially harm" content creators through "exclusionary conduct" and "artificial technical limitations." *United States v. Google LLC,* Case No. 1:23-cv-108, slip op. at 99, 115

(E.D. Va. Apr. 17, 2025). If this control weren't valuable, Google wouldn't use exclusionary

conduct to maintain it.

Google's alleged "contradiction" is no contradiction at all. Google benefits from having

comprehensive content indexed (including Mr. Richards' high-quality biblical scholarship) while

simultaneously benefiting from discriminating in how that content is displayed to serve Google's

institutional partnerships. It is precisely this combination -- index everything to appear

comprehensive, then discriminate in display to serve institutional preferences -- that federal

courts found constitutes illegal monopolistic conduct. The benefit exists at both stages: the initial

indexing that makes Google comprehensive, and the subsequent discriminatory control that

serves Google's partnerships.

Inequitable Retention: It is inequitable for Google to (1) unilaterally index Mr. Richards' content;

(2) use that comprehensive index to maintain monopoly power; (3) discriminate in displaying

that content to serve Google's religious partnerships; and then (4) claim no benefit was conferred.

As an adjudicated illegal monopolist controlling essential information infrastructure, Google

cannot have it both ways. Having unilaterally chosen to index Mr. Richards' content and

integrate it into Google's search infrastructure, Google acquired an obligation to provide equal

treatment rather than discriminatory suppression.

Moreover, Google's own argument proves the benefit. Google claims Mr. Richards' site receives

"virtually no traffic from Google searches" (FAC ¶ 53) due to systematic suppression. This

demonstrates the extent of Google's discriminatory control, not the absence of benefit. The benefit to Google is precisely this ability to suppress -- the monopolistic power to determine which religious perspectives reach the public. That power derives from Google's initial decision to index Mr. Richards' content and make him dependent on Google's platform. Google cannot simultaneously claim (1) it has monopoly power over content visibility and (2) that controlling content visibility provides no benefit. The monopoly power itself IS the benefit.

Google's alleged "contradiction" is no contradiction at all.

### B.  Alternative Damages Theory: Quantifiable Cost to Restore Suppressed Visibility

While unjust enrichment traditionally seeks restitution of benefits conferred, Virginia law also recognizes damages measured by the cost to restore what was wrongfully taken. Here, counsel's LinkedIn experiments provide empirical data quantifying the current cost to purchase visibility equivalent to what Google's suppression destroyed.

The Measured Economics:

Through approximately $250 in paid LinkedIn promotions across multiple posts, counsel measured:

- Cost per 1,000 impressions: $0.50-$6.09

- Conversion rate (impressions to followers): 0.025-0.035%

- Organic reach without payment: Effectively zero despite 16-year established account with 700+ connections

Applying These Metrics:

Assuming similar pricing on Google's advertising platform to that on LinkedIn, to achieve follower counts comparable to what Mr. Richards would have through continued organic growth from his 2009 #2 ranking:

- 5 million followers: 16.7 billion impressions = $8.35-101.5 million

- 10 million followers: 33.3 billion impressions = $16.65-203 million

- 20 million followers: 66.6 billion impressions = $33.30-406 million

Why This Alternative Theory Is Appropriate Here:

First, quantifiable and proven: Unlike calculations of lost speaking engagements or ministry opportunities which are more difficult to quantify, these figures derive from actual measured costs in today's platform economy. Google cannot dispute that visibility now requires payment -- Google itself generates $234 billion annually selling such visibility through Google Ads.

Second, restores the status quo ante: The cost to purchase equivalent visibility represents the minimum necessary to restore Mr. Richards to the position he would occupy had Google not systematically suppressed his content following the 2009 Vatican partnership. This is a recognized measure of unjust enrichment damages.

Third, proves the temporal investment theory: In 2009, Mr. Richards achieved #2 ranking and 1% through merit alone -- zero payment. The $8-406 million cost to artificially purchase equivalent reach today quantifies the value of early-internet investment during the brief window (2000-2009) when organic merit-based reach was possible. Google appropriated that investment value by closing the window after inducing the investment.

Fourth, accounts for the impossibility of alternative remedy: Mr. Richards cannot simply "create competing platform" or "rebuild audience elsewhere" because the open internet no longer exists and Google is a monopolist search engine. The only path to visibility now is purchasing it at costs measured similar to the LinkedIn experiments. Google's unjust enrichment is therefore quantifiable: Google appropriated early-internet investment value worth $8-406 million (measured by current replacement cost) while providing zero corresponding benefits.

Fifth, demonstrates market-wide transformation: The fact that even counsel's established 16-year professional account with 700+ connections generates essentially zero organic reach proves this isn't about Mr. Richards' content quality. The entire internet transformed from merit-based to pay-to-play. Google's monopoly power enabled and profited from this transformation while systematically suppressing early adopters like Mr. Richards who invested during the merit-based period.

Critical Limitation -- What Money Cannot Purchase:

This damages calculation provides a floor, not a ceiling. It measures only the cost to purchase impressions and followers -- it cannot purchase:

- 16 years of authentic audience relationships built through genuine engagement

- Credibility established through mission-driven work that audiences sought voluntarily

- Speaking invitations and daily viewer contacts that ceased after 2009

- Trajectory toward household-name status as internet adoption grew exponentially

- Reputation as authority that audiences trusted because he earned it organically through 25 years of biblical scholarship

The LinkedIn experiments thus provide an alternative, empirically-grounded damages theory that survives any challenge to speculative lost-opportunity calculations: the measured cost in today's platform economy to purchase the visibility that organic merit provided in 2009, before Google's monopoly transformed the internet from public commons to commercial gatekeeping system.

No Contract Defense: Google's unjust enrichment claim is properly pled in the alternative to contract claims, as Virginia law permits.


6. **Defamation by Implication Claim (Count 10)**

Google argues that Mr. Richards fails to identify any specific defamatory statement and that search result rankings cannot constitute actionable defamation. Def. MTD at 26-29. Both arguments fail. Count 10 alleges that Google's systematic conduct communicates defamatory implications about Richards' credibility and authority. The Restatement explicitly recognizes that conduct can convey defamatory meaning, and Google's 16-year pattern of suppression constitutes exactly such conduct.


A. Conduct Can Communicate Defamatory Meaning

The Restatement recognizes that defamatory meaning can be communicated through persistent conduct: "The publication of defamatory matter may be made by conduct which by reason of its persistence it may be more appropriate to treat as a libel rather than a slander." Restatement (Second) of Torts § 568, cmt. d.

The classic illustration demonstrates this principle:

"A procures two men to 'shadow' B. They follow him from one public place to another until the 'shadowing' becomes notorious in the community. A has libeled B."

*Id.*, illus. 1.

The conduct of persistently following someone communicates a clear message to observers: the person being followed is suspected of wrongdoing and requires surveillance. No words are necessary -- the conduct itself conveys defamatory meaning to the community.

When conduct constitutes defamation, "the area of dissemination, the deliberate and premeditated character of its publication and the persistence of the defamation are factors to be considered in determining whether a publication is a libel rather than a slander." Restatement (Second) of Torts § 568(3). These factors establish whether defamatory conduct constitutes the more serious form of defamation -- libel, which is actionable per se without proof of special damages.

B. Google's Persistent Conduct Communicates Defamatory Messages About Richards

Google's treatment of Mr. Richards operates through the same type of persistent, deliberate conduct that the Restatement recognizes as defamatory. Just as the "shadowing" became "notorious in the community" and communicated suspicion of wrongdoing, Google's systematic

treatment of Richards has become observable to millions and communicates specific false messages about his credibility.

Message #1: Richards' Content Violates Policies

Google places warning labels on Mr. Richards' original YouTube videos while identical stolen copies of his own content appear without any restrictions. This differential treatment is persistent conduct observable to viewers that communicates: "There is something specifically wrong with Thomas Richards that makes his content require warnings, even though identical content from others is acceptable."

This message is demonstrably false. The identical content from others appears without restriction, proving the issue is discriminatory treatment of Richards personally, not legitimate content concerns.

Message #2: Richards Lacks Authority and Credibility

Before Google's January 2009 Vatican partnership:

- Richards was #2 for "Vatican" searches on YouTube (which Google acquired in 2006)

- Top 1% creator on Google's proprietary Video platform

- Received daily speaking invitations and viewer contacts

After the Vatican partnership:

- Near-invisibility in search results across Google's consolidated video ecosystem

- Systematic suppression continuing for 16 years

- Professional opportunities and audience contacts ceased

This dramatic reversal constitutes persistent conduct that communicates to the public: "Thomas Richards is not an authoritative or credible source -- if he were, he would appear prominently like he once did."

The timing makes the message particularly clear: Google's "judgment" that Richards lacks credibility coincided precisely with Google's exclusive Vatican partnership, not with any decline in Richards' scholarship quality.

Message #3: Richards Is Less Relevant Than Others With Similar Names

Google Alerts for "Thomas Richards" or "Tommy Richards" systematically features individuals with minimal online presence (baseball coach with 2,602 followers, alleged Meta employee) while completely obscuring Richards' 25-year established ministry, extensive scholarship, and documented prominence.

This persistent pattern -- continuing for 16 years across millions of alert notifications -- communicates to subscribers: "These other people are more noteworthy than the Thomas Richards you seek."

C. Google's Defamatory Conduct Constitutes Libel Under Restatement § 568(3)

Having established that Google's conduct is defamatory (it communicates false messages harming Richards' reputation), the question becomes whether this defamatory conduct constitutes libel or slander. This distinction matters because libel is actionable per se without proof of special damages, while slander generally requires such proof.

The Restatement provides that when defamation occurs through conduct, "the area of dissemination, the deliberate and premeditated character of its publication and the persistence of

the defamation are factors to be considered in determining whether a publication is a libel rather than a slander." Restatement (Second) of Torts § 568(3).

Google's conduct satisfies all three factors to an extraordinary degree, establishing that this defamatory conduct constitutes libel -- the more serious form of defamation that is actionable per se.

D. Google's Conduct Satisfies All Three Restatement Factors

1. Area of Dissemination - Massive Public Exposure

Google's defamatory conduct reaches:

- Millions of search users globally

- Google Alerts subscribers

- YouTube viewers seeing warning labels

- Potential collaborators, publishers, speaking venues seeking information about Richards

This far exceeds the "community" exposure in the Restatement's shadowing illustration, where two men following someone around town was sufficient for defamation.

2. Deliberate and Premeditated Character

- Exclusive Vatican Partnership (2009) - Only religious institution in Google's 20-year history to receive such preferential treatment

- High-level coordination - Eric Schmidt's 2016 promise to Pope Francis: "We will make it happen"

- Discriminatory implementation - Warning labels on Richards' videos but not on identical stolen copies

- Continued despite notice - Pattern persists after Google legal counsel directly contacted (January 2025)

- Apparent escalation - Further suppression following lawsuit filing

3. Persistence of the Defamation

- 16-year duration - Systematic suppression from 2009 to present

- Daily republication - Each search result, alert, and warning label republishes the defamatory message

- Cross-platform coordination - Suppression across Google Search, YouTube, Google Alerts

- Intensifying rather than diminishing - Escalating suppression over time

E. The Defamatory Messages Are False and Caused Substantial Harm

Falsity:

Message #1 (policy violations): Identical content from others appears unrestricted, proving Richards' content is acceptable and the restrictions target him discriminatorily.

Message #2 (lack of authority): Richards achieved #2 ranking, top 1% status, received daily professional contacts, demonstrates 25 years of biblical scholarship including biblical Greek mastery. His visibility declined due to systematic suppression, not quality decline.

Message #3 (less relevant than others): Richards' 25-year digital presence, extensive scholarship, and historical prominence vastly exceed the individuals Google features instead.

Harm:

Before suppression (pre-2009): Daily speaking invitations, viewer contacts, expanding audience, professional recognition, #2 ranking for major search terms.

After suppression (post-2009): Speaking invitations ceased, viewer contacts stopped, audience growth reversed despite improving scholarship, professional opportunities disappeared.

The harm continues with each republication -- every search result, every Google Alert, every warning label communicates the false defamatory messages anew to new audiences.

F. This Application of Restatement § 568 Is Straightforward

The Restatement explicitly contemplates conduct as defamation. Google's systematic treatment of Richards satisfies all three factors the Restatement identifies. The conduct is more persistent (16 years vs. brief shadowing), more deliberate (exclusive Vatican partnership, high-level coordination), and reaches far more people (millions of users vs. one community) than the shadowing illustration that the Restatement recognizes as defamation.

If two men following someone around town until it becomes "notorious in the community" constitutes defamation, then Google's 16-year systematic suppression of Richards across all its platforms, observable to millions, while promoting less-relevant individuals in his place, clearly satisfies the Restatement's standard for conduct-based defamation.

G. Google's Arguments Misunderstand Conduct-Based Defamation

Google argues that search results "not mentioning" Richards cannot be defamatory. This misunderstands the Restatement's recognition that conduct communicates meaning. The "shadowing" in Restatement § 568, illus. 1 involves no words at all -- yet it defames through observable conduct that becomes "notorious in the community."

Google's systematic exclusion of Richards from where he should appear (Google Alerts for his name, search results for topics he addresses) combined with preferential featuring of less-relevant individuals, communicates a clear message about Richards to observers. Just as following someone communicates suspicion, systematically obscuring someone while promoting others communicates lack of credibility.

Google also argues the conduct is not "sufficiently defamatory" for a religious scholar. For someone whose professional reputation depends entirely on perceived authority and trustworthiness in biblical scholarship, systematic suppression from #2 ranking and top 1% status to near-invisibility, combined with warning labels on original content while identical stolen copies appear unrestricted, directly destroys professional reputation. This is precisely the type of reputational harm defamation law protects against.

### 7. Virginia Misappropriation Claim (Count 11)

Google misappropriates the specific commercial value of Mr. Richards' early internet investment:

Property Interest Misappropriated: The value Mr. Richards created through early adoption -- established search authority, built audience, recognized expertise -- constitutes property interest

under Virginia law. This value was created during the 2000-2009 period when such investment could succeed through merit. The temporal nature of this investment makes it particularly valuable: it cannot be recreated because the open internet no longer exists.

Google's Commercial Use: Google continues using this property for commercial purposes:

- Indexing and organizing Mr. Richards' content to attract users

- Profiting from search authority that early adopters like Mr. Richards created

- Using the infrastructure and audience relationships built through early adopters' investment

- Benefiting from the credibility and comprehensiveness that early content provided

Misappropriation Through Suppression: Google misappropriates this value by denying Mr. Richards the visibility benefits his investment earned while retaining all commercial benefits for itself. This is not mere "editorial discretion" -- it is taking property value created by early investment while providing none of the corresponding benefits. Google's algorithmic suppression and Google Alerts manipulation misrepresent Mr. Richards' identity by obscuring his established presence in favor of less-relevant individuals.

Irreplaceable Harm: The harm is particularly severe because the property misappropriated cannot be recreated. Mr. Richards invested during a specific historical window; Google's monopoly closed that window. Google now exclusively controls access to the value Mr. Richards created, using it for Google's commercial benefit while suppressing Mr. Richards himself -- classic misappropriation of property rights. The irreplaceable nature of this harm was further demonstrated on October 31, 2025, when LinkedIn appears to have disabled counsel's

promotional access entirely after experiments proved the transformation from merit-based to pay-to-play accessibility -- showing that even billions in advertising spend might not restore what Google's monopoly destroyed.

No Consent: Mr. Richards never consented to Google's use of his identity for these commercial purposes. Google unilaterally began indexing his content.

---

IV. CONCLUSION

For the foregoing reasons, this Court should DENY Google's Motion to Dismiss in its entirety.

This case presents facts never before combined in any platform content moderation dispute: (1) adjudicated illegal monopoly status controlling essential information infrastructure; (2) documented government entanglement through Executive Order 14319 AI mandates and DHS/FBI coordination; (3) exclusive Vatican partnership—the only religious institution in Google's 20-year history to receive such treatment; (4) systematic religious viewpoint discrimination beginning precisely when that partnership formed in January 2009; and (5) 16 years of continuing suppression despite direct notice to Google's legal counsel.

Google's motion ignores these unique circumstances. Federal courts have found Google uses "exclusionary conduct" that "substantially harmed" customers through "artificial technical limitations." United States v. Google LLC, Case No. 1:23-cv-108, slip op. at 99, 115 (E.D. Va. Apr. 17, 2025). Mr. Richards is such a harmed content creator. The combination of monopolistic control over essential non-duplicable infrastructure, performance of public information-

organization functions, and pervasive government coordination creates state action warranting discovery, not dismissal.

The temporal investment theory distinguishes this case from ordinary disputes. Mr. Richards invested during the internet's only open period (2000-2009) when organic merit-based reach was possible. Google induced this investment through neutrality promises, promoted his content to #2 ranking for "Vatican" searches, then systematically suppressed that same content after forming its exclusive Vatican partnership. The internet Mr. Richards invested in—where quality determined reach—no longer exists. Google's monopoly transformed it into a pay-to-play system, then appropriated the value early adopters created while denying them all benefits. Counsel's LinkedIn experiments quantify this transformation: achieving reach equivalent to Mr. Richards' 2009 organic prominence now requires $8-203 million in advertising spend—if platforms will even sell such access.

The circumstantial evidence of Google's Vatican coordination—exclusive 2009 partnership, high-level executive meetings with Vatican officials, Eric Schmidt's 2016 promise to Pope Francis ("We will make it happen"), systematic suppression beginning immediately after partnership formation, discriminatory warning labels on Richards' original videos while identical stolen copies appear unrestricted, Google Alerts manipulation featuring individuals with minimal online presence while obscuring Richards' 25-year established scholarship, and Google legal counsel's refusal to address documented evidence when directly contacted in January 2025—combined with evidence of government AI coordination through Executive Order 14319 and DHS/FBI content moderation systems, creates plausible inferences that differentiate this case from ordinary content moderation disputes. While the internal documents that will fully reveal the mechanisms and extent of this coordination remain in Google's possession and require

discovery, the circumstantial evidence as pled creates plausible inferences sufficient to survive

dismissal under Rule 12(b)(6)'s plausibility standard.

At the motion to dismiss stage, accepting all well-pleaded allegations as true and drawing all

reasonable inferences in Mr. Richards' favor, the Amended Complaint states plausible claims for

relief on all counts. Discovery will develop the full scope of Google's government coordination,

Vatican partnerships, and monopolistic religious discrimination.

This Court should deny Google's motion and permit discovery to proceed.


Dated: October 31, 2025

Respectfully submitted,

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards
VSB #96671
LWR Law Offices
3060 Williams Dr. Ste 300 #510
Fairfax, VA 22031
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
Counsel for Plaintiff

---

CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2025, a true and correct copy of the foregoing document was
served upon all parties of record via the Court's ECF system.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards